# 2023-1419

In The

# United States Court Of Appeals
# For The Federal Circuit

**DONGKUK S&C CO., LTD.,**

*Plaintiff-Appellant,*

**v.**

**UNITED STATES, WIND TOWER TRADE COALITION,**

*Defendants-Appellees.*

**ON APPEAL FROM THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**ORIGINATING CASE NO.: 1:20-CV-03686-LMG**

## CORRECTED NON-CONFIDENTIAL BRIEF OF APPELLANT

**Jarrod Goldfeder**
**Robert G. Gosselink**
**MacKensie R. Sugama**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Ave., SE,**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

***Counsel for Appellant Dongkuk S&C Co., Ltd***

*Gibson*MOORE APPELLATE SERVICES, LLC ♦ 206 East Cary Street ♦
P.O. Box 1460 (23218) Richmond, VA 23219 ♦
804-249-7770 ♦ www.gibsonmoore.net

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1419

**Short Case Caption** Dongkuk S&C Co., Ltd. v. US

**Filing Party/Entity** Dongkuk S&C Co., Ltd. (Plaintiff-Appellant)

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/17/2023

Signature: /s/ Jarrod M. Goldfeder

Name: Jarrod M. Goldfeder

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Dongkuk S&C Co., Ltd. | | Dongkuk Industries Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

STATEMENT OF RELATED CASES ........ vi

STATEMENT OF JURISDICTION ........ 2

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

I. COST SMOOTHING ........ 3

II. CONSTRUCTED VALUE PROFIT AND SELLING EXPENSES ........ 16

SUMMARY OF THE ARGUMENT ........ 20

ARGUMENT ........ 21

I. STANDARD OF REVIEW ........ 21

II. THE TRIAL COURT ERRED IN SUSTAINING COMMERCE'S DECISION TO CALCULATE A SINGLE WEIGHTED-AVERAGE STEEL PLATE COSTS FOR ALL MERCHANDISE UNDER CONSIDERATION ........ 22

A. Commerce's Claim of Significant Cost Differences Unrelated to the CONNUM Characteristics of the Finished Wind Towers Is Unsupported By, and Contrary to the Record Evidence ........ 22

B. Commerce Wrongly Assumed That Steel Plate Input Dimensions Dictate Wind Tower Physical Characteristics ........ 28

C. Commerce Wrongly Focused on The Timing of Steel Plate Purchases Without Considering That the Physical Characteristics of the Finished Wind Tower Also Impact Costs ....................33

D. The Trial Court Erred in Relying on Facts Not in the Record When Sustaining Commerce's Determination ....................37

III. THE TRIAL COURT ERRED IN SUSTAINING AS REASONABLE COMMERCE'S USE OF FINANCIAL DATA UNRELATED TO THE MANUFACTURE AND SALE OF STEEL PRODUCTS IN KOREA TO CALCULATE DKSC'S PROFIT AND SELLING EXPENSES....................38

CONCLUSION....................45

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

## CONFIDENTIAL MATERIALS STATEMENT

Confidential information can be found enclosed in highlighted brackets ([ ]) on brief pages 6, 9, 11-13, 27, 30, 31, 33, 35, and 36. The bracketed highlighted material has been redacted in the nonconfidential version.

Dated: April 19, 2023

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .............................................................. 21-22

*Consol. Edison Co. v. NLRB*,
305 U.S. 197, 83 L. Ed. 126, 59 S. Ct. 206 (1938) .......................................21

*Dongkuk S&C Co., Ltd. v. United States*,
548 F. Supp. 3d 1376 (Ct. Int'l Trade 2021).................................................14

*Dongkuk S&C Co., Ltd. v. United States*,
600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022)..............................15, 20, 37, 40

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997) ......................................................................22

*Kemira Fibres Oy v. United States*,
61 F.3d 866 (Fed. Cir. 1995) ........................................................................21

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir 1984) ........................................................................21

*Micron Technology, Inc. v. United State*s,
117 F.3d 1386 (Fed. Cir. 1997) ......................................................................21

*Mid Continent Steel & Wire, Inc. v. United States*,
203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017).................................................39

*Mid Continent Steel & Wire, Inc. v. United States*,
941 F.3d 530 (Fed. Cir. 2019) ........................................................................39

*Thai I–Mei Frozen Foods Co. v. United States*,
32 CIT 865, 572 F.Supp.2d 1353 (2008).......................................................40

*Thai I–Mei Frozen Foods Co. v. United States*,
616 F.3d 1300 (Fed. Cir. 2010) ......................................................................40

*U.S. Steel Corp. v. United States*,
637 F.Supp.2d 1199 (Ct. Int'l Trade 2009) .......... 38

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) .......... 44

**Statutes**

19 U.S.C. § 1516a .......... 2

19 U.S.C. § 1516a(a)(2)(B)(i) .......... 2

19 U.S.C. § 1516a(b)(1)(B)(i) (1994) .......... 21

19 U.S.C. § 1673d .......... 2

19 U.S.C. § 1677b(b)(1) .......... 10

19 U.S.C. § 1677b(e) .......... 38

19 U.S.C. § 1677b(e)(2)(A) .......... 38, 40

19 U.S.C. § 1677b(e)(2)(B)(i) .......... 39

19 U.S.C. § 1677b(e)(2)(B)(ii) .......... 39

19 U.S.C. § 1677b(e)(2)(B)(iii) .......... 20, 39

19 U.S.C. § 1677b(f)(1)(A) .......... 16, 22, 23

19 U.S.C. § 1677b(a)(6)(C)(ii)-(iii) .......... 23

28 U.S.C. § 1295(a)(5) .......... 2

28 U.S.C. § 1581(c) .......... 2

**Agency Determinations**

*Certain Steel Nails from the Republic of Korea; 2016-2017*,
84 Fed. Reg. 4,770 (Dep't of Commerce Feb. 19, 2019)............25, 27, 28, 29

*Utility Scale Wind Towers from the Republic of Korea*,
85 Fed. Reg. 40,243 (July 6, 2020) ...............................................1, 11, 20, 25

*Utility Scale Wind Towers from the Republic of Korea*,
85 Fed. Reg. 8,560 (Dep't of Commerce Feb. 14, 2020)............10, 17, 18, 20

**Rules**

Fed. R. App. P. 4(a)(1)(B) ..........................................................................2, 4

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Dongkuk S&C Co., Ltd. advises that there has been no other appeal of the underlying court proceeding before this or any other appellate court. Dongkuk S&C Co., Ltd. also currently is not litigating any other case that would directly affect this Court's decision in the pending appeal.

Although not before this Court, Plaintiff-Appellant, Dongkuk S&C Co., Ltd. ("DKSC"), has filed a Summons concerning the U.S. Department of Commerce's ("Commerce") final results of the first antidumping duty administrative review of *Utility Scale Wind Towers from the Republic of Korea* at the U.S. Court of International Trade ("CIT"). *See* CIT Court No. 23-00075. This CIT appeal also involves an appeal of Commerce's cost adjustments made when calculating a weighted-average dumping margin for DKSC and, thus, may be affected by the outcome of the present appeal.

While counsel for Plaintiff-Appellant is aware of other appeals before the CIT and the Federal Circuit that involve the same general legal issues, counsel understands that such cases "are not 'related' within the meaning of" the Court's rules. *See* Practice Note to Fed. Cir. R. 47.5.

**NON-CONFIDENTIAL VERSION**

**2023-1419**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**DONGKUK S&C CO., LTD.,**

**Plaintiff-Appellant,**

**v.**

**UNITED STATES, WIND TOWER TRADE COALITION,**

**Defendant-Appellees.**

**Appeal from the United State Court of International Trade in Case No. 20-03686, Judge Leo M. Gordon**

**PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT DONGKUK S&C CO., LTD.**

This is the principal brief of Plaintiff-Appellant Dongkuk S&C Co., Ltd. ("DKSC" or "Plaintiff-Appellant"), a producer of utility scale wind towers from the Republic of Korea. DKSC appeals from the judgment of the United States Court of International Trade ("CIT" or "trial court") affirming aspects of the U.S. Department of Commerce's ("Commerce") final determination in *Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 40,243 (July 6, 2020)

("*Final Determination*"), Appx1972-1974, and accompanying Issues and Decision Memorandum, Appx1686-1716.

## **STATEMENT OF JURISDICTION**

The CIT has exclusive jurisdiction to review Commerce's determinations pursuant to 28 U.S.C. § 1581(c) because this action arose under 19 U.S.C. § 1516a. *See* 19 U.S.C. § 1516a(a)(2)(B)(i) (*i.e.*, an affirmative determination by Commerce pursuant to 19 U.S.C. § 1673d). This Court has appellant jurisdiction based on 28 U.S.C. § 1295(a)(5), the judgment from which Plaintiff-Appellant appeals is final. As required by Fed. R. App. P. 4(a)(1)(B), DKSC timely noticed its appeal on January 17, 2023, within sixty days of entry of the CIT's final decision and judgment (Nov. 17, 2022). This appeal is from a final judgment that disposes of all parties' claims.

## **STATEMENT OF THE ISSUES**

This appeal raises the following two issues:

I. Whether Commerce's determination to calculate a single weighted-average steel plate cost for all merchandise under consideration sold to the United States and to Japan during the period of investigation ("POI") was supported by substantial evidence. Here, Commerce erred in concluding that steel plate cost fluctuations were unrelated to the physical characteristics of the finished wind towers. Moreover, substantial verified record information demonstrated that

DKSC assigned specific steel plate costs to each individual utility scale wind tower project depending on the nature of the project and the grade and type of steel plate required. Commerce's cost adjustment introduced inaccuracies and distortions into the antidumping duty calculations.

II. Whether Commerce's determination to calculate constructed value profit and selling expenses using the *consolidated* financial data of SeAH Steel Holdings Corporation ("SSHC") rather than the *unconsolidated* financial data of SeAH Steel Corporation was supported by substantial evidence. Here, SSHC's consolidated financial data includes the experience of companies unrelated to the manufacture or sale of steel products, as well as many companies located outside of Korea, and thus was an unreasonable surrogate for home market profit experience for the manufacture and sale of the merchandise under consideration. In contrast, the unconsolidated SeAH Steel Corporation financial data reflected the manufacturing and sales operations for comparable steel pipe products in Korea.

## STATEMENT OF THE CASE

### I. COST SMOOTHING

Utility scale wind towers are used in utility scale wind turbine electrical power generating systems. The towers are huge structures, designed to support the nacelle and rotor blades in a wind turbine, and can range from 60 to over 150 meters in height measured from the base of the tower to the bottom of the nacelle

(*i.e.*, where the top of the tower and nacelle are joined). A wind tower typically consists of three to five circular steel plate sections that are shipped separately to be assembled at a project site. *See* Petition from Wiley Rein LLP, Vol. IV, page 9 (July 9, 2019), Appx119 ("Petition"). Each section contains multiple steel plates that are rolled into cylindrical or conical shapes and welded together to form a steel shell. *Id.* at Vol. I, page 6, Appx108. The weight of the final assembled tower can range from 100 to 350 metric tons depending on its finished height and the thickness of the steel plate used.

