No. 2023-1419

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DONGKUK S&C CO., LTD.,

Plaintiff-Appellant,

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants-Appellees

Appeal from the United States Court of International Trade in
Case No. 1:20-cv-03686, Senior Judge Leo M. Gordon

**NONCONFIDENTIAL BRIEF OF
DEFENDANT-APPELLEE UNITED STATES**

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
JESUS N. SAENZ
Attorney
Department of Commerce
Office of the Chief Counsel
for Trade Enforcement & Compliance
U.S. Department of Commerce

JOSHUA E. KURLAND
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 616-0477
Fax: (202) 353-0461
Email: Joshua.E.Kurland@usdoj.gov

July 12, 2023

*Attorneys for Defendant-Appellee
United States*

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES...................................................................1

STATEMENT OF THE CASE....................................................................1

STATEMENT OF FACTS ........................................................................1

I.    Legal Framework ........................................................................1

II.   Commerce's Investigation .........................................................4

III.  Commerce's Determination To Weight-Average Steel Plate Costs ............6

IV.  Commerce's Valuation Of DKSC's Profit And Selling Expenses ..............10

V.   Trial Court Proceedings.............................................................12

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ........................................................................................19

I.    Standard Of Review....................................................................19

II.   Commerce's Determination To Weight-Average DKSC's Steel Costs Across CONNUMs Is Supported By Substantial Evidence And Lawful ................................................................................21

    A.   Commerce Reasonably Weight-Averaged DKSC's Reported Steel Plate Costs Across CONNUMs ..................................22

    B.   Commerce Reasonably Identified A Relationship Between The Steel Plate Inputs And Wind Towers' Physical Characteristics ........30

    C.   Commerce Reasonably Determined That The Timing Of The Steel Plate Purchases, Rather Than The Physical Characteristics Of The Finished Wind Towers, Affected DKSC's Costs ..................34

III.  Commerce's Calculation Of DKSC's Constructed Value Profit And Selling Expenses Is Supported By Substantial Evidence And Lawful ........40

CONCLUSION ......................................................................................48

## <u>CONFIDENTIAL MATERIAL DESIGNATION</u>

The material designated as confidential using brackets on pages 30, 35, and 37-39 of this brief entails information about the dimensions, costs, and numbering of the appellant's wind tower products and steel plate inputs that was designated as confidential in the underlying administrative proceeding and that was released by the Department of Commerce under an administrative protective order (APO). The APO provides that the information cannot be shared with any party not approved under the APO.  Because the information is proprietary information of another person, pursuant to regulation, no further public summary is provided in the public version of this response brief beyond the general descriptor required by the Court's rules.  *See* 19 C.F.R. § 351.304(c)(1) ("A submitter should not create a public summary of business proprietary information of another person.").

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  618 F.3d 1316 (Fed. Cir. 2010) ...............................................................20

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) .............................................................20

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007) ..................................................... 20, 46

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ...............................................................................20

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ...............................................................................20

*Dillinger France S.A. v. United States*,
  350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ................................. 22, 23

*Dong-A Steel Co. v. United States*,
  337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018) .......................................28

*Dongkuk S&C Co. Ltd. v. United States*,
  548 F. Supp. 3d 1376 (Ct. Int'l Trade 2021) .............................. *passim*

*Dongkuk S&C Co. Ltd., v. United States*,
  600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) .............................. *passim*

*Downhole Pipe & Equip. L.P. v. United States*,
  776 F.3d 1369 (Fed. Cir. 2015) ..................................................... 20, 46

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996) .............................................................21

*JBF RAK LLC v. United States*,
  790 F.3d 1358 (Fed. Cir. 2015) ...........................................................21

*Marmen Inc. v. United States*,
  545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021),
  *appeal pending*, Fed. Cir. No. 2023-1877 .................................... 17, 29

*NEXTEEL Co. v. United States*,
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .................................................. 4, 28

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ...........................................................................20

*PSC VSMPO-Avisma Corp. v. United States*,
  688 F.3d 751 (Fed. Cir. 2012) .............................................................................21

*QVD Food Co. v. United States*,
  658 F.3d 1318 (Fed. Cir. 2011) .................................................................... 20, 47

*Shakeproof Assembly Components, Div. of Illinois Tool
  Works, Inc. v. United States*,
  268 F.3d 1376 (Fed. Cir. 2001) .................................................................... 19, 46

*Thai Plastic Bags Indus. Co. v. United States*,
  746 F.3d 1358 (Fed. Cir. 2014) .............................................................................4

*Torrington Co. v. United States*,
  68 F.3d 1347 (Fed. Cir. 1995) ...................................................................... 4, 19

*Union Steel v. United States*,
  713 F.3d 1101 (Fed. Cir. 2013) ...........................................................................19

*United States v. Eurodif*,
  555 U.S. 305 (2009) ............................................................................................19

*Uttam Galva Steels Ltd. v. United States*,
  997 F.3d 1192 (Fed. Cir. 2021) .............................................................................2

**Statutes**

19 U.S.C. § 1673 .....................................................................................................2

19 U.S.C. § 1677 ............................................................................................. 2, 40

19 U.S.C. § 1677b(a) ..................................................................................... *passim*

19 U.S.C. § 1677b(b) ..................................................................................... *passim*

19 U.S.C. § 1677b(e) ..................................................................................... *passim*

19 U.S.C. § 1677b(f) ...................................................................................... *passim*

19 U.S.C. § 3512(d) ..............................................................................41

28 U.S.C. § 2639(a) ..............................................................................19

**Administrative Determinations**

*Certain Pasta from Italy*,
    83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018) ........................... 16, 27

*Certain Steel Nails From the Republic of Korea*,
    84 Fed. Reg. 4,770 (Dep't of Commerce Feb. 2019)......................................... 28

*Pure Magnesium from Israel*,
    66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) ................................ 43

*Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea,
    and the Socialist Republic of Vietnam:Initiation Notice of Less-Than-Fair-
    Value Investigations*,
    84 Fed. Reg. 37,992 (Dep't of Commerce Aug. 5, 2019)................................. 5, 6

*Utility Scale Wind Towers from Canada*,
    85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020)............................. 17, 29

*Utility Scale Wind Towers from the Republic of Korea*,
    85 Fed. Reg. 8,560 (Dep't of Commerce Feb. 14, 2020)...................................... 5

*Utility Scale Wind Towers from the Republic of Korea,*
    85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020).................................. 1, 6

*Welded Carbon Steel Standard Pipe and Tube Products From Turkey*,
    82 Fed. Reg. 49,179 (Dep't of Commerce Oct. 24, 2017).................................. 27

**Legislative History**

Statement of Administrative Action Accompanying the Uruguay Round
    Agreements Act,
    H.R. Rep. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ....... 41, 42

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, defendant-appellee's counsel states that he is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. Although not before this Court, counsel is aware that plaintiff-appellant, Dongkuk S&C Co., Ltd. (DKSC), has filed a Court of International Trade action challenging the final results of the Department of Commerce's first administrative review of the antidumping duty order at issue in this appeal. *See* Ct. Int'l Trade No. 23-00075. That Court of International Trade action also involves a challenge to Commerce's adjustments to DKSC's reported steel plate costs in calculating a weighted-average dumping margin for DKSC, and thus may be affected by the outcome of this appeal. The action has been stayed pending issuance of the mandate in this appeal. Finally, counsel is aware of another appeal currently pending before this Court, *Marmen Inc. v. United States*, 2023-1877, that is not "related" under the Court's rules, but involves a similar issue because the plaintiffs have challenged Commerce's determination to adjust reported steel plate costs (in the context of a separate record in that case concerning wind towers from Canada).

## STATEMENT OF THE ISSUES

1.     Whether the Department of Commerce's (Commerce's) decision to adjust or "smooth" Dongkuk S&C Co., Ltd.'s (DKSC's) steel plate costs through weight-averaging is supported by substantial evidence and otherwise lawful.

2.     Whether Commerce's selection of data to calculate DKSC's profit and selling expenses is supported by substantial evidence and otherwise lawful.

## STATEMENT OF THE CASE

This appeal concerns Commerce's antidumping duty investigation covering utility scale wind towers from Korea. *Utility Scale Wind Towers from the Republic of Korea,* 85 Fed. Reg. 40,243 (Dep't of Commerce July 6, 2020) (*Wind Towers from Korea*), and accompanying Issues and Decision Memorandum (IDM) (Appx1686-1716). DKSC, a Korean wind towers producer, appeals the trial court's final judgment in *Dongkuk S&C Co. Ltd., v. United States*, 600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) (*Dongkuk II*), sustaining Commerce's investigation following Commerce's remand redetermination in this proceeding (Appx42-75).