The production of utility scale wind towers is a large-scale, multi-step process that includes steel plate cutting and rolling, can/cone welding, flange mating, section assembly, installation of welded internals, door frame installation, painting, and final internals assembly. *Id*., Appx108. The main materials that DKSC uses to produce wind towers are different types of steel plate. *See* Letter from Trade Pacific PLLC, "Sections B, C, D Questionnaire Responses" (Oct. 15, 2019), at D-5, Appx703 ("DKSC Section D"). These steel plates, often 10 feet wide, over 40 feet long, and with thicknesses up to 3.0 inches, are cut using a plasma or oxygen acetylene cutter into either cone or can shapes suited to forming the tower's structural shape. *Id*., at Exhibit D-2, Appx744-750; *see also* Petition at Vol. IV, page 10, Appx120. Depending on the weight of the additional turbine, nacelle, and rotor blades – and the different wind and torsional forces exerted on

the tower – different types and grades of alloy steel plate or high-strength low alloy steel plate are required. *Id*. At DKSC, in the normal course of business, the different steel plate costs are tracked and assigned to specific projects. *See* DKSC Section D, at D-12, D-34, Appx710, Appx732. DKSC explained at the outset of Commerce's investigation that the normal approach of limiting production costs to those incurred during the POI might not be appropriate in this case because of the lengthy construction period:

> {A}s the Department knows, utility scale wind towers often take a considerable amount of time to produce, sometimes up to six or eight months after receiving a customer order. Given the long lead time, situations sometimes arose in which a project commenced prior to the POI and was completed during the POI. As a result, reporting production costs incurred during the POI will cause certain costs to be omitted where they were incurred prior to the POI.
>
> Dongkuk S&C's cost accounting system tracks all activities on a project-specific basis. *Most raw material and other material costs incurred are directly traceable to individual projects because Dongkuk S&C procures materials according to its customers' requirements once it confirms the specifications of the wind tower project. This means that raw materials are purchased and consumed for designated projects*. Therefore, Dongkuk S&C notifies the Department that it intends to report its costs of manufacturing on a project-specific basis.

Letter from Trade Pacific PLLC, "Notification of Reporting Issues" (Sept. 6, 2019), at 2-3, Appx672-675 (emphasis added). In response, Commerce provided the following instructions:

> Regarding your request that Dongkuk report cost and sales data on a project-specific basis for all product sold during the POI, regardless of

> when these costs were incurred, the starting point for your cost reporting should be wind towers or sections (if such sections are sold separately) completed during the POI. Dongkuk should report the cost of manufacturing associated with those wind towers or sections ***completed*** during the POI. … {I}n reporting the costs associated with POI production, ***it may be necessary to include project costs incurred prior to the POI***. In such case, the pre-POI costs should include not only direct project costs, but also indirect costs, such as variable and fixed overhead costs attributable to each project incurred during the pre-POI period.

Letter from Commerce, re: "Home Viability Supplemental Questionnaire and Cost Reporting Info" (Sept. 13, 2019), Appx679-681 (emphasis added).

Therefore, for direct project costs for steel plate materials, DKSC – as instructed by Commerce – reported the specific costs associated with tower projects completed and sold during the POI even if some of those costs were incurred prior to the POI. *See* DKSC Section D at D-12, Appx710 (DKSC "maintains costs on a project-specific basis in the normal course of business. And {DKSC} classifies the costs into direct costs and indirect costs. . . . {D}irect costs take up approximately [redacted] percent of total production costs."); *see also* Letter from Trade Pacific PLLC, "Responses to the Department's November 14 and 20 Supplemental Questionnaires-Supplemental Section D Questionnaire" (Dec. 9, 2019), at SD-25, Appx842 ("most costs are directly traceable to the specific projects and ultimately all costs are captured on an individual project level"). DKSC assigned steel plate costs directly to each individual project, and then calculated final costs by weight-averaging the costs of all wind towers that shared

identical CONNUMs, as instructed by Commerce's questionnaire. *See* DKSC Section D, at Exhibit D-13, Appx794-800.

Because DKSC purchased steel plates for specific projects and linked the direct steel plate costs to each individual project, each wind tower project functioned as a unique cost center in DKSC's accounting records. Also, because different completed wind towers had different physical characteristics, DKSC reported different CONNUMs for each specific project. As a natural consequence, DKSC therefore reported different steel plate costs for different CONNUMs. *See* Letter from Trade Pacific PLLC, "Response to the Department's February 5 Supplemental Section D Questionnaire," at S6-1 (Feb. 12, 2020), Appx1392 ("Feb. 12th Supplemental Response"). In choosing the steel plate materials for each wind tower project, DKSC followed the design requirements of each customer and adhered to each customer's drawings and specifications. *Id*. at S6-1, Appx1392. The customer's measurements and conditions thus dictated the types of steel plate that DKSC used to produce each wind tower so that the structure would function as designed. *Id*. In procuring steel plate, DKSC therefore considered: (i) the appropriate design, including height and wall thickness, of the specific wind tower model to be produced; (ii) the shape of the supporting structure; (iii) the quality of materials; (iv) the thickness, width, and length of the materials; (v) the specific customer requirements; (vi) the location of the project and the required local

standards; and (vii) the prices for the steel plate at the time of purchase. *Id*. at S6-1 to S6-4, Appx1392-1395. Ultimately, DKSC produced the merchandise under consideration in accordance with its customer's project design and specifications. *Id*. at S6-2 and S6-3, Appx1393-1394.

The design (*i.e.*, the structure and shape) of a wind tower is determined by turbine type, capacity, and various design factors, which means that stress is a critical design factor that determines what steel plate types must be used. *Id*. at S6-3, Appx1394. Because the stress that a tower must tolerate varies by project, these factors result in differences in steel plate thickness and width, tower height, etc. *Id*. As such, there is a correlation between the dimensions of a tower and the type and grade of steel plates, and costs thereof, used to produce that tower. The steel plate costs for the wind towers that DKSC sold to Japan and the United States were not the same because the Japanese projects predominantly used lower yield strength plates, which resulted in lower costs. *Id.*, at S6-2 to S6-3 and Exhibit S6-1, Appx1399-1402 (showing the differences in yield strength between the different grades of plates used by DKSC for the Japanese and U.S. markets) and Exhibit S6-2, Appx1403-1413 (identifying all the steel plate grades used to produce wind towers during the POI). The steel plate costs also were impacted by the timing of the steel plate purchases. For the POI sales of wind towers to Japan, DKSC placed its steel plate material orders in July 2017—*i.e.*, approximately a year before the

start of the POI. *Id*., at S6-2, Appx1393. In contrast, for the POI sales of wind towers to the United States, DKSC set its selling prices and placed its steel plate orders in September 2018, *i.e.*, a year later. Fluctuating world prices, inherent in the steel industry, therefore also affected the costs of the steel plates used in the wind tower CONNUMs that DKSC sold in the Japanese and U.S. markets. *Id.*

In its preliminary determination, Commerce observed that DKSC reported different steel plate costs for different CONNUMs, and took the following action:

> We analyzed such differences and found based on record evidence that the differences in steel plate costs between CONNUMs do not appear to be related to differences in the physical characteristics of the products. Therefore, to mitigate the unreasonable cost differences unrelated to the product physical characteristics, we weight-averaged the reported plate costs for all reported CONNUMs.

Commerce Memorandum re: "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Dongkuk S&C Co., Ltd." at 2 (Feb. 4, 2020), Appx1377-1383 ("Prelim Cost Calculation Memo"). Commerce provided a worksheet showing how it made its averaging (*i.e.*, "smoothing") adjustment, but did not provide any support for its conclusion that the steel plate cost differences were unrelated to the steel plate physical characteristics. *Id.* at Attachment 3, Appx1382. The result of Commerce's adjustment was a [redacted]% to [redacted]% percent increase in the cost of the steel plate in the wind tower CONNUMs sold to Japan. *Id.* As a consequence of this adjustment, Commerce found that all of DKSC's sales of wind towers to Japan were made at

prices below the cost of production. Commerce therefore disregarded all of DKSC's comparison (Japanese) market sales and based normal value instead on constructed value in accordance with 19 U.S.C. § 1677b(b)(1). *See Utility Scale Wind Towers from the Republic of Korea*, 85 Fed. Reg. 8,560 (Dep't of Commerce Feb. 14, 2020) ("*Preliminary Determination*") and accompanying Issues and Decision Memorandum (Feb. 4, 2020), at 19, Appx1357-1376 ("*Preliminary Decision Memo*").

At its subsequent on-site cost verification, Commerce confirmed that DKSC purchased steel plates for each specific project and reported its cost data on a project/CONNUM-specific basis, consistent with how DKSC tracked and assigned costs in its normal cost accounting records. *See* Commerce Memorandum re: "Verification of Cost Response of Dongkuk S&C CO., Ltd. in the Antidumping Duty Investigation of Utility Scale Wind Towers from the Republic of Korea" (Apr. 17, 2020), at 6, 16, 18, Appx1613, Appx1623, Appx1625 ("Cost Verification Report"). With respect to the production process, Commerce:

> observed the wind tower production process begins with the raw material steel plate cutting process based on the customers' requests. Each steel plate has a label that provides the production instructions, including the material product code, project type, project name, type of can (i.e., can for the top, middle, or bottom section), size specifications, etc.

*Id.* at 7, Appx1614.

Commerce thus verified that each steel plate that DKSC purchased linked to the specific project in which it was used. Commerce also confirmed the differences in the steel plates used for Japanese versus U.S. projects:

> According to DKSC, each country follows different types of standards for the steel grades, and therefore, DKSC purchased steel plates based on the Japanese Industrial Standards (JIS) for the wind tower projects sold in Japan and Euro Norm (EN) Steel Standards for wind tower projects sold in the US. DKSC noted that due to differences in design standards, it is not possible for wind tower manufacturers to use EN steel plates interchangeably with JIS steel plates. DKSC indicated that the only exception would be if customers request specific change orders. However, it is very rare, and it was not the case during the POI. We selected the highest purchase quantities of steel grade for each project above for further testing (*e.g.*, [redacted] steel grade for the Japan market and [redacted] steel plate grade for the US market). Company officials referenced the EN Steel and JIS standards (see CVE 5), noting that [redacted] steel grade has a yield strength of approximately [redacted] megapascals (MPa) and a tensile strength of [redacted] Mpa, whereas [redacted] steel grade has a yield strength of approximately [redacted] ]N/mm2 and a tensile strength of [redacted] N/mm2 (1 MPa is equal to 1 N/mm2). In addition, we traced both wind tower projects listed above from the sales ledger to the BOL and to invoices and confirmed that the project [redacted] was sold to Japan and project [redacted] was sold to the US.