## STATEMENT OF FACTS

## I.     Legal Framework

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices. Under that regime, Commerce must impose antidumping duties on imported goods that are being sold, or are likely to be sold,

in the United States at less than fair value (*i.e.*, dumped) in a way that injures a domestic industry in the United States.  19 U.S.C. § 1673.  Dumping occurs when a foreign firm sells a product in the United States at a price lower than the product's normal value.  *Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1194 (Fed. Cir. 2021) (citation omitted).  Commerce determines a respondent's dumping margin by calculating the amount by which the normal value exceeds the United States export price or a constructed export price.  *Id.*

Normal value is generally calculated as "the price at which the foreign like product is first sold . . . for consumption in the exporting country."  19 U.S.C. § 1677b(a)(1)(B)(i).  To determine normal value, Commerce will consider only those sales in the comparison market that are made in the "ordinary course of trade."  *Id.* § 1677b(a).  The statute at 19 U.S.C. § 1677(15) provides that sales are in the "ordinary course of trade" if they are made under conditions and practices that, for a reasonable amount of time prior to the date of sale, have been normal for sales of the foreign like product (meaning sales of the same or similar merchandise in a foreign market).

Similarly, in calculating normal value, Commerce will disregard sales made at less than the respondent's "cost of production" (such sales are not in the "ordinary course of trade").  19 U.S.C. §§ 1677b(b)(1), 1677(15)(A).  If there are no sales in the exporting country that remain after removing sales below the cost

of production, Commerce will base normal value on a constructed value for the subject merchandise. *Id.* §§ 1677b(a)(4), (b)(1).[1] Constructed value is essentially the cost of production plus profit. *See id.* § 1677b(e). The statute defines the "cost of production" as the sum of "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business{.}" *Id.* § 1677b(b)(3)(A).

When Commerce must evaluate a respondent's reported costs, Commerce relies on the company's normal books and records for purposes of calculating the cost of production (and constructed value) if the books and records satisfy two conditions: (1) they are kept in accordance with generally accepted accounting principles (GAAP) in the company's home country, and (2) they reasonably reflect the cost to produce and sell the merchandise. 19 U.S.C. § 1677b(f)(1)(A). When costs reported in a company's books are not reasonable—for example, if cost differences among products do not represent differences in their physical characteristics—Commerce may revise the reported costs. Appx1706 (citations omitted). It is thus normal for Commerce to adjust reported costs to address distortions when it encounters cost differences attributable to factors beyond

---

[1] In this case, Commerce determined that DKSC lacked a viable home market, and thus used DKSC's sales to Japan as the comparison market because it was DKSC's only viable third-country market. Appx1372. Ultimately, however, Commerce based its normal value calculation on a constructed value. Appx1375-1376.

differences in the products' physical characteristics. *See*, *e.g.*, *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1366-67 (Fed. Cir. 2014); *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019).

Finally, the statute directs that "a fair comparison shall be made between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a); *see Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (statutory framework seeks "to produce a fair . . . comparison between foreign market value and United States price"). To this end, Commerce identifies the subject merchandise's commercially significant physical characteristics and uses them to establish control numbers or CONNUMs for sales comparison purposes.[2]

## II.   <u>Commerce's Investigation</u>

Wind towers are large structures designed to support the nacelle and rotor blades of a wind turbine, and can vary in height and weight, among other physical characteristics. *Dongkuk S&C Co. v. United States*, 548 F. Supp. 3d 1376, 1379 (Ct. Int'l Trade 2021) (*Dongkuk I*). Wind towers typically consist of three to five cylindrical or conical sections, each consisting of multiple steel plates (the main material input), rolled and welded together to form a steel shell. *Id.* The sections are usually produced and then shipped to a project site for assembly. *Id.*

---

[2] A CONNUM is a "control number" assigned to a group of materially identical products to distinguish the group from similar but non-identical products.

In response to a petition filed by defendant-appellee, Wind Tower Trade

Coalition (WTTC), Commerce initiated an antidumping duty investigation of

wind tower imports from Korea in August 2019.  *Utility Scale Wind Towers from*

*Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam:*

*Initiation of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 37,992 (Dep't of

Commerce Aug. 5, 2019) (*Initiation Notice*); *see* Appx105-107, Appx115-116.

Commerce selected DKSC as a mandatory respondent in its investigation because

it was one of the largest exporters of wind towers to the United States by volume

during the period of investigation.  Appx1357-1358.[3]

In February 2020, Commerce published an affirmative preliminary

determination in its investigation, calculating a 5.98 percent weighted-average

dumping margin for DKSC.  *Utility Scale Wind Towers from Korea*, 85 Fed. Reg.

8,560, 8,561 (Dep't of Commerce Feb. 14, 2020), and Preliminary Decision

Memorandum (PDM) (Appx1357-1376).  Two issues relevant to this appeal

contributed to Commerce's affirmative determination:  (1) the need to weight-

average DKSC's reported steel plate input costs to address the fact that DKSC's

reported costs varied across CONNUMs based on factors unrelated to the wind

towers' physical characteristics; and (2) Commerce selection of surrogate value

---

[3] Commerce also selected Vestas Manufacturing A/S (Vestas) as a mandatory
respondent; however, Vestas later informed Commerce that it was not a producer
or exporter of subject merchandise.  Appx1358.

information from SeAH Steel Holdings Corporation to value DKSC's profit and

selling expenses for purposes of calculating a constructed normal value for DKSC.

Appx1374-1375; *see also* Appx1377-1378 (prelim. calculation memo).

In July 2020, Commerce issued its affirmative final determination in which

it calculated a final weighted average antidumping duty margin of 5.41 percent for

DKSC, resulting in the imposition of an antidumping duty order on wind towers

from Korea. *Wind Towers from Korea,* 85 Fed. Reg. at 40,244.

## III.   Commerce's Determination To Weight-Average Steel Plate Costs

In initiating the investigation, Commerce stated that it would provide parties

an opportunity to comment on which physical characteristics associated with wind

towers Commerce should require the foreign respondents to report in responding to

Commerce's antidumping questionnaire. *Initiation Notice,* 84 Fed. Reg. at 37,993-

94.  Commerce explained that the requested information "will be used to identify

the key physical characteristics of the subject merchandise in order to develop

appropriate product-comparison criteria, as well as to report the relevant factors of

production (FOPs) accurately." *Id.* at 37,994.  Commerce then issued a list of

proposed product characteristics to differentiate costs among various wind tower

models and provided parties an opportunity to comment on the list.  Appx124-131.

Several parties, including DKSC and petitioner WTTC, submitted initial and

rebuttal comments.  Appx1358 (listing comment letters).

Based on the parties' comments, Commerce identified and selected nearly a dozen physical characteristics that were the most significant in differentiating costs among wind tower models.  Appx682-691; Appx1706.  In order of importance, the physical characteristics are:  (1) tower type (*i.e.*, full tower or section); (2) weight of tower/section; (3) height of tower/section; (4) total sections; (5) type of paint coating; (6) metalizing; (7) electrical conduit – bus bars; (8) electric conduit – power cables; (9) elevators; (10) number of platforms; and (11) other internal components (whether other components exist).  Appx685-691.  These 11 physical characteristics define the unique products, *i.e.*, CONNUMs, for sales comparison purposes, and the level of detail within each physical characteristic reflects the importance that Commerce places on comparing the most similar products in a price-to-price comparison.  Appx1706.

Thus, as Commerce explained, the respondent's reported costs should reflect meaningful cost differences attributable to these different physical characteristics. Appx1706-1707.  This approach ensures that the product-specific costs that Commerce uses in its calculations accurately reflect the physical characteristics of the products covered by Commerce's analysis.  Appx1707.

Commerce instructed DKSC to use the selected product characteristics in completing its response to Commerce's  antidumping questionnaire.  Appx682. Commerce antidumping questionnaire also provided DKSC with the opportunity to

add any product characteristic that Commerce had not selected: "You may add additional product characteristics in separate fields. However, if you add characteristics not specified in the questionnaire, describe in the narrative response why you believe that Commerce should use this information to define identical and similar merchandise." Appx470, Appx496 (emphasis omitted); *see also generally* Appx433-435 (cover letter). Despite this opportunity, DKSC did not report any additional product characteristics—such as the grade of the steel plate input—in its questionnaire responses. *See generally* Appx692-736.

Analyzing DKSC's cost of production for the preliminary determination, Commerce identified cost differences in DKSC's reported steel plate costs that were unrelated to the products' physical characteristics. Appx1374. Specifically, Commerce stated in its preliminary calculation memorandum that "DKSC reported significant steel plate cost differences between control numbers (CONNUMs)" and that "{w}e analyzed such differences and found based on record evidence that the differences . . . do not appear to be related to differences in" the products' physical characteristics. Appx1377-1378. To mitigate these unreasonable cost differences, and consistent with its practice, Commerce weight-averaged or "smoothed" the reported steel plate costs for all CONNUMs. Appx1374; Appx1378.

In its July 2020 affirmative final determination, Commerce continued to weight-average DKSC's reported steel plate input costs based on Commerce's

identification of cost differences across CONNUMs unrelated to the products'

physical characteristics.  Using DKSC's reported physical characteristics as

guidance, Commerce analyzed the steel plate costs by first grouping CONNUMs

by the related height and weight characteristics, and then analyzing the steel plate

costs differences between steel grades and dimensions.  Appx1706-1707.