*Id.* at 19, Appx1626. Commerce therefore verified that the steel plate standards for the Japanese and U.S. markets were different, and that wind towers with different designs (*i.e.*, different heights and different wall thicknesses) thus required steel plate with different gauges, grades, yield strengths, and tensile strengths.

Nonetheless, in the *Final Determination*, Commerce disregarded DKSC's reported steel plate costs that differed for different CONNUMs, and continued to

calculate a single weighted-average steel plate cost for all CONNUMs reported by DKSC based on its decision "to mitigate the significant steel plate cost differences between CONNUMs that are unrelated to the product physical characteristics." *Decision Memorandum* at 21, Appx1706.

To reach this decision, Commerce claimed that it analyzed DKSC's steel plate costs by reviewing "the steel plate cost differences between steel grades and dimensions (*i.e.*, thickness, width or height) within the same time period." *Id.* at 22, Appx1707. Commerce stated that it "compared the steel plate costs between a project produced for the Japanese comparison market and a project produced for the U.S. market, both of which were purchased within the same month, {and found that} the costs were virtually the same regardless of the grade, thickness, width, or height." *Id.* In performing this analysis, however, Commerce did not compare substantially different steel plate. Rather, Commerce compared steel plate types that were functional equivalents.

Specifically, in a chart entitled "Comparison of Timing within *Comparable* Grades" (emphasis added), Commerce compared the date purchase prices of steel plate grades grade and grade (used for wind towers for the Japanese market) with the date purchase prices of steel plate grade grade (used for wind towers for the U.S. market). *See* Commerce Memorandum re: "Cost of Production and Constructed Value Calculation

Adjustments for the Final Determination – Dongkuk S&C Co., Ltd.” (June 29, 2020), at Attachment 1, Appx1969 (“DKSC Cost Calculation Memorandum”). Commerce stated that these three steel grades were “comparable” and had virtually the same physical characteristics. Specifically, steel plate grades [redacted], [redacted], and [redacted] all had a yield strength of approximately [redacted] megapascals (“MPA”) and tensile strengths of [redacted] to [redacted] Mpa. *See* Letter from Trade Pacific PLLC, “Submission of DKSC’s Cost Verification Exhibits,” at Exhibit CV-5 (Feb. 28, 2020) (“Cost Verification Exhibits”), Appx1584-1607. Moreover, the particular plate purchases that Commerce included in its “Comparison of Timing within Comparable Grades” chart for the three grades of steel plate all had overlapping dimensions (*i.e.*, thickness, width, and length). *See* DKSC Cost Calculation Memorandum, at Attachment 1, Appx1969. Therefore, to support its conclusion that “the overwhelming factor that caused the differences in the steel plate costs was the timing of the steel plate purchases, rather than the physical characteristics of the merchandise,” *Decision Memorandum*, at 22, Appx1707, Commerce compared the purchase prices of steel plate material inputs that in fact had the ***same*** grade and dimension physical characteristics.

In reviewing Commerce’s original final determination, the trial court found that—contrary to Commerce’s claim—“{t}here is nothing in {the Final Cost Calculation Memorandum} that supports a contention that Commerce did in fact

group CONNUMs by any of the 11 physical characteristics or otherwise use those characteristics as a 'guidepost.'" *Dongkuk S&C Co., Ltd. v. United States*, 548 F. Supp. 3d 1376, 1381 (Ct. Int'l Trade 2021), Slip Op. 21-167 at 9 ("*DKSC I*"), Appx39. The trial court concluded that Commerce's final determination to disregard DKSC's actual costs and to calculate a single weighted-average steel plate cost for all merchandise under consideration sold to the United States and to Japan was unsupported by substantial evidence, reasoning that "the record fails to demonstrate how Commerce's analysis could lead a reasonable mind to conclude that DKSC's reported costs did not reflect the cost to produce and sell the subject merchandise." *Id.* at 9-10, Appx39-40. The trial court thus remanded Commerce's final determination so that Commerce could further explain and/or demonstrate how DKSC's reported cost differences were ***not*** attributable to the physical characteristics of the finished wind towers. *Id.* at 11, Appx41.

But rather than explaining how or why reported cost differences were unrelated to the physical characteristics of the ***finished wind towers***, as the trial court required, Commerce on remand once again focused largely on "the dimensions (*i.e.*, thickness, width, and height/length) of the steel plate ***input***" used to produce the subject wind towers. *See* Commerce's Results of Redetermination (Apr. 14, 2022), at 1, Appx44 (emphasis added). Commerce provided an "analysis of the cost of the steel plate input, ***which is not a physical characteristic***," to

support its position that DKSC's reported costs do not reflect the costs to produce the merchandise under consideration. *Id.* at 3, Appx46 (emphasis added). Critically, and contrary to the trial court's instructions, Commerce failed to address the differences in the physical characteristics of the finished wind towers that resulted in reported cost differences among the differing wind towers.

In ignoring such an analysis—which was the focus of the trial court's remand given Commerce's unsupported claim to have grouped CONNUMs by their related height and weight—Commerce failed to explain why DKSC's reported costs did not reasonably reflect differences in the physical characteristics of the finished wind towers. In this case, there is no dispute whether the thickness, width, and length of *steel plate inputs* are among any of the physical characteristics that comprise the CONNUM of finished wind towers. They are not. By focusing again on the inputs and not the finished wind towers, Commerce did not comply with the trial court's instructions to explain why the cost differences reported among the CONNUMs produced by DKSC were *not* attributable to the actual physical characteristics of the finished wind towers.

Despite these deficiencies, the trial court sustained Commerce's Remand Results. *See Dongkuk S&C Co., Ltd. v. United States*, 600 F. Supp. 3d 1331, 1335-39 (Ct. Int'l Trade 2022) ("*DKSC II*"), Appx78-93. The trial court stated that:

> The court is not persuaded by Plaintiff's arguments. Commerce's explanation of its cost analysis on remand supports a conclusion that

> Commerce grouped CONNUMs by the physical characteristics of height and weight and used them as guideposts. To that end, Commerce found that the steel plate used in producing the subject merchandise impacts those physical characteristics of the completed wind towers and that "the cost of the steel plate consumed is the only factor that ultimately determines the raw material cost of the wind tower." . . .
>
> Contrary to Plaintiff's argument, by comparing both the steel plate costs for CONNUMs with differing height and weight physical characteristics in an isolated time period, as well as comparing the steel plate costs for the same CONNUM across different time periods, Commerce used those physical characteristics as guideposts for its analysis under § 1677b(f)(1)(A). . . . Given this analysis, it was reasonable for Commerce to determine that DKSC's reported costs were not reflective of the costs associated with the production and sale of the subject merchandise, and to adjust those costs accordingly.

*Id.* at 1337-38, Appx87, Appx89. The trial court also dismissed that Commerce failed to follow its own remand instructions, stating that "DKSC's argument ignores the fact that the standard for the court's review is whether Commerce's decision-making is reasonable given the circumstances provided by the record as a whole, not whether the agency 'complied with the court's order.'" *Id.* at 1337, Appx86.

## II. CONSTRUCTED VALUE PROFIT AND SELLING EXPENSES

On February 5, 2020, Commerce provided all interested parties the opportunity to submit new factual information on constructed value ("CV") profit and selling expenses in the event that DKSC's sales failed the statutory sales-below-cost test. *See* Commerce Memorandum re: "Request for Constructed Value Profit and Selling Expense Comments and Information" (Feb. 5, 2020), Appx1384-

1385. However, before interested parties could submit new CV profit and selling expense information, Commerce issued its preliminary determination.

In the *Preliminary Determination*, Commerce performed the AD duty margin calculations on a price-to-CV comparison basis after determining, based on certain adjustments that Commerce implemented, that DKSC's third-country sales all had failed the sales-below-cost test. *See Preliminary Decision Memo* at 17, Appx1373. To calculate constructed value for DKSC, Commerce used a CV profit ratio of 12.35 percent and a CV selling expense ratio of 0.86 percent based on the fiscal year 2018 *consolidated* financial statements of SeAH Steel Holdings Corporation ("SSHC"). *See* Prelim Cost Calculation Memorandum, at 2 and Attachment 4, Appx1378, Appx1383. SSHC is a large holding company with numerous subsidiaries. Three of these subsidiaries are engaged in steel producing activities in Korea. *See* Letter from Trade Pacific, "CV Profit and Selling Expense Comments and Information" (Feb. 26, 2020), at 5-6, Exhibit CV-6-A, pp. 8, Appx1418-1419, Appx1432 ("DKSC CV Profit Submission"). But the remaining entities of SSHC either are involved in investment activities or are involved in steel-producing or non-production activities outside of Korea, including in the United States, Japan, Indonesia, the United Arab Emirates, Italy, and Vietnam. As acknowledged by Commerce, SSHC's financial data "include the results of other business operations," and "include activities from business operations other than

comparable merchandise." *Decision Memorandum* at 27, Appx1712. The POI in this case ran from July 1, 2018, through June 30, 2019, and SSHC's consolidated 2018 financial data thus covered a period of time that preceded the POI by six months and that overlapped with the POI for six months.

Following the *Preliminary Determination*, on February 26, 2020, DKSC submitted additional factual information for Commerce to use to calculate CV profit and selling expenses, including the 2018 *standalone* financial statements of SeAH Steel Corporation, a longstanding steel pipe producer and previous subsidiary of SSHC that had spun off from SSHC in September 2018. *See* DKSC CV Profit Submission at Exhibit CV-6-B, Appx1446-1578. SeAH Steel Corporation is a prominent producer of large diameter pipe and other steel pipe in South Korea with production facilities in the same city as DKSC. *Id.* In contrast to the financial data of SSHC, which reflected a basket category of many different types of companies in addition to steel pipe producers and sellers in Korea, the SeAH Steel Corporation financial data reflected exclusively the production of large diameter pipe and other steel pipe in Korea. *Id.* Because of SeAH Steel Corporation's spin off from SSHC in September 2018, the company's standalone financial statements reflected its financial results from September 1, 2018 to December 31, 2018, a four-month period falling entirely *within* the POI. *Id.*

In briefing before Commerce, DKSC raised the issue of the numerous deficiencies evident in SSHC's consolidated financial statements. *See* DKSC's Case Brief (Apr. 29, 2020), at 29-35, Appx1658-1664. DKSC reiterated to Commerce that SSHC's consolidated financial statements included financial data for products that were not comparable to utility scale wind towers. *Id.* In particular, the corporate information in SSHC's consolidated financial statements identified six subsidiaries whose type of business was "Investments," four subsidiaries that were distributors – not manufacturers – of steel products, and various subsidiaries that were located in markets outside of Korea (*i.e.*, Indonesia, Italy, Japan, the United Arab Emirates, the United States, and Vietnam). *Id.* Importantly, SSHC's *non-Korean, non-steel manufacturing* entities represented **92.68 percent** of the parent company's total consolidated sales. *See* DKSC CV Profit Submission at Exhibit CV-6-A, at 10-17, Appx1434-1441.