Based on this analysis, Commerce determined that *timing* was the significant

factor driving the steel plate cost differences between products, which is unrelated

to differences in the products' physical characteristics.  Appx1707.  As part of its

analysis, Commerce compared DKSC's steel plate purchases that took place in the

same month for separate projects destined for the Japanese and the United States

markets, and found that they shared "virtually the same" steel plate costs regardless

of physical characteristics such as grade, thickness, width, or length of the steel

plate.  *Id.*; Appx1966-1967, Appx1969.  In each case, Commerce identified all

purchases of steel plate of varying dimensions (*i.e.*, thickness, width, and length of

the steel plate input) that occurred within an isolated period of time, September

2018, and that were used to produce two different CONNUMs reported in DKSC's

cost database.  *See id.*; Appx47-48 (remand results describing same).

Despite the fact that Commerce's analysis comparing same-month purchases

involved different dimensions and grades of steel plate used to produce two

different CONNUMs, Commerce found no meaningful differences in the steel

9

plate input costs on a per-unit weight basis for the different grades and dimensions. Appx48 (citing Appx1966-1967, Appx1969).  In other words, by neutralizing the effect of timing, Commerce found that the per-unit weight cost for different grades and dimensions of steel plate was the same.  Appx48-49.  Thus, Commerce determined that DKSC's reported steel plate cost differences did not reflect production differences associated with the wind towers' physical characteristics, but, instead, were attributable to the timing of the steel plate purchases that resulted in fluctuations in price.  Appx49; Appx1707; Appx1966-1967.

Hence, Commerce concluded that the material cost differences that DKSC reported in its cost database were not attributable to the physical characteristics defining the CONNUMs.  When faced with such a situation, Commerce's practice is to adjust the costs to address the distortions.  Appx1707.  Therefore, Commerce continued to weight-average DKSC's steel plate costs for all CONNUMs.  *Id.*

## IV.    Commerce's Valuation Of DKSC's Profit And Selling Expenses

Another issue that Commerce addressed in its determination concerned the surrogate data it used to value DKSC's profit and selling expenses in calculating a constructed value as the basis for DKSC's normal value.

Based on its cost calculations, Commerce concluded in its preliminary determination that there were no above-cost sales of the foreign like product (wind towers) in the comparison market (Japan).  Appx1375.  Thus, under 19 U.S.C.

10

§§ 1677b(a)(4) and (b)(1), Commerce based its normal value calculation on a

constructed value for the subject merchandise.  *Id.*  Likewise, in calculating

constructed value under 19 U.S.C. § 1677b(e), Commerce explained that it was

unable to determine DKSC's selling expenses and profit due to the absence of

comparison market sales made in the ordinary course of trade.  *Id.*  As a result,

Commerce was unable to use its "preferred method" to calculate these figures.  *Id.*

Instead, Commerce relied on 19 U.S.C. § 1677b(e)(2)(B)(iii), which permits it to

employ any "reasonable method" to calculate a constructed value.  *Id.*

Commerce thus used the financial statement of SeAH Steel Holdings

Corporation (SSHC) to calculate the constructed value profit and selling expenses

for DKSC.  Appx1375; Appx1378.  SSHC's financial statement was included in

the petition and is the only financial statement on the record for a Korean producer

of comparable merchandise with a full year of financial data.  *Id.*  Commerce

preliminarily found that SSHC's consolidated 2018 financial statement "represents

a complete {fiscal year} of financial results, meets our criteria in that it is

contemporaneous, represents a Korean producer of comparable merchandise (and

thus similar business operations and products to the respondent), and appears to

reflect sales (thus profits) in the Korean market."  Appx1378; *see* Appx1375.

Commerce also stated that it would solicit additional profit and selling expense

information from interested parties.  Appx1376; Appx1384-1385.

For the final determination, in response to its request for additional sources to calculate constructed value profit and selling expenses, Commerce considered 10 sets of audited financial statements and the public version of a cost calculation memorandum from another proceeding (including the unconsolidated financial statements of SeAH Steel Corporation, a Korean steel pipe producer). Appx1710. After analyzing this information, Commerce found that the consolidated 2018 financial statement of SSHC remained the best information available on the record for calculating constructed value profit and selling expenses. Appx1710-1712.

Commerce explained that "{w}hile the {SSHC} consolidated financial results include activities from business operations other than comparable merchandise, we find that the data represents the best option from among the sources on the record." Appx1712. Commerce elaborated that the SSHC statement "is the only option on the record that includes 12 months of financial data, and reflects profits on the production and sale of comparable merchandise that is produced and sold in the Korean market." *Id.* Thus, Commerce continued to rely on SSHC's consolidated 2018 financial statement.

## V.    Trial Court Proceedings

DKSC challenged Commerce's weight-averaging (smoothing) adjustment to DKSC's reported steel plate input costs and selection of SSHC's consolidated 2018

financial statement for calculating DKSC's constructed value profit and selling expenses before the Court of International Trade.

In December 2021, the trial court remanded Commerce's determination. *Dongkuk I*, 548 F. Supp. 3d 1376. In particular, the court found Commerce's explanation of its weight-averaging/smoothing analysis insufficient to determine whether Commerce's cost adjustment was reasonable. *Id.* at 1381-82. The court thus ordered Commerce to further explain its weight-averaging adjustment, and if appropriate, to reconsider its cost analysis under 19 U.S.C. § 1677b(f)(1)(a). *Id.* at 1382. The court held in abeyance DKSC's challenge to Commerce's selection of the SSHC consolidated financial statement as surrogate data to calculate DKSC's constructed value profit and selling expenses, pending reconsideration of the cost adjustment issue (given that Commerce's reconsideration of the cost adjustment issue might impact Commerce's calculation of constructed value). *Id.*

In April 2022, Commerce issued its remand redetermination. Appx42-75. Commerce continued to apply its weight-averaging adjustment to the steel plate input costs to address the significant cost differences across CONNUMs unrelated to the wind towers' physical characteristics, while further explaining why such an adjustment was necessary, lawful, and supported by substantial evidence. *See id.*

In particular, regarding its comparison of steel plate costs in September 2018 for separate projects in the United States and Japan, Commerce explained that its

analysis had scrutinized DKSC's purchases of steel plate of varying dimensions and grades for an isolated time period. Appx48. Commerce further explained that, by comparing purchases within the same month, Commerce performed a "'like for like' comparison" that "mitigated any distortions related to the timing of the steel plate purchases or any other factors that could distort such comparisons." *Id.* In other words, Commerce held timing constant, while examining whether DKSC's purchase costs varied based on factors such as the CONNUMs' differing physical characteristics or the steel plate's dimensions, with the result that there was "virtually no cost differences on a per-unit weight basis for the different grades and dimensions of steel plate used." *Id.*

Commerce also discussed the significance of this result in light of the trial court's remand. Commerce explained that it had specifically analyzed the steel plate input costs for the different CONNUMs because steel plate is the primary input that affects the weight and height physical characteristics of the finished wind tower. *Id.* If the cost of the steel plate varied significantly with timing held constant, it would be due to grade and dimensional differences in the steel plate used to produce the different types of wind towers, which in turn would explain the significant steel plate cost differences between CONNUMs of differing weights and heights. *Id.* To the contrary, however, the analysis showed that, after neutralizing timing effects, there was virtually no difference in cost associated with

steel plate purchases used to produce different CONNUMs. Appx48-49. Thus, although DKSC's reported per-unit steel plate costs for the two CONNUMs reflected significant differences, the actual purchase price for the steel plate input was very consistent for the selected month (despite being incorporated into wind towers with different physical characteristics). Appx49.[4]

Moreover, in response to DKSC's argument that Commerce's analysis compared steel plate that is generally equivalent, Commerce performed a further analysis, for May 2018, of four additional CONNUMs—with a similar outcome. Appx65, Appx69 (discussing Appx72-75). Commerce explained that the four CONNUMs it analyzed involved steel inputs and finished products with widely-ranging physical characteristics, yet the per-unit cost differences for steel plate purchased in the same month (May 2018) were negligible. *Id.* Conversely, for one of the CONNUMs, the record evidence showed that per-unit steel plate costs for purchases to build the same wind towers increased from May 2018 to September 2018. Appx69 (discussing information reflected on Appx72-75).

Commerce found that this additional evidence supported its determination that timing was the main factor affecting the significant cost differences for DKSC's wind tower steel inputs. *Id.* Correspondingly, Commerce observed that

---

[4] Commerce equally addressed and refuted DKSC's claims that the cost differences reflect differences in steel grades and that Commerce's analysis compared steel plate that was generally equivalent. *See* Appx64-66; *see also* DKSC Br. 13.