Nonetheless, Commerce continued to rely on SSHC's *consolidated* financial statements to calculate the CV profit and selling expense ratios, finding that:

> While the consolidated financial results include activities form business operations other than comparable merchandise, we find that the data represents the best option from among the sources on the record. Specifically, it is the only option on the record that includes 12 months of financial data, and reflects profits on the production and sale of comparable merchandise that is produced and sold in the Korean market.

*Decision Memorandum* at 27, Appx1712.

In the *Final Determination*, the CV profit and selling expense ratios remained unchanged from the *Preliminary Determination*. *See* Commerce Memorandum re: "Calculations for the Final Determination" (June 29, 2020), Appx1819; DKSC Cost Calculation Memorandum at 2, Appx1967.

The trial court "sustain{ed} as reasonable Commerce's use of SHCC's consolidated financial statement to calculate DKSC's profit and selling expenses under 19 U.S.C. § 1677b(e)(2)(B)(iii)." *DKSC II*, 600 F. Supp. 3d at 1340.

## SUMMARY OF THE ARGUMENT

In weight-averaging DKSC's reported steel plate costs for all reported CONNUMs, Commerce failed to consider the evidence and to articulate a satisfactory explanation for its decision-making. Commerce claimed that its approach was necessary "to mitigate the cost differences unrelated to the product physical characteristics." *Decision Memorandum* at 19, Appx1704. This finding was unsupported by substantial evidence. While the administrative record contained some evidence to indicate that the timing of steel plate purchases had some impact on pricing, the complete record and the analysis undertaken by Commerce demonstrates that Commerce erred in concluding that cost differences among finished wind towers were unrelated to their physical characteristics.

Separately, Commerce's decision to calculate constructed value profit and selling expenses using the *consolidated* financial data of SSHC, which reflected

principally the financial results of non-steel producing subsidiaries and companies located outside of Korea, rather than the *standalone* financial data of SeAH Steel Corporation that reflected the financial results from the exclusive production of comparable merchandise in Korea, was unsupported by substantial evidence.

## ARGUMENT

### I. STANDARD OF REVIEW

In reviewing the trial court's decision regarding a final determination issued by Commerce, this Court applies anew the trial court's statutorily mandated standard of review. *See, e.g., Kemira Fibres Oy v. United States*, 61 F.3d 866, 871 (Fed. Cir. 1995). Accordingly, the Court will "uphold Commerce's determination unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Micron Technology, Inc. v. United State*s, 117 F.3d 1386, 1393 (Fed. Cir. 1997) (*quoting* 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "Substantial evidence" must be "more than a mere scintilla," and has been characterized as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 83 L. Ed. 126, 59 S. Ct. 206 (1938); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir 1984). To determine if substantial evidence exists, the Court reviews the record as a whole, including evidence that supports as well as evidence that "fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United*

*States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, the substantial evidence standard requires more than a mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citations omitted).

## II. THE TRIAL COURT ERRED IN SUSTAINING COMMERCE'S DECISION TO CALCULATE A SINGLE WEIGHTED-AVERAGE STEEL PLATE COST FOR ALL MERCHANDISE UNDER CONSIDERATION

In sustaining Commerce's Remand Results concerning Commerce's steel plate cost adjustment, the trial court erred by ignoring that Commerce focused on the physical characteristics of the steel inputs rather than on the physical characteristics of the finished wind towers. For the reasons described below, this Court should reverse the trial court's decision.

### A. Commerce's Claim of Significant Cost Differences Unrelated to the CONNUM Characteristics of the Finished Wind Towers Is Unsupported by, and Contrary to the Record Evidence

When Commerce evaluates a respondent's reported costs, 19 U.S.C. § 1677b(f)(1)(A) directs that costs normally shall be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles ("GAAP") of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise. Accordingly, Commerce customarily relies on a

company's normal books and records if two conditions are met: (1) the books are kept in accordance with the home country's GAAP; and (2) the books reasonably reflect the cost to produce and sell the merchandise. Under 19 U.S.C. §§ 1677b(f)(1)(A) and (a)(6)(C)(ii)-(iii), a respondent's reported costs should reflect meaningful cost differences attributable to the finished product's different physical characteristics. This approach ensures that the product-specific costs that Commerce uses as part of its antidumping analyses accurately reflect the physical characteristics of the products used in Commerce's margin calculations. In cases where the costs reported according to a company's normal books are unreasonable (*e.g.*, if cost differences among products do not represent differences in physical characteristics), Commerce may revise such costs. *See Decision Memorandum*, at 21-22, Appx1706-1707.

In this case, all parties agree that the reported costs were derived from DKSC's normal books and records and that those books were kept in accordance with Korean GAAP. *Id.* at 21. Hence, the question is whether substantial evidence supported Commerce's determination that DKSC's normal books and records did not reasonably reflect the cost to produce the merchandise under consideration *based on the physical characteristics identified by Commerce*.

In the proceeding, Commerce chose the following physical characteristics, in order of significance, for purposes of: (1) defining the unique products, *i.e.*,

CONNUMs, for sales comparison purposes; (2) identifying the level of detail within each physical characteristic (*e.g.*, thickness, width or height, etc.) to reflect the importance that Commerce placed on comparing the most similar products in price-to-price comparisons; and (3) differentiating the costs between products:

| Physical Characteristic | Description |
|---|---|
| 1. Type | Whether the product is a complete tower or section |
| 2. Weight | Weight of tower/section |
| 3. Height | Height of tower/section |
| 4. Tower Sections | Number of tower sections for the particular sale |
| 5. Type of Paint | The top paint coat for the tower/section |
| 6. Metalizing | The degree of metalizing of the tower/section |
| 7. Elec.-Bus Bars | Whether the tower/section contains bus bars |
| 8. Elec.-Power | Whether the tower/section contains power cables |
| 9. Lift | Whether an elevator is attached to the tower |
| 10. Platform | The number of platforms in the tower/section |
| 11. Internal Components | Whether there were other internal components |

Commerce's Letter, re: "Product Characteristics for the Antidumping Duty Investigation of Utility Scale Wind Towers from the Republic of Korea (Korea)" (Sept. 17, 2019), at Attachment I, Appx684-691. The issue for Commerce therefore was whether DKSC's books and records reasonably reflected the cost differences attributable to these eleven physical characteristics.

As discussed *supra*, DKSC reported, and Commerce verified, that DKSC maintains costs on a project-specific basis in the normal course of business, which means that it linked the actual steel plate costs for each project and, in turn, for each CONNUM, reported in the cost of production database. Despite the fact that DKSC reported the actual steel plate costs associated with each project based on

the costs recorded in its normal accounting books and records, and such information was verified, Commerce in the *Final Determination* concluded that in order to mitigate "*steel plate* cost differences between CONNUMs that are unrelated to the product physical characteristics," it was necessary to "weight average the reported *steel plate* costs for all reported CONNUMs." *Decision Memorandum*, at 21, Appx1706 (emphasis added).

But steel plate was *not* one of the physical characteristics identified by Commerce for defining the CONNUMs. Simply put, Commerce never indicated that the type of steel plate, the grade of steel plate, the dimensions of steel plate, or any other attribute of steel plate was a physical characteristic that should have been incorporated in the CONNUMs, either for establishing similar products or for differentiating the costs between products. Any analysis by Commerce of DKSC's *steel plate* material input prices thus was not relevant to a determination of whether the costs in DKSC's normal books and records reasonably reflected differences in the physical characteristics of the completed wind towers. *See generally Certain Steel Nails from the Republic of Korea; 2016-2017*, 84 Fed. Reg. 4,770 (Dep't of Commerce Feb. 19, 2019) (Decision Memorandum, at cmt. 2) ("the costs reported for similar CONNUMs are substantially different based on factors unrelated to the physical characteristics of the products themselves. Therefore, the cost differences are not driven by differences in the CONNUMs physical characteristics.").

In this case, the administrative record did not contain any comparison of CONNUM costs by the height of the finished merchandise, by the weight of the finished merchandise, or by any of the other physical characteristics identified above. Commerce never determined, for example, that CONNUMs with different tower heights had the same costs or that CONNUMs with the same tower weights had different costs. Commerce never compared the costs of DKSC's wind towers by type or the number of tower sections or the type of paint or whether the products had lifts or platforms, etc. In fact, it appeared that Commerce never compared DKSC's CONNUM costs using any of the eleven enumerated physical characteristics. Essentially, Commerce analyzed the cost differences of the *steel plate* material inputs instead of the cost differences resulting from the wind tower *physical characteristics* listed above. As such, when Commerce stated that there were differences in the CONNUM costs that were unrelated to the products' physical characteristics, Commerce reached a conclusion of fact that was not supported by record evidence. Given the absence from the administrative record of any type of analysis that compared or contrasted the costs of finished wind towers based on the reported CONNUM characteristics, Commerce did not provide a reasonable basis for its decision "to mitigate cost differences unrelated to the product physical characteristics." Commerce's disregard for the project-specific wind tower costs reported in DKSC's normal books and records and its

decision to resort to a "smoothing" approach were unsupported by substantial evidence.

Furthermore, Commerce failed to demonstrate that significant cost differences existed that were unrelated to the physical characteristics of the wind towers. *See* Remand Results, at 5, 20-21, Appx48, Appx63-64. Commerce acknowledged that the grades and dimensions of DKSC's steel plate purchases for Japanese and U.S. projects for September 2018 were "comparable" and had the same physical characteristics. Yet, without conducting a comprehensive analysis or focusing on the CONNUM characteristics of the *finished* wind towers, Commerce repeatedly claimed that the steel plate inputs caused cost differences unrelated to differences in the finished wind towers' physical characteristics. But Commerce's analysis compared only a subset of steel plate costs (*i.e.*, not the finished merchandise) within a subset of two months for only a limited number of CONNUMs, without considering that DKSC reported costs for CONNUMs with [redacted] combined variations of weight, height, and sections. *Id.*

And even under this approach, Commerce failed to demonstrate that any steel plate cost differences across CONNUMs were significant. Contrary to Commerce's unsupported assertion, only a minor variance existed in DKSC's reported steel plate costs based on Commerce's own analysis. Only one CONNUM representing just over one percent of total production had steel plate

costs that varied more than 15 percent from the average steel plate cost; and when steel plate costs are averaged by weight, height, and number of sections, all the CONNUMs produced by DKSC had steel plate costs that varied less than three percent from the average. *Id.* As such, there was no basis for Commerce to presume that DKSC's reported costs based on the company's normal books and records varied unreasonably, and thus subject to a cost-smoothing approach, much less that the reported cost differences among the wind towers did not represent differences in the physical characteristics of the finished wind towers.