DKSC had acknowledged that the cost of steel plate fluctuated before and during the period of investigation.  Appx50, Appx69; *see also* Appx1393 (acknowledging that "fluctuating raw material prices during the {period of investigation}" led to differing reported steel plate costs).  Consequently, Commerce continued to conclude that DKSC's reported cost differences did not reflect differences associated with wind towers' physical characteristics, but instead reflected differences in the timing of steel plate purchases.  Appx70.

Finally, addressing the trial court's concern in ordering remand about Commerce's lack of explanation regarding its practice of adjusting unreasonable cost reporting both for finished products (overall CONNUMs) and for individual inputs for such products, Commerce explained that practice as it had been applied in the original final determination.  Appx51-52.  Commerce cited its determination in *Certain Pasta from Italy*, in which it smoothed the costs for semolina (an input for pasta) upon finding that respondents reported significantly different input costs, resulting in varied material costs across CONNUMs.  Appx51 (discussing *Certain Pasta from Italy*, 83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018), and IDM at 3-11).  Commerce also highlighted its determination in its investigation concerning *Utility Scale Wind Towers from Canada*, in which Commerce, as in this case, smoothed the respondent's steel plate input costs upon concluding that reported differences in those costs were based on timing rather than differences in

physical characteristics of the wind towers.  Appx52 (discussing *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020), and IDM Cmt. 1); *see also Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1314-15 (Ct. Int'l Trade 2021), *appeal pending*, Fed. Cir. No. 2023-1877 (determination was "consistent with the relevant statute and Commerce's stated practice").

In November 2022, the trial court sustained Commerce's redetermination. *Dongkuk II*, 600 F. Supp. 3d 1331.  The court held that, on remand, "Commerce provided a more thorough explanation as to how and why its cost analysis and the record supported its determination to reject DKSC's reported steel plate costs in accordance with 19 U.S.C. § 1677b(f)(1)(A)."  *Id.* at 1337 (citations omitted).  It also rejected DKSC's contentions that Commerce had been insufficiently attentive to the products' physical characteristics and that Commerce should have performed a more "comprehensive" analysis, explaining that "DKSC's arguments . . . do little more than ask the court to reweigh the evidence."  *Id.* at 1337-38 (citation omitted); *see also id.* (explaining that Commerce had performed a "like for like" comparison, considered evidence detracting from its findings, and explained the rationale for its determination).  The court thus concluded that "it was reasonable for Commerce to determine that DKSC's reported costs were not reflective of the costs associated with the production and sale of the subject merchandise, and to adjust those costs accordingly."  *Id.* at 1338.

The trial court likewise sustained Commerce's selection of SSHC's 2018 consolidated financial statement as surrogate data to calculate DKSC's constructed value profit and selling expenses. *Id.* at 1339-40. It explained that "{w}hile Plaintiff may have preferred that Commerce select SeAH Steel Corporation's financial statement, Plaintiff has failed to demonstrate that Commerce acted unreasonably by selecting SHCC's statement instead." *Id.* at 1340. The trial court thus entered judgment in November 2022, and this appeal followed. Appx76-77.

## SUMMARY OF THE ARGUMENT

The trial court's judgment should be affirmed because Commerce's determinations are both supported by substantial evidence and lawful.

First, Commerce lawfully weight-averaged or "smoothed" DKSC's disparate steel plate costs. The record evidence supports Commerce's reasonable finding that significant differences in DKSC's steel plate costs among CONNUMs resulted primarily from factors unrelated to differences in the physical characteristics of the wind tower products associated with the CONNUMs. Thus, Commerce reasonably determined that the timing of the steel plate purchases was the significant factor driving the steel plate cost differences between the finished wind towers, and that weight-averaging the costs was appropriate under Commerce's practice.

Second, Commerce's calculation of DKSC's constructed value profit and selling expenses was supported by substantial evidence and otherwise lawful.

18

Commerce reasonably determined that the consolidated 2018 financial statement of

SSHC, a Korean producer of comparable merchandise with sales in Korea, was the

best available information on the record for calculating these figures.

## ARGUMENT

### I.    Standard Of Review

This Court upholds Commerce's determinations unless they are unsupported

by substantial record evidence, or otherwise not in accordance with law.  *Union*

*Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C.

§ 1516a(b)(1)(B)(i)); *see United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009)

("The specific factual findings on which {Commerce} relies . . . are conclusive

unless unsupported by substantial evidence.").  The Court in doing so recognizes

"Commerce's special expertise" as "master" of the antidumping laws.  *Shakeproof*

*Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d

1376, 1381 (Fed. Cir. 2001); *Torrington*, 68 F.3d at 1351.  Indeed, determinations

by Commerce are "presumed to be correct."  28 U.S.C. § 2639(a)(1).

Substantial evidence connotes "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*,

305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of

the evidence," and the possibility of drawing inconsistent conclusions from the

record does not render Commerce's findings unsupported by substantial evidence.

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Hence, "{i}t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *Downhole Pipe & Equip. L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (citation omitted); *see Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (Court cannot overturn decision "simply because {it} would have reached a different conclusion based on the same record" (citations omitted).

A party disputing Commerce's determination under the substantial evidence standard thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains a determination if it is reasonable and supported by the record as a whole, including detracting evidence.  *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Moreover, Commerce is accorded particular deference in determining the "best available information" to value factors of production in antidumping duty proceedings.  *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010)).

Finally, the Court affords Commerce "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to make "complex economic and accounting decisions of a technical nature, for which agencies

possess far greater expertise than courts." *Fujitsu Gen. Ltd. v. United States*, 88

F.3d 1034, 1039 (Fed. Cir. 1996) (citations omitted); *PSC VSMPO-Avisma Corp.*

*v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (quoting *Fujitsu*).  Likewise,

when a statute "fails to make clear any Congressionally mandated procedure or

methodology for assessment of the statutory tests," Commerce "may perform its

duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790

F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted).

## II.    Commerce's Determination To Weight-Average DKSC's Steel Costs Across CONNUMs Is Supported By Substantial Evidence And Lawful

Commerce's determination to weight-average or smooth DKSC's reported

steel plate costs is supported by substantial evidence showing that significant cost

differences among DKSC's CONNUMs resulted primarily from timing factors

unrelated to the products' physical characteristics.  *See* Appx46-70; Appx1378;

Appx1706-1707.  None of DKSC's contrary arguments are persuasive.  That is

because they do not refute Commerce's reasonable findings that "after neutralizing

the impact of timing associated with steel plate purchases, steel plate input cost

differences are virtually nonexistent, regardless of the grade or dimension of the

steel plate used to produce the wind towers" such that "the significant cost

differences reported for the steel plate inputs for wind towers of differing

dimensions are not associated with the differences in the identified physical

characteristics (i.e., height and weight) of the wind towers produced."  Appx45.

21

**A.    Commerce Reasonably Weight-Averaged DKSC's Reported Steel Plate Costs Across CONNUMs**

DKSC's claim that Commerce's determination is unsupported, in effect, ignores Commerce's explanation in its redetermination.  *See* Appx46-70.  As we explained, Commerce relies on a company's normal books and records in its cost calculations if they (1) are kept in accordance with GAAP in the company's home country and (2) reasonably reflect the cost to produce and sell the merchandise.  19 U.S.C. § 1677b(f)(1)(A); *see also Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1374 (Ct. Int'l Trade 2018) (discussing section 1677b(f)(1)(A)).  Accordingly, when the costs reported in a company's books are not reasonable— for example, if cost differences among products do not represent differences in their physical characteristics—it is normal for Commerce to adjust the costs to address such distortions.  *See* Appx1706-1707, Appx1707 n.103 (explaining that production costs should reflect meaningful differences attributable to products' physical characteristics and citing examples of Commerce's practice).

In this case, Commerce used the physical characteristics of DKSC's products as a "guidepost" to analyze the steel plate costs "by grouping CONNUMs by related height and weight physical characteristics, and {analyzing} the steel plate cost differences between steel grades and dimensions (*i.e.*, thickness, width, or height) within the same time period."  Appx1707.  In comparing all of DKSC's steel plate purchases within an isolated time period (September 2018), which were

used to produce wind towers for separate CONNUMs corresponding to projects in Japan and the United States (with ostensibly different costs), Commerce found that the per-unit steel costs were "virtually the same regardless of the grade, thickness, width, or height" of the steel plate. *Id*. (citing Appx1969); Appx47-48 (further explaining analysis and that Commerce "found virtually no cost differences on a per-unit weight basis for the different grades and dimensions of steel plate used"). This was true "despite the fact that the steel plate was incorporated into finished wind towers with different physical characteristics (*i.e.*, weight and height), *while DKSC's reported per-unit costs for the two selected CONNUMs reflected significant cost differences for the steel plate input*." Appx49 (citing Appx1969 (emphasis added)). Further, on remand, Commerce analyzed steel plate costs for four CONNUMs during May 2018 with similar results, while additionally finding that the costs for one of the CONNUMs *did increase based on timing* from May to September 2018. Appx65, Appx69 (discussing information on Appx72-75).