### B. Commerce Wrongly Assumed That Steel Plate Input Dimensions Dictate Wind Tower Physical Characteristics

Even if trial court believed it was reasonable for Commerce to ignore the trial court's own instructions to explain how the cost differences of finished wind towers were *not* attributable to the physical characteristics of the finished wind towers, Commerce's Remand Results did not support the agency's belief that the steel plate input is an appropriate basis to determine if an adjustment was warranted. Commerce first claimed that "the steel plate input *directly impacts* the weight and height physical characteristics of the differing finished wind towers produced." Remand Results at 2, Appx45 (emphasis added). But immediately thereafter, Commerce adopted the exact opposite view, claiming that it found "the significant cost differences reported for the steel plate inputs for wind towers of differing dimensions *are not associated* with the differences in the identified

physical characteristics (*i.e.*, height and weight) of the wind towers produced." *Id.* (emphasis added). These statements are not taken out of context. Rather, Commerce adopted an internally inconsistent approach that sought to validate its focus on the dimensions of steel plate inputs instead of the different physical characteristics of finished wind towers.

Commerce's Remand Results also misconstrued DKSC's position with respect to the relationship between the physical characteristics of a wind tower and the costs of the steel plate used to produce a wind tower. First, Commerce acknowledged DKSC's position that "a direct correlation exists between the dimensions of a tower and the steel plate used to produce that tower." *Id.* at 4, Appx47 (quoting DKSC's Feb. 12th Supplemental Response, at S6-3, Appx1394). Commerce then stated in the same paragraph that "DKSC's arguments here seem to imply that the steel plate input does not directly relate to the weight and height physical characteristics of the completed wind tower." *Id.* at 4. But Commerce was mistaken. DKSC's clear position was that a relationship exists between the physical characteristics of a finished wind tower (*e.g.*, its height and weight) and the amount of steel plate needed to produce that tower. Intuitively, taller and heavier towers require more steel plates. But a steel consumption relationship does not mean that there is a direct link between the physical characteristics of a finished wind tower and, separately, the dimensions of the individual steel plates

consumed to produce that wind tower. Commerce believed otherwise, and stated *categorically* and *repeatedly* that the dimensions of the material input steel plate directly impact the weight and height physical characteristics of the finished wind tower. *Id.* at 2, 4, 18, 19, 20, Appx45, Appx47, Appx61, Appx62, Appx63. Repeating a fallacy multiple times does not make it more correct, especially when Commerce provided no record citation for its unqualified assertion. The trial court erred in accepting Commerce's Remand Results despite these plain errors.

Importantly, substantial record evidence demonstrated the inaccuracy of Commerce's absolute assertion. Nowhere is this more evident than in Commerce's own final cost calculation memorandum where Commerce examined the steel plate DKSC used to produce two different CONNUMs reported in its cost database. *See* DKSC Cost Calculation Memorandum, at Attachment 1, Appx1969. Based on the individual CONNUM characteristics that DKSC reported for these two different wind towers (*i.e.*, CONNUMs [redacted] and [redacted], the net ton weight of the former was [redacted] to [redacted] MT and the latter was substantially heavier at [redacted] to [redacted] MT. The two different finished wind towers also had different heights, with the former [redacted] meters tall and the latter [redacted] meters tall despite being substantially heavier. In addition, the former wind tower was composed of only [redacted] sections while the latter had [redacted] sections. Despite these considerable physical differences, DKSC produced these wind

towers with steel plates that shared substantially comparable and overlapping thickness, width, and length dimensions.

Attachment 2 of the Remand Results contained data showing similar overlap. For example, all four of the CONNUMs for which steel plate inputs were purchased in May 2018—CONNUMs with significant height and weight differences—used steel plates with thicknesses in the *same* range of [redacted] to [redacted] millimeters, and with the [redacted] width of [redacted] meters and the [redacted] length of [redacted] meters. While Commerce claimed that "the fact remains that the height and weight of the wind towers produced dictates the dimensions of the input steel plate used," Remand Results at 19, Appx62, the record evidence clearly established that the steel plate (input) dimensions did not dictate the physical characteristics of the finished wind towers. Otherwise, DKSC could not have used similar steel plate to produce CONNUMs with substantially different physical characteristics, which incontrovertible record evidence presented by Commerce itself established that DKSC did.

At the heart of Commerce's fundamental misunderstanding is that while the purchase price of the plate *is* relevant to DKSC's reported costs, it is the consumption of the plate in the production of wind towers with *different* heights, weights, and tower sections that ultimately determines the *different* steel costs reported. Commerce's Remand Results considered only the initial plate per-ton

purchase costs without considering that DKSC's reported costs were a function of both price ***and*** the physical characteristics of the finished merchandise. That is, DKSC's reported costs were based on the cost of the steel plate cost multiplied by consumption. Thus, DKSC's reported costs—maintained in its normal books and records—incorporated both the steel input costs ***and*** the physical characteristics of the finished wind towers, and therefore reflected the correlation that exists between the dimensions of a tower versus the steel plate used to produce that tower.

In contrast, Commerce's approach considered only the initial steel plate prices without analyzing how those prices result in different consumption costs for wind towers of different dimensions. In its Remand Results, Commerce considered only the original plate costs alone, and failed to consider that the wind tower dimensions (*e.g.*, height and weight) impacted the steel plate consumption—and therefore dictated the steel plate *costs* reported by DKSC. Consequently, Commerce's conclusion that "the cost of the steel plate consumed is the *only* factor that ultimately determines the raw material cost of the wind tower" is erroneous. *See* Remand Results at 19, Appx62 (emphasis in original). In accepting Commerce's explanation, the trial court erred in failing to recognize that Commerce did not include steel plate as one of the finished wind tower CONNUM characteristics, so steel plates clearly are not the *only* fact that mattered.

### C. Commerce Wrongly Focused on the Timing of Steel Plate Purchases Without Considering That the Physical Characteristics of the Finished Wind Towers Also Impacted Costs

Commerce's determination also is unsupported by substantial evidence because it focuses only on the timing of DKSC's steel plate purchases, and failed to consider that the physical characteristics of the finished wind towers also impacted each product's costs of production. In its original final determination, Commerce stated that it analyzed DKSC's steel plate costs by reviewing "the steel plate cost differences between steel grades and dimensions (*i.e.*, thickness, width or height) within the same time period." *Decision Memorandum* at 22, Appx1707. Commerce said that it "compared the steel plate costs between a project produced for the Japanese comparison market and a project produced for the U.S. market, both of which were purchased within the same month, {and found that} the costs were virtually the same regardless of the grade, thickness, width, or height." *Id.*[1] But in performing this analysis, Commerce did not compare substantially different steel plate; rather, Commerce compared generally equivalent steel plate types. *See*

[1] Commerce repeatedly referred to the "height" of steel plate inputs. *See, e.g.*, Remand Results at 1, Appx44 ("the dimensions (*i.e.*, thickness, width, and *height*/length) of the steel plate input"); at 21, Appx64 ("this project also consumed steel plate covering a wide range of dimensions: . . . *heights* ranging from [redacted] to [redacted] cm."); at 22, Appx65 ("steel plate . . . {with} *heights* ranging from [redacted] to [redacted] cm."); and at Attachment 1, Appx73 ("Steel Plate *Height*"). But steel plate does not have "height" dimensions; rather, plate has "thickness" dimensions. To the degree that Commerce used the expression "height" as suggestive of the "height" characteristic for the CONNUM of finished wind towers, Commerce's misplaced terminology reflects the flawed basis of its reasoning.

DKSC Cost Calculation Memorandum, at Attachment 1, Appx1969 (where Commerce acknowledged the various steel grades to be "comparable" and to have virtually the same yield and tensile strengths); *see also* Cost Verification Report, at 19; Appx1626; Cost Verification Exhibits, at Exhibit CV-5, Appx1584-1607.

Moreover, the plate purchases that Commerce included in its "Comparison of Timing within Comparable Grades" chart had overlapping thickness, width, and length dimensions. *See* DKSC Cost Calculation Memorandum, at Attachment 1, Appx1969. The result of Commerce's analysis—having "neutralized the effect of time"—therefore was simply to reach the unsurprising conclusion that steel plate purchased in the *same* month with *equivalent* grades and *overlapping* thicknesses, widths, and lengths, had virtually the same prices. But such an obvious outcome did not support Commerce's inference that "the overwhelming factor that caused the differences in the steel plate costs was the timing of the steel plate purchases, rather than the physical characteristics of the merchandise." *Decision Memorandum* at 22, Appx1707.

Commerce's Remand Results suffered from the same flaw. Instead of addressing the differences in the physical characteristics, Commerce continued to focus on the timing of DKSC's purchases of steel plate as the reason for any cost differences among the wind towers produced without providing analysis related to the actual 11 physical characteristics of the finished merchandise. *See* Remand

Results at 5-6, Appx48-49. Specifically, Commerce repeated its previous explanation that it examined the same month purchases of steel plate used to produce two CONNUMs reported in DKSC's cost database with different physical characteristic ranges for both the height and weight physical characteristics that resulted in the trial court's initial remand. *Id.* at 5, Appx48. Instead of considering whether it was the comparison physical characteristics of these two CONNUMs that resulted in their having different reported costs over the entire POI, Commerce focused on the fact that the purchase prices for the steel plate used to produce these two CONNUMs in the same month were substantially the same. *Id.* But, as reiterated above, the steel plates that DKSC used to produce these CONNUMs in the same month had overlapping thickness, width, and length dimensions, and were essentially the same grade of steel. Therefore, it is unsurprising that Commerce found "virtually no cost differences" on a per-unit weight for the same month purchases of the steel plate used to produce these products. *Id.* at 22, Appx65. That similar steel plate inputs with similar dimensions and grades purchased in the same month had similar costs regardless of their thickness, width, and length is both natural and intuitive; it certainly did not establish that the differences in DKSC's reported costs were unrelated to the physical characteristics of the finished wind towers.

Having confirmed that the costs in the same month for the same steel plate grades and dimensions used to produce different CONNUMs were the same, and thus having "mitigated any distortions related to the timing of the steel plate purchases" as Commerce stated, *id.* at 5, Appx48, it was incorrect, illogical, and unreasonable for Commerce to ignore that the reported cost differences of different CONNUMs might relate to the different physical characteristics of the finished wind towers, especially when Commerce acknowledged that the CONNUM characteristics of the examined merchandise were comparison. Even if there were raw material price fluctuations during the POI, Commerce's Remand Results failed to establish that the timing of DKSC's plate purchases was the sole reason for any reported cost differences. Wind towers with the *same* weight might consume similar volumes of plate. But these towers could have significantly *different* heights and different costs—*e.g.*, a higher tower might require thinner plate with different costs. Similarly, wind towers with the *same* height and the same number of sections might have significantly *different* weights and, in turn, different costs. And, as shown by the particular examples that Commerce selected, wind towers with different weights, heights, and numbers of sections can have different costs even if they are produced in the same month. Commerce's "timing-of-plate-purchase-centric" analysis did not address the physical characteristics of the finished wind towers let alone establish that any differences in DKSC's

reported plate costs were unrelated to these physical characteristics. The trial court's decision to accept Commerce's Remand Results should be reversed.