Consequently, Commerce reasonably determined that the timing of DKSC's steel plate purchases was "the overwhelming factor" prompting the reported cost differences. Appx1707; *see also* Appx49 ("record evidence demonstrated that the timing of the purchases was the significant factor driving the resulting steel plate cost differences between products"). This dovetailed with further evidence that DKSC itself had acknowledged that steel plate prices fluctuated based on timing.

23

*See* Appx50, Appx69 (discussing Appx1393, Appx1625-1626). Upon

determining that DKSC's reported costs did not reflect meaningful differences

attributable to the physical characteristics defining CONNUMs, Commerce

followed its practice to correct that distortion by weight-averaging costs across

CONNUMs. Appx49-50; Appx1707; *see also Dongkuk II*, 600 F. Supp. 3d at

1338 (finding Commerce's determination and adjustment reasonable).

Further, complying with the trial court's concern that Commerce had not

explained how it used CONNUM physical characteristics as a "guidepost" in its

analysis, *Dongkuk I*, 548 F. Supp. 3d at 1381, Commerce explained how it had

done so in comparing DKSC's costs across CONNUMs. Appx49. This stems

from the fact that, based on the virtually unchanged per-unit costs Commerce

observed, there "should have been little difference among products of different

physical characteristics." *Id.*; *see also* Appx48 ("We neutralized the effect of the

timing of steel plate purchases to better analyze the cost differences associated

with steel plate purchases of differing dimensions and grades."). But Commerce

nonetheless did identify clear differences from the average reported steel plate

costs among the CONNUMS that disappeared when it isolated the timing of the

steel plate purchases. *Id.* As the trial court explained:

> If, as DKSC suggests, the variation in steel plate costs
> was due to the height and weight physical characteristics,
> Commerce anticipated that its comparison of two
> CONNUMs, varying in height and weight, would result

24

> in different steel plate costs for each CONNUM. . . . Yet,
> as Commerce explains, its analysis showed no difference
> in steel plate costs between the two CONNUMs.

*Dongkuk II*, 600 F. Supp. 3d at 1338.  Thus, notwithstanding DKSC's claims, Commerce considered the effect of physical characteristics in explaining the significant cost differences across CONNUMs, and rooted its analysis in record evidence indicating that physical characteristics did not explain them.

DKSC nonetheless argues that Commerce's determination is unsupported because Commerce's analysis, allegedly, focuses on the dimensions and costs of the steel plate *input* rather than the physical characteristics of the finished wind towers.  DKSC Br. 22.  Contrary to this claim, the *whole point* of Commerce's analysis was to examine whether the significant differences that Commerce observed among the costs for DKSC's different CONNUMS were related to the wind towers' physical characteristics, which Commerce did by isolating the time period and analyzing whether costs varied based on the physical characteristics of either the wind towers or the steel input.  This enabled Commerce to conclude that timing was the main factor.  *See Dongkuk II*, 600 F. Supp. 3d at 1337-38 (rejecting DKSC's argument that Commerce failed to consider physical characteristics).

Relatedly, DKSC is incorrect to assert that Commerce failed to compare the wind towers based on the reported CONNUM characteristics and that "Commerce never determined, for example, that CONNUMs with different tower heights had

the same costs or that CONNUMs with the same tower weights had different costs." DKSC Br. 26. Commerce explicitly stated that it analyzed DKSC's costs "by grouping CONNUMs by related height and weight physical characteristics" in addition to analyzing differences between steel grades and dimensions within the same time period. Appx1707; *see also* Appx63-64. A core finding in Commerce's analysis, moreover, is that cost differences among "finished wind towers with different physical characteristics (*i.e.*, weight and height)" disappear when timing is held constant, notwithstanding that "DKSC's reported per-unit costs for the two selected CONNUMs reflected significant cost differences for the steel plate input." Appx49. As the trial court held, "{c}ontrary to Plaintiff's argument, by comparing both the steel plate costs for CONNUMs with differing height and weight physical characteristics in an isolated time period, as well as comparing the steel plate costs for the same CONNUM across different time periods, Commerce used those physical characteristics as guideposts for its analysis under § 1677b(f)(1)(A)." *Dongkuk II*, 600 F. Supp. 3d at 1338.

DKSC further argues that, because steel plate was not identified as one of the physical characteristics for defining the CONNUMs, analysis of DKSC's steel plate input prices is "not relevant" to determining whether the costs in DKSC's normal books and records reasonably reflect differences in physical characteristics of the completed wind towers. DKSC Br. 25. In other words, DKSC challenges

whether it was appropriate for Commerce to analyze steel input costs rather than look solely at the wind towers' overall cost. *See id.* at 26 (arguing that Commerce should have limited its analysis to costs of finished wind towers).

This misunderstands Commerce's practice. As Commerce elaborated on remand, Commerce adjusts cost reporting both for finished products and individual inputs. Appx51-52; *see also, e.g.*, *Pasta from Italy*, 83 Fed. Reg. 63,627, at IDM 3-11 (smoothing costs for semolina input); *Welded Carbon Steel Standard Pipe and Tube Products From Turkey*, 82 Fed. Reg. 49,179, at IDM Cmt. 2 (reallocating costs for zinc input). When there are unreasonable cost differences for an input that do not stem from meaningful physical differences in the input—*e.g.*, semolina used in finished products comprising different pasta types—Commerce will smooth the costs for that input.[5] The key for Commerce to apply cost smoothing is the need to address distortions when it encounters cost differences attributable to factors beyond differences in products' physical characteristics. *See* Appx47, Appx52 (citations omitted). That is what Commerce found in this case. *See* 19 U.S.C. § 1677b(f)(1)(A) (records must "reasonably reflect" production costs); *cf.*

---

[5] DKSC argued before the trial court that *Pasta from Italy* stands for only the proposition that Commerce may engage in cost smoothing when cost differences exist for an input that is itself a physical characteristic of the finished product. However, consistent with Commerce's reliance on *Pasta from Italy*, Commerce explained in that case that "{w}hen there is an absence of meaningful physical characteristics in the input, Commerce will smooth costs for that input." Appx51 (citing *Pasta from Italy* 83 Fed. Reg. 63,627, and IDM at 3-11).

*NEXTEEL*, 355 F. Supp. 3d at 1361-62 (sustaining determination to adjust cost differences for hot-rolled steel coil input); *Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1371 (Ct. Int'l Trade 2018) (sustaining determination to adjust costs stemming from "fluctuating raw material costs" during investigation period).

Commerce also applied its practice in *Steel Nails from Korea*, which DKSC wrongly cites as support for its contention that Commerce must limit its analysis to the overall CONNUMs. *See* DKSC Br. 25. Commerce found in that case that "Daejin's reported costs are distortive because the cost differences between similar products are the result of factors *other* than the physical characteristics of the merchandise," and Commerce thus "mitigate{d} the cost distortion by smoothing out differences in costs." *Certain Steel Nails From the Republic of Korea*, 84 Fed. Reg. 4,770 (Dep't of Commerce Feb. 2019), at IDM Cmt. 2 (emphasis added). By analyzing per-unit steel input costs in this case, moreover, Commerce removed the distortions from comparing purchases of different dimensions and quantities. *See* Appx48. Thus, DKSC's contention that Commerce improperly considered the unreasonable cost differences for an individual input lack merit.

Additionally, despite citing other Commerce determinations, DKSC attempts to discard one of Commerce's most analogous determinations: Commerce's decision to similarly smooth steel plate input costs in *Wind Towers from Canada*. DKSC Br. 37-38 (claiming that *Wind Towers from Canada* is "in no way relevant"

based on separate facts); *but see Utility Scale Wind Towers from Canada*, 85 Fed.
Reg. 40,239, at IDM Cmt. 1 (smoothing steel plate costs); *Marmen*, 545 F. Supp.
3d at 1314-15 (sustaining determination). Like this case, Commerce in the Canada
investigation found that there should be minimal, if any, cost differences for the
steel plate input, and that differences that the respondent reported were based on
*timing* rather than differences in the wind towers' physical characteristics. *See*
Appx52. Given that *Wind Towers from Canada* involved a similar determination
for the same product, and Commerce applied the smoothing adjustment based on
cost fluctuations for the *steel plate input*, Commerce's application of its practice in
the two similar proceedings is consistent. *See Dongkuk II*, 600 F. Supp. 3d at 1339
("Although each of Commerce's determinations involve a unique combination and
interaction of many variables, DKSC fails to identify what facts, if any, distinguish
*Wind Towers from Canada* from this proceeding.").

DKSC also claims that Commerce's analysis is flawed because it compares
only a subset of the steel plate costs corresponding to particular CONNUMs and
months. DKSC Br 27. Commerce, however, explained the basis for its analysis:
"Commerce's analysis was performed within the same month to reflect a 'like for
like' comparison that mitigated any distortions related to the timing of the steel
plate purchases or any other factors that could distort such comparisons." Appx48.
DKSC suggests that Commerce was required to compare all of the CONNUMs

produced during the investigation period for Commerce's analysis to be valid.