### D. The Trial Court Erred in Relying on Facts Not in the Record When Sustaining Commerce's Determination

In accepting Commerce's Remand Results, the trial court accepted Commerce's reliance on a separate determining arising out of an investigation of *Utility Scale Wind Towers from Canada*:

> In explaining its cost adjustment rationale, Commerce also relied on the determination in the AD investigation of wind towers from Canada. . . . Commerce noted that its similar findings of cost differences "amongst CONNUMs which were unrelated to differences in the product's physical characteristics" justified the same approach in this proceeding as in *Wind Towers from Canada*, *i.e.*, to apply cost smoothing to the steel plate input. . . .
>
> As Commerce explained, both administrative proceedings involve Commerce's application of a weighted average to variable reported steel plate costs used in the construction of wind towers. *Remand Results* at 9. Although each of Commerce's determinations involve a unique combination and interaction of many variables, DKSC fails to identify what facts, if any, distinguish *Wind Towers from Canada* from this proceeding. The court therefore does not agree that Commerce acted unreasonably in relying on *Wind Towers from Canada* in reaching its determination here. Given the record as a whole, the court sustains Commerce's determination to smooth DKSC's reported steel plate costs.

*DKSC II*, 600 F. Supp. 3d at 1338-39, Appx89-90.

It is well-established that "each agency determination is *sui generis*, involving a unique combination and interaction of many variables, and therefore a prior administrative determination is not legally binding on other reviews before

this court." *U.S. Steel Corp. v. United States*, 637 F.Supp.2d 1199, 1218 (Ct. Int'l Trade 2009). Thus, *Wind Towers from Canada* does not establish a practice that Commerce must follow or that has any precedential authority here. The trial court erred in accepting Commerce's reliance on a determination from a different proceeding with a different set of facts that were *not* even on the administrative record. Commerce's fact-based decision in a separate proceeding is in no way relevant to its unsupported decision to smooth DKSC's costs in the proceeding under consideration. For this reason as well, reversal is appropriate.

## III. THE TRIAL COURT ERRED IN SUSTAINING AS REASONABLE COMMERCE'S USE OF FINANCIAL DATA UNRELATED TO THE MANUFACTURE AND SALE OF STEEL PRODUCTS IN KOREA TO CALCULATE DKSC'S PROFIT AND SELLING EXPENSES

The statute directs Commerce to calculate CV based on the sum of the cost of materials and fabrication employed in producing the subject merchandise, plus amounts for selling, general, and administrative (SG&A) expenses, interest expenses, U.S. packing expenses, and profit. *See* 19 U.S.C. § 1677b(e). When calculating CV, the statutory preference is to rely on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product." 19 U.S.C. § 1677b(e)(2)(A).

Because of the "smoothing" cost adjustment that Commerce made that increased the overall reported costs of production, as discussed *supra*, all comparison market sales failed the statutory sales-below-cost test. In the absence of comparison market sales made in the ordinary course of trade for calculating CV profit and selling expenses, Commerce had to rely on one of the three alternatives outlined in 19 U.S.C. § 1677b(e)(2)(B)(i) through (iii). Commerce concluded that it could not rely on the first alternative provided in 19 U.S.C. § 1677b(e)(2)(B)(i) because the record did not contain information representing the same general category of product as the subject merchandise sold by DKSC. *See Decision Memorandum* at 25, Appx1710. Nor was the second alternative in 19 U.S.C. § 1677b(e)(2)(B)(ii) available because there were no other exporters or producers subject to the investigation. *Id.* Commerce therefore calculated CV profit and selling expenses by selecting from available audited financial statements on the record in accordance with 19 U.S.C. § 1677b(e)(2)(B)(iii), *i.e.*, based on "any other reasonable method." *Id.*

This Court has explained that, when using CV to calculate normal value, "The objective is to find a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price for the particular merchandise." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 542 (Fed. Cir. 2019) (citing *Mid Continent Steel & Wire, Inc. v. United States*, 203

F. Supp. 3d 1295, 1310 (Ct. Int'l Trade 2017) ("The goal in calculating CV profit is to approximate the home market profit experience of the respondents.") (citation omitted). This Court likewise has held that "the alternative methods outlined in {§ 1677b(e)(2)(B)} all 'mimic' the methodology of {§ 1677b(e)(2)(A)} by giving alternatives to that attempt to track its requirements." *Thai I–Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1307 (Fed. Cir. 2010). *See also, e.g., Thai I–Mei Frozen Foods Co. v. United States*, 32 CIT 865, 883, 572 F.Supp.2d 1353, 1368 (2008) ("Commerce's task {is} to estimate, reasonably and fairly, a profit rate that {the respondent} would have realized from sales in its home market.")

The trial court sustained as reasonable Commerce's determination to calculate DKSC's profit and selling expense components of CV using the 2018 consolidated financial statements of SSHC. *See DKSC II*, 600 F. Supp. 3d at 1340, Appx91. The trial court first summarized Commerce's analytical framework for choosing a source for CV profit and selling expense as follows:

> In selecting surrogate financial data to calculate profit and selling expenses, Commerce relies on "(1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States; … (3) the contemporaneity of the date to the POI; … {and (4)} the extent to which the customer base of the surrogate and the respondent were similar."

*Id.* at 1339, Appx91 (citations omitted).

In essence, the question in evaluating record evidence under this framework is whether the record evidence supported Commerce's conclusion that best approximated the profit experience of DKSC if it had sold the foreign like product *in the home market (i.e., in Korea*) during the period examined. The trial court erred in upholding Commerce's use of SSHC's consolidated financial statements, specifically when it accepted Commerce's "expla{nation} that only SHCC's consolidated financial statement was complete and satisfied all four of the criteria relied on by Commerce." *Id.* at 1340, Appx92 (citations omitted). The trial court noted that "Commerce acknowledged that business activities unrelated to the comparable merchandise were included in the consolidated financial statement," but it nonetheless accepted Commerce's reasoning that "SHCC's statement 'is the only option on the record that includes 12 months of financial data, and reflects profits on the production and sale of comparable merchandise that is produced and sold in the Korean market.'" *Id.* The trial court's holding was in error because, in fact, SHCC's financial data had no correlation with the production or sale of comparable merchandise in Korea.

Undisputed record evidence shows that SSHC's consolidated financial statements reflected: (1) substantial production and sales activities in Indonesia, Italy, Japan, the United Arab Emirates, the United States and Vietnam; and (2) profit unrelated to the merchandise under consideration or comparable

merchandise because SSHC's statements included financial data from investment companies and non-steel producing activities. *See* DKSC CV Profit Submission at Exhibit CV-6-A, Appx1432-1441. In total, the non-Korean, non-steel manufacturing entities represented **92.68 percent** of SSHC's total consolidated sales revenue. *Id.* at Exhibit CV-6-A, at Appx1432-1441. The record evidence similarly showed that **62.68 percent** of SSHC's overall consolidated sales revenue and **41.03 percent** of SSHC's overall profits were attributable to sales by two affiliated distribution companies located in the United States. *Id.* An additional 4.5 percent of SSHC's profits were attributable to production operations in Vietnam by another affiliated company. *Id.*

Commerce's reasoning, which the trial court accepted, suggested that SSHC's consolidated financial statements principally reflected the production and sale of comparable merchandise in the Korean market. But, at most, only 7.32 percent of SSHC's consolidated financial data related to steel production and sales activities in the Korean market, so this conclusion was not supported by substantial record evidence.

In contrast, the record contained than the *standalone* financial data of SeAH Steel Corporation, which is a longstanding steel pipe producer in Korea and one of the many entities included in SSHC's consolidated financial statements. SeAH Steel Corporation's standalone statements properly reflected the profit and selling

expenses associated with exclusively producing comparable merchandise (*i.e.*, large diameter and other steel pipes) in Korea, and thus provided the only reasonable basis for deriving the CV profit and selling expenses necessary for determining DKSC's constructing value. Commerce, and in turn, the trial court, erred in dismissing this company's financial data because its financial data covered only four months, all of which were within the POI. However, nothing in the law or Commerce's analytical framework described above requires that the selected source must span a full year of financial data; rather, it simply requires that the financial data should be "contemporaneous" with the period examined. SeAH Steel Corporation's financial data undisputedly satisfied the "contemporaneity" factor because the data overlapped with the POI. Indeed, there was no dispute that SeAH Steel Corporation's financial data satisfied all of the factors under Commerce's analytical framework.

But Commerce rejected this source in favor of SSHC's consolidated financial data because SSHC's data covered a longer period. The trial court likewise accepted Commerce's reliance on the fact that SSHC's consolidated financial data covered a 12-month period. But the timespan covered by SSHC's consolidated financial data is irrelevant when such data reflected almost entirely the financial experience of subsidiaries that were *not* in Korea and/or of subsidiaries that were mainly investment or distribution companies (*i.e.*, not

producers of any merchandise). That is, SSHC's financial statements included the financial data of non-steel producing entities and companies outside of Korea whereas SeAH Steel Corporation's financial statements did not.

Commerce's choice thus ignored the agency's own analytical framework of selecting CV profit and selling expenses based on producers in *the foreign market* (*i.e.*, in Korea) that had similar business operations and products. In selecting SSHC's data, Commerce distorted the profit and selling expenses assigned to DKSC by using the consolidated financial data of a company whose operations had almost nothing to do with the production or sale of comparable merchandise in the home market, *i.e.*, Korea. In this case, it was particularly unreasonable for Commerce to attribute SSHC's products and business operations experience to DKSC or to consider that SSHC's financial data reflected sales in the home market when: (1) such a high percentage of SSHC's sales was outside of Korea; and (2) such a high percentage of profits was unrelated to the manufacture of products comparable to those produced by DKSC and, in fact, related to non-manufacturing activities such as investments and distribution.

It is well-settled that for agency action to be based on substantial evidence, the agency must explain why evidence that fairly detracts from the reasonableness of its determination is not outweighed by evidence that supports Commerce's determination. *See, e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488

(1951). For the reasons explained above, Commerce's determination to calculate DKSC's profit and selling expenses using financial data ***unrelated*** to the manufacture and sale of steel products in Korea was unreasonable and not supported by substantial evidence in light of Commerce's failure to address sufficiently the substantial evidence fairly detracting from its determination. The trial court's holding should be reversed.