DKSC Br. 27.  Assuming such a thing would be feasible while still isolating the

timing factor, there is no such requirement in 19 U.S.C. § 1677b(f)(1)(A).  In any

event, Commerce on remand analyzed data for a number of additional CONNUMs,

while also detailing how the steel cost data for one particular CONNUM increased

over time, and found that this evidence further "supports that timing is the main

factor affecting the significant cost differences for the wind tower."  Appx69-70.

Finally, DKSC reprises contentions that "Commerce failed to demonstrate

that any steel plate cost differences across CONNUMs were significant" because

"only a minor variance existed in DKSC's reported steel plate costs{.}"  DKSC Br.

27.  Commerce, however, explained that the variance in DKSC's costs ranged from

[ # ] to [ # ] percent.  Appx66-67 (citing Appx1378, Appx1382 Column f).

Commerce further explained that steel plate costs varied widely under both its own

and DKSC's calculations.  *Id.*  Although DKSC claims that the differences were

insignificant, DKSC admitted before Commerce and the trial court that variance

from the *average* (let alone each other) reached 5, 10, or above 25 percent.  *See*

Appx1996, Appx2001; Appx2106-2107, Appx2114.  That is far from minor.

### B.    Commerce Reasonably Identified A Relationship Between The Steel Plate Inputs And Wind Towers' Physical Characteristics

Despite Commerce's analysis in its initial and remand determinations,

DKSC argues that Commerce wrongly assumes that steel plate input dimensions

dictate wind tower physical characteristics and that this undermines Commerce's broader determination.  DKSC Br. 28-32.  DKSC is mistaken because Commerce's analysis supports the agency's redetermination.

Although Commerce did not identify steel input dimensions as the specific physical characteristics defining a CONNUM, Commerce reasonably determined that the weight and height physical characteristics of the completed wind tower, which define the CONNUMs, have a relationship to the dimensions (*i.e.*, thickness, width, and length) of the steel plate input.  Specifically, Commerce indicated that "the weight and height product characteristics of the completed wind tower dictate the dimensions and grades of the steel plate consumed . . . ."  Appx63; Appx62 (similar statement).  Conversely, "the weight and height physical characteristics of the completed tower are directly impacted by the dimensions (*i.e.*, thickness, width, and length) of the steel plate input, as DKSC has acknowledged on the record."  Appx62.  Indeed, in the investigation, DKSC acknowledged that "a *direct* correlation exists between the dimensions of a tower and the steel plates used to produce that tower."  Appx47, Appx62 (discussing Appx1394 (emphasis by Commerce)).  DKSC also continues to admit that "a relationship exists between the physical characteristics of a finished wind tower (*e.g.*, its height and weight) and the amount of steel plate needed to produce that tower" and that "{i]ntuitively, taller and heavier wind towers require more plates."  DKSC Br. 29.

Yet, DKSC argues that Commerce wrongly assumed that the steel plate input dimensions dictate wind tower physical characteristics and that Commerce "has adopted an internally inconsistent approach that seeks to validate its focus on the dimensions of steel plate inputs instead of the different physical characteristics of finished wind towers." DKSC Br. 29-30. Likewise, DKSC argues that "a steel consumption relationship does not mean that there is a direct link between the physical characteristics of a finished wind tower and, separately, the dimensions of the individual steel plates consumed to produce that wind tower." *Id.*

DKSC misses the point.[6] Commerce determined that reported cost differences among the wind tower products did not represent differences in the physical characteristics enumerated at the outset of the investigation, but instead, were attributable to the fluctuating cost of the steel plate input based on timing. Appx1706-1707; Appx47-49. Commerce explained that "the steel plate cost differences were unrelated to the physical characteristics of the steel plate and the merchandise made from it (*i.e.*, wind towers)." Appx47. Moreover, Commerce repeated its analysis for additional CONNUMs and time periods in the remand

---

[6] Indeed, Commerce's allegedly incorrect statement about the relationship between the tower's dimensions and those of the steel plates used to produce the tower is tangential to the thrust of Commerce's analysis—which is that the per-unit steel plate costs did not vary based on *either* of those physical characteristics if timing was held constant—because Commerce adjusts unreasonable cost reporting to both the physical characteristics that define the CONNUMs *and* to individual inputs for the finished product. *See* Appx48-49.

redetermination.  *See* Appx65, Appx69 (discussing information on Appx72-75).

The analyses showed that the cost differences reported by DKSC were not the

result of the enumerated physical characteristics defined by the CONNUMs.[7]

DKSC further argues that Commerce "failed to consider that the wind tower

dimensions (*e.g.*, height and weight) impact the steel plate consumption—and

therefore dictate the steel plate *costs* reported by DKSC."  DKSC Br. 32.  This

again misses the point.  Commerce explicitly stated that "the weight and height

product characteristics of the completed wind tower dictate the dimensions and

grades of the steel plate consumed, and the cost of the differing grades and

dimensions of steel plate consumed directly impacts the reported steel plate costs

in the cost database."  Appx63; *see also* Appx62 ("the differences in the steel plate

costs for varying dimensions and grades of the consumed plate are the only raw

material cost difference between CONNUMs").  But Commerce's analysis of the

*per-unit* costs of purchases for different CONNUMs in particular months teases out

that, with distorting factors removed, the price of steel was fluctuating based on the

*timing* of the purchases rather than differences in physical dimensions.  Because

"the cost of the steel plate consumed is the *only* factor that ultimately determines

---

[7] At the same time, the record contradicts DKSC's assertions that Commerce's
analyses are flawed because they involve steel plate with dimensions that are
essentially equivalent.  *Compare* DKSC Br. 30-31 *with* Appx72-75; Appx1969
(showing varying plate dimensions); *see also* Appx64-65 (refuting DKSC's claims
that Commerce compared steel plate that was generally equivalent).

the raw material cost of the wind tower," it was appropriate for Commerce to adjust DKSC's reported costs to address this issue.  Appx62, Appx70.

By focusing on particular statements in Commerce's remand results with which it disagrees, DKSC's arguments ignore the totality of Commerce's analysis. Commerce explained why its analysis shows that the significant differences in steel plate costs across CONNUMs do not stem from the physical characteristics of the finished wind towers.  Contrary to DKSC's arguments, DKSC Br. 31-32, these cost differences are not merely a function of DKSC's consumption of more steel for certain CONNUMs and not others because the *per-unit* cost of the steel plate remained constant when time was isolated, despite DKSC reporting per-unit costs that varied by CONNUM.  Appx48-49.  Thus, DKSC's criticisms of Commerce's statements are not a basis to overturn Commerce's determination.

### C.    Commerce Reasonably Determined That The Timing Of The Steel Plate Purchases, Rather Than The Physical Characteristics Of The Finished Wind Towers, Affected DKSC's Costs

DKSC next argues that Commerce improperly focused on the timing of DKSC's steel plate purchases (versus the physical characteristics of the finished wind towers), while also asserting that Commerce's analyses are flawed because they compare purchases of essentially equivalent steel that one would expect to have similar costs.  DKSC Br. 33-37.  DKSC thus claims that "{t}he result of Commerce's analysis . . . was simply to reach the unsurprising conclusion that

steel plate purchased in the same month with equivalent grades and overlapping thicknesses, widths, and lengths, had virtually the same prices." *Id.* at 34. There are several flaws in these arguments.

As an initial matter, contrary to these claims, Commerce and the trial court both explained how Commerce had used the physical characteristics of the finished wind towers as its "guidepost" to compare DKSC's steel plate costs. *See* Appx47-50, Appx63-64; *Dongkuk II*, 600 F. Supp. 3d at 1337-38. Commerce found, however, that the cost differences DKSC reported were not attributable to those physical characteristics, but rather to the steel plate purchases' timing—and the trial court agreed that Commerce's conclusion was reasonable. *See id.*

Moreover, DKSC admitted in the investigation that timing affected its steel plate costs. During its initial analysis, Commerce asked DKSC in a supplemental questionnaire to explain the reported difference in DKSC's steel plate costs:

> Commerce's Question: It appears that all CONNUMs sold in the third country have [ Relative Value ] steel plate cost than CONNUMs sold in the US. Please explain what caused such cost differences.

> DKSC Response: For DKSC's sales of wind towers to Japan, the raw material orders were placed in July 2017—*i.e.*, one year prior to the start of the POI—for these specific projects sold during the {period of investigation (POI)}. Raw material prices are not fixed, and they fluctuate frequently due to external factors such as changes in iron ore prices. At the time the orders were placed, raw material prices were generally low. For DKSC's sales of wind towers to the United States during the POI, raw material orders were placed in September 2018 (during the POI) when raw materials prices were high. *Due to the fluctuating raw material prices during the POI,* DKSC's reported

> CONNUMs sold in the third country show differing plate costs from CONNUMs sold in the U.S. market.