## CONCLUSION

For these reasons, Plaintiff-Appellant respectfully requests that this Court reverse the decision of the trial court on these issues and remand the case with instructions requiring Commerce to recalculate the weighted-average dumping margin for DKSC in the manner described herein.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Robert G. Gosselink
Jarrod M. Goldfeder
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Dated: April 19, 2023

*Counsel to Dongkuk S&C Co. Ltd.*
*Plaintiff-Appellant*

# ADDENDUM

**TABLE OF CONTENTS**

ADDENDUM

Page

Judgement [ECF No. 72]
filed November 17, 2022 .......... Appx76

Opinion [ECF No. 71]
filed November 17, 2022 .......... Appx78

UNITED STATES COURT OF INTERNATIONAL TRADE

DONGKUK S&C CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

WIND TOWER TRADE COALITION,

Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 20-03686

**JUDGMENT**

This action having been submitted for decision, and the court, after due deliberation, having rendered opinions; now in conformity with those opinions, it is hereby

**ORDERED** that the final affirmative determination in the antidumping duty investigation of Utility Scale Wind Towers from the Republic of Korea, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020) ("Final Determination"), is sustained, except for the matter covered by the Final Results of Redetermination ("Remand Results"), ECF No. 54-1, filed pursuant to Dongkuk S&C Co. v. United States, 45 CIT ___, 548 F. Supp. 3d 1376 (2021); and it is further

**ORDERED** that the Remand Results are sustained.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: November 17, 2022
New York, New York

Slip Op. 22-125

UNITED STATES COURT OF INTERNATIONAL TRADE

DONGKUK S&C CO., LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

WIND TOWER TRADE COALITION,

Defendant-Intervenor.

Before: Leo M. Gordon, Judge

Court No. 20-03686

**OPINION**

[Sustaining Commerce's surrogate data selection from the Final Determination, and Commerce's Remand Results as to steel plate cost smoothing.]

Dated: November 17, 2022

Robert G. Gosselink, Jarrod M. Goldfeder, and MacKensie R. Sugama, Trade Pacific PLLC, of Washington, D.C., for Plaintiff Dongkuk S&C Co., Ltd.

Joshua E. Kurland, Senior Trial Counsel, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant United States. With Mr. Kurland on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Jesus N. Saenz, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, D.C.

Alan H. Price, Robert E. DeFrancesco III, and Derick G. Holt, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Wind Tower Trade Coalition.

Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") final affirmative determination in the antidumping ("AD") duty investigation

of utility scale wind towers ("wind towers") from the Republic of Korea. See Utility Scale Wind Towers from the Republic of Korea, 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020) ("Final Determination"), and the accompanying Issues and Decision Memorandum, A-580-902, PD[1] 324 (Dep't of Commerce June 29, 2020), https://enforcement.trade.gov/frn/summary/korea-south/2020-14438-1.pdf (last visited this date) ("Decision Memorandum").

Before the court is Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 54-1 ("Remand Results"), filed pursuant to the court's remand order in Dongkuk S&C Co. v. United States, 45 CIT ___, 548 F. Supp. 3d 1376 (2021) ("Dongkuk I"). See Pl. Dongkuk S&C Co. Ltd.'s ("DKSC") Comments in Opp'n Final Results of Remand Redetermination Pursuant to Ct. Remand, ECF No. 58[2] ("Pl.'s Cmts."); see also Def.'s Remand Resp. Comments, ECF No. 62 ("Def.'s Resp."); Def.-Intervenor Wind Tower Trade Coalition's Comments on Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 65. Additionally, the court will consider DKSC's challenge to Commerce's selection of surrogate financial data that was reserved in Dongkuk I. See Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1382. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[3] and 28 U.S.C. § 1581(c). For the

[1] "PD" refers to a document in the public administrative record, which is found in ECF No. 15-3, unless otherwise noted. "CD" refers to a document in the confidential administrative record, which is found in ECF No. 15-2, unless otherwise noted.
[2] All citations to the Remand Results, the agency record, and the parties' briefs are to their confidential versions unless otherwise noted.
[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

reasons that follow, the court sustains the Remand Results, as well as Commerce's selection of surrogate data in its Final Determination.

## I. Background

The court presumes familiarity with the procedural history of and the prior decision in this action; however, the court highlights the following background information as an aid to the reader. DKSC is a mandatory respondent in the underlying investigation. See Final Determination, 85 Fed. Reg. at 40,243. Wind towers are large structures designed to support the nacelle and rotor blades of a wind turbine and may vary in height, weight, and other physical characteristics. See Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1379. Wind towers typically consist of three to five cylindrical or conical sections, with each section consisting of multiple steel plates—the main material input—rolled and welded together to create a steel shell. Id. At the outset of its investigation, Commerce identified the 11 most significant characteristics differentiating the cost between completed wind towers. Id. at ___, 548 F. Supp. 3d at 1379 n.3 (listing characteristics). When combined, the physical characteristics identified by Commerce define unique products, i.e., CONNUMs,[4] used for sales comparison purposes. Id. at ___, 548 F. Supp. 3d at 1379 (citing Decision Memorandum at 21). Commerce then determined that a wind tower's height and weight were the two of the most important physical

---

[4] A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding). All products whose product hierarchy characteristics are deemed to be identical are part of the same CONNUM and are regarded as "identical" merchandise for the purposes of price comparison. The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the subject merchandise.

characteristics of a completed wind tower. Decision Memorandum at 21; see also Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1380.

Commerce rejected DKSC's reported specific steel plate costs for each individual wind tower during the period of investigation ("POI"), finding that those costs "were significantly different between [CONNUMs] sold in the Japanese comparison market and those sold in the U.S. market." Decision Memorandum at 19. To determine the cause of price differences in each of those markets, Commerce analyzed DKSC's reported costs "[u]sing physical characteristics as [its] guidepost" and "grouping CONNUMs by the related height and weight physical characteristics, and the steel plate cost differences between steel grades and dimensions (i.e., thickness, width, or height) within the same time period." Id. at 22. As a result, Commerce concluded that the "overwhelming factor" causing the variation in those costs was the timing of the steel plate input purchase, not the physical characteristics of the subject merchandise. Id. at 22. Commerce then adjusted the steel plate costs to address distortions not attributable to the physical characteristics of the wind tower by weight averaging "the reported steel plate costs for all reported CONNUMs." Id. at 21.

In this action, DKSC challenged Commerce's decision to adjust DKSC's reported steel plate costs under 19 U.S.C. § 1677b(f)(1)(A), as well as the agency's selection of surrogate financial data to calculate DKSC's constructed value profit and selling expenses under 19 U.S.C. § 1677b(e)(2)(B)(iii). See Mem. in Supp. of Mot. for J. upon the Agency R. of Dongkuk S&C Co., Ltd. at 3–11, 17–26, ECF No. 22 ("Pl.'s Br."). After observing that there did not appear to be anything in the record "that supports a conclusion that

Commerce did in fact group CONNUMs by any of the 11 physical characteristics or otherwise use those characteristics as a 'guidepost,'" the court remanded Commerce's steel plate cost adjustment for reconsideration or additional explanation. Dongkuk I, 45 CIT ___, 548 F. Supp. 3d at 1381. As noted above, the court also reserved decision on DKSC's challenge to Commerce's selection of surrogate financial data.

**II. Standard of Review**

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must also take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Fundamentally, though, “substantial evidence” is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2022). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action “was reasonable given the circumstances presented by the whole record.” 8A West’s Fed. Forms, National Courts § 3.6 (5th ed. 2022).

## III. Discussion

### A. Steel Plate Cost Adjustment

In an antidumping duty investigation where Commerce is to determine whether sales of the foreign like product were made at less than the cost of production of the subject merchandise, Commerce normally calculates costs based on the company’s records. These records are used “if such records are kept in accordance with the generally accepted accounting principles of the exporting country … and reasonably reflect the costs associated with the production and sale of the merchandise.” 19 U.S.C. § 1677b(f)(1)(A). In applying this provision, Commerce determined that it will “adjust costs to address distortions when it encounters cost differences that are attributable to factors beyond differences in the products’ physical characteristics.” See Remand Results at 4 (citing Thai Plastic Bags Indus. Co. v. United States, 746 F.3d 1358 (Fed. Cir. 2014) and NEXTEEL Co. v. United States, 43 CIT ___, ___, 355 F. Supp. 3d 1336, 1361–62 (2019)). Here, Commerce identified all purchases of steel plate of varying dimensions that occurred within the POI that were used to produce two different CONNUMs. See id. at 5. Commerce then performed a “like for like” comparison by

examining the purchases made in the same month of different dimensions and grades of steel plate that were used to produce those two CONNUMs. Id. Commerce found virtually no cost difference on a per-unit weight basis for the different grades and dimensions of steel plate used. Id. Commerce explained that "if the cost of the steel plate varied significantly, it would have been due to grade and dimensional differences in the steel plate used to produce the different types of wind towers, which would have explained the significant steel plate cost differences between CONNUMs of differing weights and heights." Id. Commerce, however, found "that, after neutralizing the effect of timing, there was virtually no difference in the cost associated with the different dimensions and grades of steel plate purchases used to produce the CONNUMs analyzed." Id. at 5–6 (further noting that "the analysis showed that the purchase price for input steel plate in the selected month was very consistent, despite the fact that the steel plate was incorporated into finished wind towers with different physical characteristics (i.e., weight and height), while DKSC's reported per-unit costs for the two selected CONNUMs reflected significant cost differences for the steel plate input"). Consequently, Commerce determined that the material cost differences reported in DKSC's database were not attributable to the physical characteristics defining the CONNUMs, but rather due to the timing of the steel plate purchases. Id.

Based on these findings, Commerce again found that DKSC's reported steel plate costs did not reasonably reflect the cost of producing the wind towers. Commerce therefore continued to adjust DKSC's reported costs under § 1677b(f)(1)(A) to "address distortions where cost differences occurred that were not attributable to the physical

characteristics of the products." See Remand Results at 1, 10. Commerce explained that "its analysis of the dimensions (i.e., thickness, width, and height/length) of the steel plate input is an appropriate and reasonable basis to use in the analysis to determine if adjustment is warranted because the steel plate input directly impacts the weight and height physical characteristics of the differing wind towers produced." See id. Commerce also observed that its prior analysis of the dimensions of the steel plate input is reasonable because the steel plate input directly impacts the physical characteristics of the finished wind towers. See id. at 9. Commerce therefore determined that DKSC's reported costs required a smoothing adjustment in order to accurately reflect the cost to produce the subject wind towers. See id. at 9–10.

DKSC contends that Commerce's Remand Results do not comply with the court's instructions in Dongkuk I, arguing that the court directed Commerce to "explain and/or demonstrate how DKSC's reported cost differences were not attributable to the physical characteristics of the finished wind towers." Pl.'s Cmts. at 2. DKSC maintains that Commerce wrongly focused on the steel plate input dimensions, rather than addressing the finished product dimensions as ordered by the court. Id. at 3. DKSC's argument ignores the fact that the standard for the court's review is whether Commerce's decision-making is reasonable given the circumstances provided by the record as a whole, not whether the agency "complied with the court's order." See 19 U.S.C. § 1516a(b)(1)(B)(i).