Appx1393 (emphasis added). At verification, DKSC again indicated that its steel plate input costs fluctuated based on the time of purchase. *See* Appx1625-1626. Commerce highlighted DKSC's statements repeatedly acknowledging that the cost of steel plate fluctuated due to the timing of the steel plate purchases before and during the period of investigation. *See* Appx50, Appx69.

Likewise, DKSC's claim that Commerce improperly focused on timing by comparing equivalent steel plate types lacks merit. Commerce stated with respect to its initial analysis of DKSC's steel plate purchases during September 2018 that the analysis included "scores of steel plate purchase transactions that encompassed different grades and a wide range of dimensions, which were used to produce two different CONNUMs (*i.e.*, wind tower projects) with different height and weight characteristics{.}" Appx64 (discussing Appx1966-1967, Appx1969); *see also* Appx75; Appx1707 (stating that "costs were virtually the same regardless of the grade, thickness, width, or height"). Indeed, Commerce explained that it analyzed the steel plate costs in this way to "neutralize{ } the effect of the timing of steel plate purchases to better analyze the cost differences associated with steel plate purchases of differing dimensions and grades." Appx48. These statements are borne out by the record showing that the steel plate purchases that Commerce analyzed involved varying grades and dimensions. Appx75; Appx1969.

As Commerce further explained, "if the cost of the steel plate varied significantly, it would have been due to grade and dimensional differences in the steel plate used to produce the different types of wind towers, which would have explained the significant steel plate cost differences between CONNUMs of differing weights and heights." Appx48. Yet, after neutralizing timing, the projects destined for the Japanese and United States markets involving separate CONNUMs shared "virtually the same" steel plate costs regardless of physical characteristics such as the grade, thickness, width, or length of the steel plate. Appx1707; *see also* Appx48 (finding "virtually no cost differences on a per-unit weight basis for the different grades and dimensions of steel plate used").

Specifically, the per-unit cost of steel plate across dimensions and grades for two physically different CONNUMs was ([ # ] Korean won (KRW)/kilogram (kg) for one CONNUM versus [ # ] KRW/kg) for the other. Appx64-65. Hence, with timing held constant, the physical differences between CONNUMs *did not* result in a significant difference in per-unit steel input costs that would support DKSC's position. *Id.* This refutes both DKSC's claim that Commerce was just comparing equivalent steel plate inputs, and its broader argument that Commerce's analysis fails to consider the physical characteristics of the finished wind towers.

Underscoring this point, Commerce on remand additionally compared the per-unit costs for four CONNUMs for which DKSC made steel plate purchases in

May 2018.  Appx65, Appx69.  To do so, Commerce examined DKSC's steel plate purchases for wind towers that DKSC sold to four different wind tower projects in the United States, each having different physical characteristics.  *Id.*; Appx72-75. Although the steel plate consumed for these four projects entailed a wide range of physical characteristics (*e.g.*, wind tower weight ranging from [ # ] to [ # ] MT, and height ranging from [ # ] to [ # ] m), as well as steel plate dimensions (*e.g.*, thickness ranging from [ # ] to [ # ] mm, widths ranging from [ # ] to [ # ] mm, and heights ranging from [ # ] to [ # ] mm), the per-unit cost for the steel plate was once again very similar.  *Id.*  Contrary to DKSC's reporting of significantly different steel plate costs for different CONNUMs, the cost difference between these physically different CONNUMs ranged only from [ # ] to [ # ] KRW/kg.  *See id.*  The negligible cost differences again demonstrate that, when timing is neutralized, "the per-unit costs of steel plate did not fluctuate, despite the wide range of dimensions for the steel plate purchased during this period {for four separate CONNUMs.}"  Appx65.  Hence, rather than merely demonstrating that "similar steel plate inputs with similar dimensions and grades purchased in the same month had similar costs," DKSC Br. 35, Commerce showed that DKSC's varying costs were unrelated to its products' physical characteristics.

Further underscoring Commerce's finding that timing was the key factor causing differences in DKSC's steel plate costs, Commerce also analyzed the steel

plate costs for the *same* CONNUM across different time periods.  Appx69.  It found that for CONNUM [      CONNUM Number      ] the per-unit costs of steel plate increased from [ # ] KRW/kg in May 2018 to [ # ] KRW/kg in September 2018.  Appx69 (discussing information on Appx72-75).  Neither the physical characteristics of the wind tower, nor the type of steel plate purchased for its construction changed during this period; thus, the remaining factor to produce the increased steel plate price was the timing of the purchases.  *See* Appx69-70; *Dongkuk II*, 600 F. Supp. 3d at 1338 (citing this aspect of Commerce's analysis).

With respect to DKSC's references to steel grades, DKSC Br. 27, 33-35, Commerce "examined whether steel plate purchase prices fluctuated based on the grade of steel plate purchased."  Appx66 (citing Appx72-75).  Commerce found that DKSC incurred the *same* per-unit steel plate cost in the month of September 2018 for both "low" and "high" steel grades used to produce wind towers for a third-country market (Japan).  *Id.* (citing Appx72-75; Appx1393-1394, Appx1403-1413).  Further, during the same month, DKSC's per-unit steel plate cost for the "higher" grade steel plate used to produce wind towers for the United States was slightly lower.  *Id.*  Commerce thus demonstrated that DKSC's claims that certain steel grades result in lower or higher costs for the wind tower lacks merit.

More broadly, it was precisely Commerce's attention to the physical characteristics of the wind towers and steel plate inputs that enabled Commerce to

determine that, despite DKSC's reporting of significant cost differences among CONNUMs, the actual per-unit costs did not vary significantly when timing was held constant. The differing physical characteristics of the CONNUMs were thus crucial to Commerce's analysis, and enabled it to conclude "that the material cost differences DKSC reported in its cost database were not attributable to the physical characteristics defining the CONNUMs." Appx49. Commerce's analyses comparing CONNUMs with differing physical characteristics and finding that they still exhibited very similar unit costs thus supports Commerce's weight-averaging (cost-smoothing) determination.

## III.    Commerce's Calculation Of DKSC's Constructed Value Profit And Selling Expenses Is Supported By Substantial Evidence And Lawful

Commerce reasonably determined that the fiscal year 2018 consolidated financial statement of SSHC, a Korean producer of comparable merchandise with sales in Korea, was the best available information on the record for calculating DKSC's constructed value profit and selling expenses. This Court should thus affirm the trial court decision sustaining Commerce's determination.

When calculating dumping margins, Commerce normally compares the "export price" or "constructed export price" of merchandise under investigation, meaning the price in the United States market, to "normal value," meaning the price in the home market or in a third-country market. 19 U.S.C. §§ 1677(35), 1677b(a)(1)(A)-(C). In other words, Commerce would compare the price of wind

towers in the United States to wind tower prices in Korea as the exporting country

or in a third country comparison market (in this case, Japan, because DKSC lacked

a viable home market).  Appx1372.  Because Commerce determined that DKSC

did not have any above-cost wind tower sales in Japan (the comparison market), it

could not calculate normal value on that basis, and relied on a constructed value as

the normal value.  Appx1709; *see* 19 U.S.C. §§ 1677b(a)(4), (b)(1); Statement of

Administrative Action Accompanying the Uruguay Round Agreements Act, H.R.

Rep. No. 103-316, at 839 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4175

(SAA) ("constructed value serves as a proxy for a sales price").[8]

The statute directs Commerce to calculate the constructed value of imported

merchandise based on the sum of (1) the cost of materials and fabrication or other

processing employed in producing the merchandise; and (2) the amounts incurred

for selling, general, and administrative (SG&A) expenses, interest expenses, U.S.

packing expenses, and profit in the exporting country.  *See* Appx1709; 19 U.S.C.

§ 1677b(e).  This statutorily preferred method expresses a preference for profit and

selling expenses reflecting production and sale of the foreign like product in the

exporting country.  *See* SAA at 839, *reprinted in* 1994 U.S.C.C.A.N. 4175-76.

---

[8] Pursuant to 19 U.S.C. § 3512(d), the SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."

If the preferred method is unavailable, the statute provides alternative methods for Commerce to calculate SG&A expenses and profit.  Under 19 U.S.C. § 1677b(e)(2)(B)(i) through (iii), Commerce has discretion to select from any of three alternative methods, depending on the information available on the record.  Appx1709.  The statute does not establish a hierarchy for selecting among these three alternatives.  *See* SAA at 840 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4176 ("At the outset, it should be emphasized that . . . new section {1677b}(e)(2)(B)} does not establish a hierarchy or preference among these alternative methods.  Further, no one approach is necessarily appropriate for use in all cases.").  Hence, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data." *Id.*

In this case, Commerce determined that alternatives (i) and (ii) were unavailable, respectively, because DKSC's other products were not in the same general category of merchandise as wind towers and because there were no other exporters or producers subject to Commerce's investigation.  Appx1375-1376; Appx1710.  Therefore, Commerce calculated constructed value profit and selling expenses under section 1677b(e)(2)(B)(iii), which provides that SG&A and profit may be calculated using:

> (iii) the amounts incurred and realized or selling, general, and administrative expenses, and for profits, *based on any other reasonable method*, except that the amount allowed for profit may not exceed the amount normally realized by

42

> exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise;

19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added).  The profit and selling expenses data used based on "any reasonable method" under subpart (iii) may, but do not have to, come from the exporting country or pertain to a foreign like product.

In employing "any reasonable method," Commerce followed its previous approach in *Pure Magnesium from Israel* and evaluated potential surrogate data sources submitted by DKSC and WTTC.  *See* 66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001), at IDM Cmt. 8.  In *Pure Magnesium from Israel*, Commerce weighed three criteria to determine the most appropriate profit and selling expenses data:  (1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to which the financial data of the surrogate company reflect sales in the United States as well as the home market; and (3) the contemporaneity of the surrogate data to the period of investigation.  *See* Appx1711.  Commerce subsequently added a fourth criterion, in *Certain Color Television Receivers from Malaysia*, focusing on the extent to which the customer base of the surrogate and respondent companies are similar.  *See* 69 Fed. Reg. 20,592 (Dep't of Commerce Apr. 16, 2004)*, at IDM Cmt. 26 (*CTVs from Malaysia*).  Commerce additionally

considered its "practice regarding completeness (*i.e.*, having complete and fully

translated audited financial statements and accompanying notes on the record)."

Appx1711 (citing Appx1384-1485).

Guided by this practice, Commerce found that SSHC's consolidated 2018

financial statement was the best available information on the record for calculating

DKSC's constructed value profit and selling expenses.  Specifically, SSHC's 2018

consolidated financial statement was the only source on the record that included a

full twelve months of financial data and reflected profits and selling expenses for

the production and sale of comparable merchandise in Korea.  *See* Appx1712.

Although interested parties submitted 10 financial statements and a cost calculation

memorandum for Commerce to consider as data sources, Commerce determined

that each of these alternate sources fell short of meeting the requisite criteria.  *See*

Appx1711-1712 ("we find the financial data from all companies except SeAH

Steel Holdings Corporation fail to meet the necessary criteria").

Importantly, DKSC does not deny that SSHC's consolidated financial

statement reflects profits on the production and sale of comparable merchandise in

Korea, or that it included a full year of financial data (unlike the other financial

statements on the record).  DKSC Br. 41, 42 (stating that "SSHC's consolidated

financial statement had no correlation with the production and sale of comparable

merchandise in Korea," but recognizing that SSHC, in fact, had "steel production

and sales activities in the Korean market."). DKSC argues, however, that it was unreasonable for Commerce to rely on SSHC's financial statement because a high percentage of SSHC's sales were made outside Korea and a high percentage of its profits were earned in non-steel activities. *See id.* at 42 ("But, at most, only 7.32 percent of SSHC's consolidated financial data related to steel production and sales activities in the Korean market."). DKSC thus argues that Commerce's reliance on SSHC's financial data results in constructed value profit and selling expenses that do not reflect the sales experience of a comparable producer in the Korean market. *See id.* at 41-42. DKSC asserts that Commerce instead should have selected an unconsolidated financial statement covering a four-month portion of 2018 from SeAH Steel Corporation, a Korean producer of steel pipe, because SeAH Steel Corporation is a producer of comparable merchandise with a greater percentage of its comparable merchandise sales in Korea. *See id.* at 42-43.

DKSC's disagreement with Commerce's weighing of the record evidence is not a valid basis to overturn Commerce's reasonable determination. *See Downhole Pipe*, 776 F.3d at 1376-77 (Court does not reweigh evidence); *Cleo*, 501 F.3d at 1296 (similar holding); *see also Dongkuk II*, 600 F. Supp. 3d at 1340 ("While Plaintiff may have preferred that Commerce select SeAH Steel Corporation's financial statement, Plaintiff has failed to demonstrate that Commerce acted unreasonably by selecting SHCC's statement instead.").

Commerce acknowledged that that SSHC's consolidated financial statement includes business activities unrelated to sales of comparable merchandise in Korea, but determined that it nonetheless "represents the best option from among the sources on the record" because it was the "only option on the record that includes 12 months of financial data, and reflects profits on the production and sale of comparable merchandise . . . in the Korean market."  Appx1712; *see also Dongkuk II*, 600 F. Supp. 3d at 1340.  Conversely, regarding the unconsolidated SeAH Steel Corporation financial statement, and given that the investigation period spans a full year, Commerce reasonably determined that four months of financial data is a less preferrable alternative to data that includes a full year of sales.  *See id.*  This falls squarely within Commerce's "broad discretion to determine the best available information for an antidumping {investigation}."  *QVD Food*, 658 F.3d at 1323; *cf. Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001) ("The process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise." (citation omitted)).

Moreover, in weighing criteria in the *Pure Magnesium from Israel* analysis, there is no rule that Commerce must select financial data from the company with the highest percentage of comparable merchandise sales in the exporting country. DKSC nonetheless argues that SeAH Steel Corporation's financial statement is

46

superior to SSHC because of its higher percentage of comparable merchandise sales in Korea. *See* DKSC Br. 42-43. Again, however, Commerce acknowledged that SeAH Steel Corporation was a steel producer located in Korea. Appx1712; *Dongkuk II*, 600 F. Supp. 3d at 1340.

DKSC discounts the critical fact that SeAH Steel Corporation's financial statement represents, at best, an incomplete year. DKSC asserts that the financial statement "satisfied the 'contemporaneity' factor because the data overlapped with the {period of investigation}" and that the relative timespan of the financial statement is irrelevant. DKSC Br. 43. The issue, however, is not whether SeAH Steel Corporation's financial statement is contemporaneous with the period of investigation; the issue is that using financial data that represent only *one-third* of a year is not indicative of normal profit. Indeed, DKSC has stated that a wind tower can take more than four months to produce. *See* Appx831 ("Tower projects are long term projects that require more than six months for the production time in order to produce each order tower set by section."). Such a limited financial picture does not represent a profit and selling expenses amount "normally realized by exporters or producers" that can be compared to sales prices covering a one-year period of time. *See* 19 U.S.C. § 1677b(e)(2)(B)(iii). Thus, SeAH Steel Corporation's financial statement is not suitable surrogate data for calculating constructed value profit and selling expenses.

In sum, Commerce reasonably found that SSHC's financial statement provided the only financial data that reflected profits and selling expenses for the production and sale of comparable merchandise in the Korean market, while also providing a full twelve months of financial data. Thus, Commerce's determination that SSHC's profit and selling expense data were the best available information for calculating a constructed value for DKSC is reasonable, supported by substantial evidence, and otherwise lawful. Commerce's methodology and its analysis are within the bounds of its statutory authority and should be sustained.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the trial court's judgment.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                    /s/ Joshua E. Kurland
JESUS N. SAENZ                                 JOSHUA E. KURLAND
Attorney                                       Senior Trial Attorney
Department of Commerce                         U.S. Department of Justice
Office of the Chief Counsel                    Civil Division
for Trade Enforcement & Compliance             Commercial Litigation Branch
U.S. Department of Commerce                     P.O. Box 480, Ben Franklin Station
                                               Washington, D.C.  20044
                                               Tel: (202) 616-0477
                                               Fax: (202) 353-0461
                                               Email: Joshua.E.Kurland@usdoj.gov


July 12, 2023                                  *Attorneys for Defendant-Appellee*
                                               *United States*


49

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7) and Federal Circuit Rule 32(b), the undersigned certifies that the word processing software used to prepare this brief indicates there are a total of 11,031 words, excluding the portions of the brief identified in the rules. The brief complies with the typeface requirements and type style requirements of Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

<u>/s/ Joshua E. Kurland</u>

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF CONFIDENTIAL MATERIAL</u>

**Case Number:** 2023-1419 ⊞

**Short Case Caption:** Dongkuk S&C Co., Ltd. v. United States

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains _____18_____ number of unique words (including numbers) marked confidential.

☐      This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑      This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐      This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 07/12/2023

Signature: /s/ Joshua E. Kurland

Name: Joshua E. Kurland

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2023-1419

**Short Case Caption** Dongkuk S&C Co., Ltd. v. United States

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on ___07/12/2023___

by ☐ U.S. Mail ☐ Hand Delivery ☐ Email ☐ Facsimile
☑ Other: _Encrypted Email_

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Jarrod Goldfeder | Trade Pacific PLLC, 700 Pennsylvania Avenue SE, Suite 500, Washington, DC 20003, jgoldfeder@tradepacificlaw.com |
| Alan H. Price | Wiley Rein, LLP, 2050 M Street NW, Washington, DC 20036, aprice@wiley.law |
| | |
| | |
| | |

☐ Additional pages attached.

Date: _07/12/2023_

Signature: _/s/ Joshua E. Kurland_

Name: _Joshua E. Kurland_