In Dongkuk I, the court held that Commerce's Final Determination lacked analytical support, specifically noting that the record did not reflect how Commerce evaluated the

CONNUMs in light of the 11 identified physical characteristics, or how it used such characteristics as a "guidepost" for its analysis. See Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1381 (observing that without such support in record, "Commerce's analysis may not constitute a reasonable application of 19 U.S.C. § 1677b(f)(1)(A)"). While the court concluded that "the record fails to demonstrate how Commerce's analysis could lead a reasonable mind to conclude that DKSC's reported costs did not reflect the cost to produce and sell the subject merchandise," see Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1382, Plaintiff's challenge to the Remand Results focuses solely on a narrow reading of the language in the court's remand order rather than the substance of the Remand Results. In remanding this matter, the court ordered that Commerce further explain its "adjustment for steel plate costs," and if appropriate, reconsider its cost analysis under 19 U.S.C. § 1677b(f)(1)(A). Dongkuk I, 45 CIT at ___, 548 F. Supp. 3d at 1382.

On remand, Commerce provided a more thorough explanation as to how and why its cost analysis and the record supported its determination to reject DKSC's reported steel plate costs in accordance with 19 U.S.C. § 1677b(f)(1)(A). See Remand Results at 3–10, 19–27. Specifically, Commerce noted that it considered variations in DKSC's reported costs and concluded that such discrepancies warranted adjustment as they not caused by differences in physical characteristics of the finished wind towers. Id. Given this, the court does not agree with DKSC that Commerce failed to comply with the court's remand order.

DKSC also contends that: (1) the Remand Results do not support Commerce's conclusion that steel plate is an appropriate basis to determine if an adjustment to DKSC's reported costs is warranted because steel plate does not dictate a wind tower's physical characteristics, Pl.'s Cmts. at 3–7; (2) Commerce failed to consider whether the physical characteristics of the finished wind towers also impact costs, Pl.'s Cmts. at 7–10; and (3) evidence cited by Commerce confirms cost differences are related to the physical characteristics of the completed wind towers. Pl.'s Cmts. at 11–14.

The court is not persuaded by Plaintiff's arguments. Commerce's explanation of its cost analysis on remand supports a conclusion that Commerce grouped CONNUMs by the physical characteristics of height and weight and used them as guideposts. To that end, Commerce found that the steel plate used in producing the subject merchandise impacts those physical characteristics of the completed wind towers and that "the cost of the steel plate consumed is the only factor that ultimately determines the raw material cost of the wind tower." Remand Results at 19.

During the investigation, DKSC noted that "fluctuating raw material prices during the POI" led to differing reported plate costs for DKSC's reported CONNUMs sold in the comparison market (Japan) and CONNUMs sold in the U.S. market. Resp. of Dongkuk S&C Co., Ltd. to Dep't's Feb. 5, 2020 Supp. D Questionnaire S6-2, Feb. 12, 2020, PD 278, CD 190. In order to neutralize the impact the time of purchase may have had on steel plate costs, Commerce identified purchases of steel plate required to produce two different CONNUMs in a one-month period, i.e., September 2018, and compared the reported costs. If, as DKSC suggests, the variation in steel plate costs was due to the

height and weight physical characteristics, Commerce anticipated that its comparison of two CONNUMs, varying in height and weight, would result in different steel plate costs for each CONNUM. Remand Results at 5. Yet, as Commerce explains, its analysis showed no difference in steel plate costs between the two CONNUMs. Id. at 5–6.

Commerce also compared the steel plate cost of a particular CONNUM in May 2018 and September 2018. Id. at 26–27. The comparison "showed that the per-unit costs of steel plate purchased to build this wind tower increased from … May 2018 to … September 2018." Id. at 26. Commerce concluded that the timing of the steel plate purchase affected the price because "[n]either the physical characteristics of the wind tower, nor the type of steel plate purchased for its construction changed during this period." Id. at 26–27.

DKSC argues remand is again warranted because Commerce did not conduct "a comprehensive analysis" or focus on the CONNUM characteristics of the finished wind towers as Commerce's analysis compared "a subset of steel plate costs within a subset of two months for only a limited number of CONNUMs . . . ." Pl.'s Cmts. at 13. DKSC further maintains that Commerce has failed to demonstrate significant steel plate cost differences across CONNUMs. Id. DKSC's arguments, however, do little more than ask the court to reweigh the evidence. See Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1376 (Fed. Cir. 2015) ("It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." (internal citation omitted)). The Remand Results demonstrate that Commerce compared and made findings as to the differences in steel plate costs across CONNUMs, differing in height and weight

physical characteristics using a "like for like" comparison, Remand Results at 4–7, considered evidence detracting from its findings, id. at 19, 21–25, and explained the rationale for its ultimate determination, consistent with its statutory obligation.

Contrary to Plaintiff's argument, by comparing both the steel plate costs for CONNUMs with differing height and weight physical characteristics in an isolated time period, as well as comparing the steel plate costs for the same CONNUM across different time periods, Commerce used those physical characteristics as guideposts for its analysis under § 1677b(f)(1)(A). See 19 U.S.C. § 1677b(f)(1)(A); see also, e.g., Marmen Inc. v. United States, 45 CIT ___, 545 F. Supp. 3d 1305 (2021) (upholding Commerce's adjustment to steel plate input costs for wind towers where Commerce determined that cost variation was unrelated to physical characteristics of the wind towers); NEXTEEL Co. v. United States, 43 CIT ___, 355 F. Supp. 3d 1336 (2019) (upholding Commerce's adjustment to reported cost of input where price of input declined substantially during period of review). Given this analysis, it was reasonable for Commerce to determine that DKSC's reported costs were not reflective of the costs associated with the production and sale of the subject merchandise, and to adjust those costs accordingly.

In explaining its cost adjustment rationale, Commerce also relied on the determination in the AD investigation of wind towers from Canada. See Remand Results at 9 (citing Utility Scale Wind Towers from Canada: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) ("Wind Towers from Canada"), and accompanying Issues & Decision Memorandum at Cmt. 1 (smoothing costs for steel

plate)). Commerce noted that its similar findings of cost differences "amongst CONNUMs which were unrelated to differences in the product's physical characteristics" justified the same approach in this proceeding as in Wind Towers from Canada, i.e., to apply cost smoothing to the steel plate input. Id.

DKSC argues that Wind Towers from Canada cannot be relied upon because it is a prior administrative determination that "does not establish a practice that Commerce must follow or that has any precedential authority here." See Pl.'s Cmts at 16. As Commerce explained, both administrative proceedings involve Commerce's application of a weighted average to variable reported steel plate costs used in the construction of wind towers. Remand Results at 9. Although each of Commerce's determinations involve a unique combination and interaction of many variables, DKSC fails to identify what facts, if any, distinguish Wind Towers from Canada from this proceeding. The court therefore does not agree that Commerce acted unreasonably in relying on Wind Towers from Canada in reaching its determination here. Given the record as a whole, the court sustains Commerce's determination to smooth DKSC's reported steel plate costs.

**B. CV Profit and Selling Expenses**

When calculating constructed value, Commerce typically relies on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits,

in connection with the production and sale of a foreign like product."[5] 19 U.S.C. § 1677b(e)(2)(A). When the actual data is not available, Commerce may use "any other reasonable method" to determine the profit and selling expenses incurred and realized. 19 U.S.C. § 1677b(e)(2)(B)(iii). In selecting surrogate financial data to calculate profit and selling expenses, Commerce relies on "(1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States; … (3) the contemporaneity of the date to the POI; … [and (4)] the extent to which the customer base of the surrogate and the respondent were similar." Decision Memorandum at 26 (citing Pure Magnesium from Israel, 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) (notice of final determination of sales at less than fair value) and the accompanying Issues and Decision Memorandum Cmt. 8, A-821-813 (Dep't of Commerce Sept. 27, 2001)). Commerce generally relies on financial statements which have "completed and fully translated audited financial statements and accompanying notes on the record." Id. Here, Commerce selected the 2018 consolidated financial statement from SeAH Steel Holdings Corporation's ("SSHC") as the basis for its constructed value calculations.

DKSC argues that Commerce's decision to calculate constructed value using SSHC's 2018 consolidated financial statement is unsupported by substantial evidence because SSHC's consolidated financial statement included financial data for products not

---

[5] These expenses are colloquially referred to as profit and selling expenses. See Decision Memorandum at Cmt. 8.

comparable to wind towers and included six months of financial data outside the POI. Pl.'s Br. at 18. DKSC contends that Commerce should instead use the standalone financial statement of SeAH Steel Corporation because it reflects "financial results from September 1, 2018 to December 31, 2018, a period falling entirely within the POI," and reports "financial results from the exclusive production of comparable merchandise." Id. at 18–19.

While Plaintiff may have preferred that Commerce select SeAH Steel Corporation's financial statement, Plaintiff has failed to demonstrate that Commerce acted unreasonably by selecting SHCC's statement instead. Commerce explained that the record contained 11 possible surrogate sources for calculating DKSC's constructed value profit and selling expenses. Decision Memorandum at 25. In support of selecting SHCC's consolidated financial statement, Commerce explained that only SHCC's consolidated financial statement was complete and satisfied all four of the criteria relied on by Commerce. Id. at 26–27. While Commerce acknowledged that business activities unrelated to the comparable merchandise were included in the consolidated financial statement, it explained that SHCC's statement "is the only option on the record that includes 12 months of financial data, and reflects profits on the production and sale of comparable merchandise that is produced and sold in the Korean market." Id. at 27. Commerce considered Plaintiff's argument to use SeAH Steel Corporation's standalone financial statement, but ultimately rejected it because, although it reflects the production of comparable merchandise, it does "not reflect a full year of financial results." Id. Accordingly, the court sustains as reasonable Commerce's use of SHCC's consolidated

financial statement to calculate DKSC's profit and selling expenses under 19 U.S.C. § 1677b(e)(2)(B)(iii).

**IV. Conclusion**

For the foregoing reasons, the court sustains Commerce's determination that DKSC's reported steel plate costs do not reasonably reflect the cost of producing the wind towers and its adjustment of those costs by using a weighted average, as well as Commerce's use of SHCC's consolidated financial statement to construct DKSC's profit and selling expenses. Judgment will enter accordingly.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: November 17, 2022
New York, New York

## CERTIFICATE OF FILING AND SERVICE

I, hereby certify that, on April 19, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I also certify that all parties have been served via electronic e-mail as agreed upon, to:

Alan H. Price, -
WILEY REIN, LLP
2050 M Street NW
Washington, DC 20036
Direct: 202-719-3375
Email: aprice@wiley.law

*Counsel for Wind Tower Trade Coalition - Defendant - Appellee*

Joshua E. Kurland
UNITED STATES
DEPARTMENT OF JUSTICE
Commercial Litigation Branch,
Civil Division
PO Box 480
Ben Franklin Station
Washington, DC 20044
Joshua.E.Kurland@usdoj.gov

*Counsel for Defendant - Appellee US*

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder

*Counsel for Appellant Dongkuk S&C Co., LTD*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 35(d) and Fed. R. App. P. 35(b)(2) because:

   this brief contains 10,458 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 35(c)(2).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in proportionally space typeface using Microsoft Word in 14-point Times New Roman.

3. This brief contains forty-two [42] unique words, (including numbers) which does not exceed the maximum of fifty (50) words permitted by Fed. Cir. R. 25.1(d)(1)(B).

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder