NON-CONFIDENTIAL VERSION

2023-1419

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DONGKUK S&C CO., LTD.,

Plaintiff – Appellant

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendants – Appellees

Appeal from the United States Court of International Trade in
Case No. 1:20-cv-03686-LMG, Judge Leo M. Gordon

## RESPONSE BRIEF OF DEFENDANT-APPELLEE
## WIND TOWER TRADE COALITION

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
202-719-7000

*Counsel to Wind Tower Trade
Coalition*

Dated: July 12, 2023

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-1419 |
| **Short Case Caption** | Dongkuk S&C Co., Ltd. v. US |
| **Filing Party/Entity** | Wind Tower Trade Coalition - Defendant-Appellee |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/06/2023

Signature: /s/ Alan H. Price

Name: Alan H. Price

FORM 9. Certificate of Interest

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Wind Tower Trade Coalition | | Arcosa Wind Towers, Inc. is wholly owned by Arcosa, Inc., a publicly owned company |
| | | Broadwind Towers, Inc. is wholly owned by Broadwind Energy, Inc., a publicly traded company |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| Daniel B. Pickard | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF RELATED CASES.............................................1

III.  STATEMENT OF THE ISSUES ......................................................2

IV.   STATEMENT OF THE CASE ..........................................................3

V.    STATEMENT OF FACTS .................................................................4

    A.    Cost Smoothing CTL Plate Prices..........................................4

    B.    Selecting SSHC's Financial Statement as the Basis for CV
        Profit ..............................................................................................11

VI.   SUMMARY OF ARGUMENT ........................................................13

VII.  ARGUMENT......................................................................................14

    A.    Commerce's Decision to Weight-Average and Adjust
        DKSC's Steel Plate Prices Was Necessary to Account for
        Cost Differences Unrelated to Physical Characteristics .....................14

        1.    Commerce Reasonably Determined That Cost
            Differences Were Unrelated to Physical
            Characteristics of the Finished Wind Towers Based
            on Substantial Record Evidence ...............................14

        2.    Commerce Reasonably Linked the Physical
            Characteristics of Steel Plates and Wind Towers ....................25

        3.    Commerce Reasonably Found that Cost Differences
            Were Related to the Timing of Steel Plate Purchases
            ...............................................................................28

    B.    Commerce's Selection of SeAH's Consolidated Financial
        Statements to Calculate DKSC's Profit and Selling
        Expenses Is Supported by Substantial Evidence and
        Otherwise Lawful ........................................................................35

VIII. CONCLUSION..................................................................................44

i

## **CONFIDENTIAL MATERIAL OMITTED**

The confidential material omitted from this brief at pages 6-8, 10, 20-21, 23, 29-31 relates to the grades, specifications, and absolute and relative prices of DKSC's steel plate inputs, which were reported in DKSC's questionnaire responses. The confidential material omitted from this brief at pages 10, 20-22, 30-31 relates to the merchandise DKSC sold during the period of investigation in the underlying administrative investigation, which were reported in DKSC's questionnaire responses.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atar S.R.L. v. United States*,
    730 F.3d 1320 (Fed. Cir. 2013) ...........................................................42

*Consol. Edison Co. of New York v. NLRB*,
    305 U.S. 197 (1938)...........................................................................38

*Dongkuk S&C Co. v. United States*,
    548 F. Supp. 3d 1376 (Ct. Int'l Trade 2021) ...........................9, 12, 24

*Dongkuk S&C Co. v. United States*,
    600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) ................................*passim*

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015) ...........................................................43

*Marmen Inc. v. United States*,
    545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021) ...........................2, 16, 34

*Marmen Inc. v. United States*,
    627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023) .........................................2

*Maverick Tube Corp. v. United States*,
    107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) .....................................37

*Mid Continent Steel & Wire, Inc. v. United States*,
    940 F.3d 662 (Fed. Cir. 2019) .............................................................38

*NEXTEEL Co. v. United States*,
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .........................15, 16, 18

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ....................................................31, 38

*Pastificio Lucio Garofalo, S.p.A. v. United States*,
    783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011) .......................................38

*Thai I-Mei Frozen Foods Co. v. United States*,
    616 F.3d 1300 (Fed. Cir. 2010) ...........................................................42

*Thai Plastic Bags Indus. Co. v. United States*,
746 F.3d 1358 (Fed. Cir. 2014) ........................................15, 18, 22, 31

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..................................................................25

19 U.S.C. § 1677(35) ..............................................................................35

19 U.S.C. § 1677b(a)(1)(A) .....................................................................35

19 U.S.C. § 1677b(a)(1)(B) .....................................................................35

19 U.S.C. § 1677b(a)(1)(C) .....................................................................35

19 U.S.C. § 1677b(a)(4)......................................................................14, 35

19 U.S.C. § 1677b(b) ...............................................................................15

19 U.S.C. § 1677b(b)(1) ..........................................................................14

19 U.S.C. § 1677b(e) ...............................................................................35

19 U.S.C. § 1677b(e)(2)(B) .....................................................................36

19 U.S.C. § 1677b(e)(2)(B)(iii) ..........................................................37, 42

19 U.S.C. § 1677b(f) ................................................................................15

19 U.S.C. § 1677b(f)(1)(A).............................................................15, 18, 31

**Administrative Materials**

*Carbon and Alloy Steel Wire Rod from the Republic of Korea*,
86 Fed. Reg. 15,461 (Dep't Commerce Mar. 23, 2021)....................16

*Certain Pasta from Italy*,
83 Fed. Reg. 63,627 (Dep't Commerce Dec. 11, 2018) ...............16, 33

*Welded Carbon Steel Standard Pipe and Tube Products from Turkey*,
82 Fed. Reg. 49,179 (Dep't Commerce Oct. 24, 2017)....................17

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Rep. No. 103-316, Vol. I (1994), *reprinted in* 1994
    U.S.C.C.A.N. 4040 .......................................................................................15, 36

## I.    <u>INTRODUCTION</u>

On behalf of Defendant-Appellee the Wind Tower Trade Coalition ("WTTC"), we respectfully submit this response to the April 19, 2023, corrected opening brief of Plaintiff-Appellant Dongkuk S&C Co., Ltd. ("DKSC"). *See* Pl.-Appellant's Corrected Opening Brief (Apr. 19, 2023), ECF No. 18 ("DKSC's Corrected Br.").

## II.    <u>STATEMENT OF RELATED CASES</u>

The WTTC, like DKSC, is unaware of any appeals in or from the same civil action or proceeding in the originating tribunal that was previously before this or any other appellate court. As DKSC recognizes, it has appealed of the final results of the first antidumping administrative review of *Utility Scale Wind Towers from the Republic of Korea* at the U.S. Court of International Trade ("CIT"), which also involves the U.S. Department of Commerce's ("Commerce") cost smoothing of steel plate. *See* DKSC's Corrected Br. at vi.

The WTTC is aware of one case that may be considered "related" under Federal Circuit Rule 47.5: *Marmen Inc. v. United States*, CAFC No. 23-1877. Like this appeal, *Marmen Inc. v. United States* concerns the appeal of an antidumping duty investigation determination by Commerce relating to the treatment of cost differences for the steel plate inputs used in utility scale wind towers ("wind towers") (in that case, related to imports from Canada rather than Korea). The CIT sustained

Commerce's determination to weight-average the plaintiff's steel plate costs. *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1315 (Ct. Int'l Trade 2021). After remanding separate issues for redetermination, the CIT sustained the underlying determination on March 20, 2023. *Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (Ct. Int'l Trade 2023). While this case arises from a review of a different antidumping duty order, counsel believes this case may be considered a "related" case and rise beyond "general legal issues" due to the highly similar factual circumstances and issues presented. *See* Practice Note to Fed. Cir. R. 47.5.

## III.  STATEMENT OF THE ISSUES[1]

1.  Whether Commerce appropriately adjusted DKSC's reported costs for steel cut-to-length ("CTL") plate, the primary input in wind towers, where the agency found that differences in CTL plate costs were related to the timing of the CTL plate's purchase, not the wind towers' physical characteristics.

2.  Whether Commerce's decision to rely on SeAH Steel Holdings Corporation's ("SSHC") 2018 consolidated financial statements, which reflected full-year sales of comparable merchandise in the Korean

---

[1]  WTTC agrees with DKSC's jurisdictional statement, and therefore does not provide a separate jurisdictional statement, consistent with Federal Circuit Rule 28(b).

market, to calculate constructed value ("CV") was supported by substantial evidence and in accordance with law.

## IV.   <u>STATEMENT OF THE CASE</u>

DKSC appeals the CIT's decision in *Dongkuk S&C Co., Ltd. v. United States*, Appx78-93, sustaining Commerce's final affirmative determination in an antidumping duty investigation into wind towers from the Republic of Korea ("Korea"). DKSC asks this Court to reweigh Commerce's factual findings through an unlawfully narrow lens and overturn the agency's decision. Contrary to DKSC's arguments, Commerce's decision was based on substantial evidence and otherwise lawful.

In antidumping duty investigations, Commerce may only rely on reported costs that reasonably reflect the production and sale of the merchandise at issue. Accordingly, Commerce must adjust costs for differences unrelated to a product's physical characteristics. Here, DKSC reported costs that differed significantly depending on when the product's primary input (*i.e.*, CTL plate) was purchased, rather than on physical differences between the products. As such, Commerce weight-averaged these costs to mitigate the distortive influence of timing in a practice commonly known as "cost smoothing." On remand from the CIT, Commerce thoroughly explained why CTL plate price differences were unrelated to product characteristics and why cost smoothing was therefore necessary, and the

CIT sustained Commerce's rationale. Commerce's determination, as explained on remand, and the CIT's ruling sustaining that determination should be upheld.

Likewise, Commerce's decision to rely on SSHC's financial statements to calculate CV was lawful and supported by substantial evidence. Where a foreign producer's home-market and third-country sales cannot be accurately compared to U.S. sales in the dumping margin calculation, Commerce will use CV. Commerce relies, in part, on information from producers of identical or comparable merchandise to develop CV. Here, parties provided various sources of financial information, and Commerce found that each of these sources had shortcomings. Commerce ultimately selected financial statements that both reflected sales of comparable merchandise and represented a full fiscal year, rather than a financial statement that reflected sales of comparable merchandise but reflected only four months of financial results. Commerce explained its rationale in light of the relevant statute, and the CIT sustained Commerce's decision. Commerce's decision should therefore be upheld again.

## V.    STATEMENT OF FACTS

### A.    Cost Smoothing CTL Plate Prices

Wind towers are massive steel tubular structures that constitute the structural component of a complete wind turbine, and a wind tower's primary input is thick CTL plate. A wind tower holds the nacelle and the blades at heights where higher

wind speeds can turn the rotor to generate electricity. *See* Appx109-110. The manufacturing process for wind towers is relatively straightforward. A large steel plate is rolled into a cylinder and welded to form a "can." *See* Appx111-112. Several of these cans are then welded together end-to-end to form a tower section. *See* Appx112. Producers then add flanges, paint the section, and install internal bracketing and wiring. *See* Appx112-114. There are multiple sections in a complete wind tower, meaning a complete wind tower will incorporate numerous steel plates. While the production process also requires smaller direct inputs—such as paint, bracketing, wiring, and flanges—steel plates represent the majority of the cost of a wind tower. *See, e.g.*, Appx1392. As a result, reported plate costs have a significant effect on a producer's overall reported costs.

On July 9, 2019, the WTTC petitioned Commerce for trade relief from unfairly dumped wind towers from Korea. *See* Appx115. DKSC was selected as a mandatory respondent, Appx433, and Commerce normally only requires respondents to report costs they incurred during the period of investigation ("POI"). *See, e.g.*, Appx528. However, DKSC explained that its towers take a "considerable amount of time to produce, sometimes up to six or eight months after receiving a customer order," meaning projects began, and costs were incurred, before the POI, even for towers produced during the POI. *See* Appx673-674. Therefore, Commerce

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

asked DKSC to report all costs for any tower completed during the POI, even if the costs related to those towers were incurred before the POI. *See* Appx679-681.

The costs for DKSC's CTL plate depend on the timing of their purchase. DKSC purchased and consumed plate in [   **Time**   ] of the POI. Appx751-756. According to DKSC, "{w}ind tower construction transactions are entirely independent of the steel plate transactions." Appx2023.[2] "{R}aw material costs are determined based on negotiations reflecting the steel plate market situation." *Id.* DKSC tracked and reported its plate costs on a project-specific basis during the POI, Appx2021-2022, and "only purchased steel plates" from an "unaffiliated supplier" during the POI. *See id.* As such, the steel plate costs reported for each project are dependent on the condition of the steel plate market when DKSC negotiated for the steel plate.

The type of steel plate used in the tower depends on the physical properties of the tower. DKSC reported that its customers "conduct{} a structural review of . . . the wind tower" to determine what type of plate should be used, based on a standard set of guidelines from the International Electrotechnical Commission.

---

[2]     An excerpted version of DKSC's December 9, 2019 Supplemental Questionnaire from the underlying administrative record was included at Appx830-852 (Tab 22). Defendant-Appellee is including the remainder of the narrative from this document at Appx2012-2024 (Tab 40).

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

*See* Appx1392. A customer's specific requests "sometimes dictate which steel plates DKSC will use," *see id.*, such as specifying the particular steel grade. *See* Appx1393.

In a February 5, 2020 questionnaire, Commerce noted that, based on DKSC's reporting, "it appears that all CONNUMs sold in {Japan} have [        **Amount**        ] steel plate cost than CONNUMs sold in the US."[3] *See id.* DKSC attributed this cost difference to the timing of the plate purchases. *See id.* Specifically, DKSC explained that "{f}or DKSC's sales of wind towers to Japan, the raw material orders were placed in July 2017—one year prior to the start of the POI," though the specific wind towers were sold during the POI. *See id.* At the time DKSC ordered the plate used to produce the wind towers sold in Japan, "raw material prices were generally low." *See id.* On the other hand, the U.S. tower sales used plate ordered in September 2018—"when raw material prices were high." *See id.* DKSC also claimed that "a direct correlation exists between the dimension of tower and the steel plates used to produce that tower." *See* Appx1394. In addition to timing, DKSC claimed that yield strength may also have an impact on pricing. *See id.*

---

[3]    CONNUM is an abbreviation for "control number," which is a coded number that Commerce uses to identify the certain characteristics of each product. Each number within a CONNUM refers to a corresponding value for a particular characteristic of the product. Commerce compares products with identical or similar CONNUMs to ensure apples-to-apples comparisons and develop sales margins used in the dumping calculation. In this case, a CONNUM describes a specific wind tower's features, such as tower height and tower weight.

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

In Commerce's preliminary determination, it attempted to remove these timing-related cost distortions for DKSC's primary input. Appx1378, Appx1382. Commerce attributed these substantial and unreasonable cost differences to factors unrelated to the wind tower's physical characteristics, consistent with DKSC's reporting, and it weight averaged plate costs between all reported CONNUMs. Appx1378, Appx1382. The weight averaging resulted in an upward adjustment to the costs of production for Japanese sales. *See* Appx1378, Appx1382. Correcting for timing-related differences revealed that all of DKSC's Japanese sales were sold at prices below the cost of production, and Commerce therefore relied on CV to determine normal value, rather than the Japanese sales. Appx1378.

This decision remained unchanged in Commerce's final determination. *See* Appx1966-1967. Commerce compared steel plate purchases from the same month (*i.e.*, September 2018) for Japanese and U.S. towers made in the same month and found that per-unit steel plate prices were nearly identical, despite numerous different dimensions and several grades of plate. *See* Appx1966-1967, Appx1969. Specifically, Japanese plate prices were [ # ] Korean won ("KRW") per kilogram ("kg") regardless of dimension, while grades used in U.S. towers were [ # ] KRW/kg regardless of dimension. *See* Appx1966-1967, Appx1969. Commerce continued to adjust plate costs to account for timing-related differences in prices. *See* Appx1966-1967.

On appeal, the CIT remanded Commerce's plate cost smoothing decision for more explanation. The CIT noted that a wind tower's height and weight were two of the most significant physical characteristics. *Dongkuk S&C Co. v. United States*, 548 F. Supp. 3d 1376, 1380 (Ct. Int'l Trade 2021) ("*DKSC I*"). The CIT ruled that Commerce did not adequately consider these physical characteristics, as Commerce claimed, and that Commerce only compared costs for Japanese and U.S. plate within the same month. *Id.* at 1381. The court also dismissed as a *post hac rationalization*, that Commerce's practice is to adjust unreasonable input costs. *See id.* at 1381-82. The Court therefore ruled that Commerce's finding that "DKSC's reported costs did not reflect the cost to produce and sell the subject merchandise" was unsupported, and it remanded Commerce's decision for "further explanation, and if appropriate, reconsideration." *See id.* at 1382.

Commerce provided this further explanation on remand. Commerce expanded its analysis to compare steel plate purchased in May 2018 for several different CONNUMs (*i.e.*, tower types), in addition to steel plate purchased for different sets of towers in September 2018. *See* Appx48-49. Commerce's remand analysis compared plate costs between identical and similar towers using the reported tower CONNUMs' height and weights—*i.e.*, the physical characteristics of the merchandise—which it had not relied on in its underlying investigation. *Compare* Appx1969, *with* Appx73. While comparisons of towers with identical or similar

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

heights and weights should have similar plate costs under DKSC's theory, Commerce found that these towers had different per-unit plate costs depending on the month that the plate was purchased (*i.e.*, depending on timing). *See* Appx65, Appx75. Commerce made the following observations based on its analysis, which each supported its conclusion that plate cost differences between similar towers were unrelated to the towers' physical characteristics:

- "Steel plate purchase unit costs increase from May 2018 to September 2018. However, the steel plate prices remain virtually the same within the same month despite various dimensions of steel plate." *See* Appx73.

- "SEQ 2 & 6 are used for the same CONNUM," yet "Steel plate unit costs increased from May 2018 to September 2018." *Id.*

- "DKSC claimed lower steel grade ([ **Grade** ]) generally results in lower costs, however, it shows that the steel plate cost is the same between higher and lower steel grade ([ **Grade** ])." *Id.*

- "DKSC claimed that SEQ 5 wind tower is the [ **Description** ] wind tower, and it will result the {sic} highest steel plate costs. Yet the record showed that the SEQ 5 wind tower steel plate purchase cost is [description] than the other '[ **Description** ]' wind towers." *Id.*

Commerce emphasized that it "based its determination on the record evidence that the physical characteristics of the finished wind tower (which, in turn, determined the dimensions and grades of the steel plate consumed in its manufacture), did not explain the significant cost differences observed." Appx68. Additionally, Commerce explained its decision to smooth plate costs in light of its past practice to smooth input costs unrelated to the cost of the finished product. *See* Appx51-52.

The CIT found that Commerce's approach was reasonable, acknowledging that Commerce had compared products with similar height and weight characteristics within the same months as well as comparing products with similar heights and weights across separate months. *Dongkuk S&C Co. v. United States*, 600 F. Supp. 3d 1331, 1338 (Ct. Int'l Trade 2022) ("*DKSC II*"). Based on this analysis and Commerce's practice in previous decisions, the CIT found that "it was reasonable for Commerce to determine that DKSC's reported costs were not reflective of the costs associated with the production and sale of the subject merchandise and to adjust those costs accordingly." *Id.* The CIT sustained Commerce's remand determination.

## B.    <u>Selecting SSHC's Financial Statement as the Basis for CV Profit</u>

In the underlying investigation, Commerce found that all DKSC's sales were below the cost of production, due to the cost smoothing analysis discussed above, and requested that parties provide sources of financial information that could serve as a surrogate for DKSC's profit and selling expenses experience (*i.e.*, as the basis for calculating CV). *See* Appx1384-1385. Parties identified and submitted information pertaining to eleven potential sources. *See* Appx1710. Commerce found that one source's underlying financial statements were not on the record, one source represented only service revenues (not product manufacturing), five sources were from companies that did not appear to produce merchandise comparable to wind

towers, two sources did not have production or sales in the Korean market, and one source (*i.e.*, SeAH Steel Corporation's ("SeAH") unconsolidated financial data) only represented four months of financial data. *See* Appx1711-1712. While the remaining source, SSHC's financial statements, included activity from comparable and non-comparable merchandise, these financial statements were the only available option that included a complete year of financial data and reflected profits of the production and sale of comparable merchandise in Korea. Appx1712. As such, Commerce determined that SSHC's financial statements were the best available source to approximate DKSC's profit and selling expense experience. *See id.*

DKSC appealed Commerce's selection, arguing that Commerce should have used SeAH's unconsolidated, 4-month financial data instead. *See generally* Appx2049-2057. The CIT first held this challenge in abeyance, recognizing that Commerce's remand determination on the cost smoothing issue could impact whether it would need to rely on CV. *DKSC I*, 548 F. Supp. 3d at 1382. However, after Commerce continued to smooth DKSC's plate costs on remand, the CIT upheld Commerce's decision to rely on SSHC's financial statements. *DKSC II*, 600 F. Supp. 3d at 1340 ("While {DKSC} may have preferred that Commerce select SeAH Steel Corporation's financial statement, {DKSC} has failed to demonstrate that Commerce acted unreasonably by selecting {SSHC's} statement instead"). This appeal followed.

## VI.    **SUMMARY OF ARGUMENT**

DKSC challenges two aspects of Commerce's final determination in the antidumping duty investigation into wind towers from Korea but fails to provide an adequate reason for the Court to displace the agency's finding.

First, Appellants argue that Commerce erred when it smoothed DKSC's steel plate costs. However, Commerce relied on record evidence demonstrating that the differences in the cost of the subject merchandise were not related to differences in the physical characteristics of the wind towers. Rather, the timing of the purchases of the main input significantly influenced the overall cost of the input and each tower. Commerce's methodology to identify and correct for these distortions was reasonable and consistent with its statutory duties and authorities, previous court decisions, and the agency's past practice.

Second, DKSC argues that Commerce selected an inappropriate source for CV information. Commerce selected a basis for CV information from among multiple potential sources. While Commerce recognized that each potential source had its shortcomings, it fully explained its decision to rely on SSHC's financial statements, which best represented the full-year profit experience of a Korean manufacturer of comparable merchandise. The agency's selection from among available options was reasonable and in accordance with law.

## VII. __ARGUMENT__[4]

### A. __Commerce's Decision to Weight-Average and Adjust DKSC's Steel Plate Prices Was Necessary to Account for Cost Differences Unrelated to Physical Characteristics__

#### 1. Commerce Reasonably Determined That Cost Differences Were Unrelated to Physical Characteristics of the Finished Wind Towers Based on Substantial Record Evidence

At the most fundamental level, a dumping margin is the gap between a foreign respondent's home market sales prices and U.S. sales prices for the same merchandise. 19 U.S.C. § 1677b(a).[5] When a foreign respondent's home market sales cannot be used in this comparison, the respondent's sale prices to a third country are used instead. *Id.* § 1677b(a)(1)(C). Where home market and third-country sales both are unavailable or unusable, Commerce will "construct" a value to compare to U.S. sales prices. *Id.* § 1677b(a)(4). In determining whether there are home market or third-country sales to compare to U.S. sales, Commerce will disregard any sales made at less than the cost of production. *Id.* § 1677b(b)(1). In the present case, how Commerce treats costs determines whether there will be any third

---

[4]    The WTTC does not disagree with Plaintiff-Appellant's description of the standard of review, and thus does not provide a separate description of that standard here, consistent with Federal Circuit Rule 28(b).

[5]    A product is sold at less-than-fair value (*i.e.*, dumped) where normal value— typically the home market price—exceeds export price or constructed export price— *i.e.*, the U.S. price.

country (*i.e.*, Japanese) sales left to compare to U.S. sales or whether all sales are below cost, requiring reliance on CV.

Commerce has specific instructions for calculating the cost of production to determine whether sales are below cost under 19 U.S.C. § 1677b(b). *See id.* § 1677b(f). Commerce will calculate costs "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* § 1677b(f)(1)(A). This Court recognizes that costs reasonably reflect the costs associated with the production and sale of the merchandise where cost differences are "attributable to different physical characteristics." *See Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1368 (Fed. Cir. 2014); *see also NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361 (Ct. Int'l Trade 2019). This is because "physical differences in products 'generally account' for major differences in costs." *Thai Plastic Bags*, 746 F.3d at 1368. Commerce has the authority to adjust costs that do not reflect costs associated with physical differences in the production and sale of merchandise to ensure the costs it relies on are not artificially reduced or distortive of true costs. *See id.* At 1367 (quoting Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, Vol. I, at 834 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4172 ("SAA")); *NEXTEEL*, 355 F. Supp. 3d at 1361

("The law permits Commerce to make adjustments to reported costs of production so that the costs reflect differences only in the product's physical characteristics.").

Commerce has often adjusted costs where input costs are unrelated to the physical characteristics of the finished merchandise, and the CIT has upheld these decisions. *See, e.g.*, *NEXTEEL*, 355 F. Supp. 3d at 1361 (upholding Commerce's decision to adjust a respondent's costs for the finished merchandise (*i.e.*, oil country tubular goods) where variances in costs of a key input (*i.e.*, hot-rolled coil) declined substantially during the review period); *Marmen*, 545 F. Supp. 3d at 1314-15 (upholding Commerce's decision to weight-average respondent's costs for the primary input (*i.e.*, steel plate) in the finished merchandise (*i.e.*, wind towers) where the costs of the primary input was based on the timing of production and other factors unrelated to differences in physical characteristics); *see also* Issues and Decision Memorandum accompanying *Certain Pasta from Italy*, 83 Fed. Reg. 63,627 (Dep't Commerce Dec. 11, 2018) (final results of antidumping duty admin. rev.; 2016-2017) at 3-11 ("*Certain Pasta from Italy* IDM") (weight-averaging the costs of a key input (*i.e.*, semolina) to adjust for cost variations after comparing identical finished products (*i.e.*, pasta) and finding that these variations were unrelated to the finished product's physical characteristics); Issues and Decision Memorandum accompanying *Carbon and Alloy Steel Wire Rod from the Republic of Korea*, 86 Fed. Reg. 15,461 (Dep't Commerce Mar. 23, 2021) (final results of antidumping

duty admin. rev.; 2017-2019) at 10 (finding that cost smoothing was necessary where products with nearly identical product characteristics nevertheless had "significantly different material costs" due to "the effect of significantly fluctuated costs of coal and different timing of production."); *Cf.* Issues and Decision Memorandum accompanying *Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 82 Fed. Reg. 49,179 (Dep't Commerce Oct. 24, 2017) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2015-2016) at 5 (adjusting respondent's allocations of costs for a key input (*i.e.*, zinc) for failure to "take into consideration necessary physical characteristics" related to, but not included as, physical characteristics listed in the CONNUM for the finished product (*i.e.*, welded carbon pipe and tube)).

All parties agree that steel plate costs differed based on the timing of the steel plate's purchase. *See* DKSC's Corrected Br. at 8-9; Appx50.[6] However, DKSC argues that because steel plate was not listed in the CONNUM,[7] Commerce cannot

---

[6]    On one occasion, DKSC appears to contradict its prior statement that steel plate prices fluctuate during the POI. *See* DKSC's Corrected Br. at 36 ("Even if there were raw material price fluctuations during the POI . . . ."); *but see* DKSC's Corrected Br. at 9 ("Fluctuating world prices, inherent in the steel industry, therefore also affected the costs of the steel plates used in the wind tower CONNUMs that DKSC sold in the Japanese and U.S. markets.").

[7]    The CONNUM lists important physical characteristics that may vary between products. A tower's height and weight are listed second and third in the wind tower CONNUM's hierarchy of important physical characteristics in the underlying investigation. As Commerce explained and the CIT upheld, the amount of steel plate used in a tower impacts that tower's height and weight, and the cost of the steel plate

consider and adjust for variances in plate prices. DKSC's Corrected Br. at 25. This is a red herring. DKSC reads a limitation into 19 U.S.C. § 1677b(f)(1)(A) that does not exist. 19 U.S.C. § 1677b(f)(1)(A) does not restrict Commerce's analysis of "costs associated with the production and sale of the merchandise" to just the characteristics listed in the CONNUM or require a direct comparison of different types of finished merchandise. Rather, "Commerce is directed to consider all available evidence on the proper allocation of costs." *NEXTEEL*, 355 F. Supp. 3d at 1361 (citing 19 U.S.C. § 1677b(f)(1)(A)). Commerce also has discretion regarding "both the meaning of 'proper allocation' and what factors can drive the assignments of those allocations." *Thai Plastic Bags*, 746 F.3d at 1368.

Indeed, it would be nonsensical to limit Commerce's analysis of the cost of production to only costs corresponding to specific physical characteristics identified in the CONNUM. The CONNUM is simply an administrative construction used by the agency to ensure that a price comparison between two sales of subject merchandise (here, wind towers) considers sales of similar types of subject merchandise (*e.g.*, wind towers of similar size). Commerce often does not list inputs in the CONNUM; that does not mean, of course, that those inputs do not have costs that affect the subject product's cost of production or sale. "Amount of electricity

---

consumed determines the tower's raw material costs. *See DKSC II*, 600 F. Supp. 3d at 1337.

consumed," for example, is not a factor typically included in a CONNUM, yet of course electricity consumption has "costs associated with the production and sale of the merchandise" it is consumed to produce.

There is no reason that Commerce should only be able to consider costs directly associated with CONNUM characteristics.[8] DKSC's absurd approach would circumscribe Commerce's authority and prohibit Commerce from accounting for obvious cost distortions attributable to the key input in subject merchandise, contrary to the statute. Here, Commerce reasonably reallocated DKSC's plate costs after finding that variances in these costs were unrelated to a tower's primary physical characteristics—*i.e.*, height and weight. It did so based on comparisons of per-unit plate costs for various types of wind towers (*i.e.*, CONNUMs) within the same months and across different months.

First, Commerce compared DKSC's plate purchases within the same month to determine whether towers with different physical characteristics had different plate prices. *See* Appx75. If plate costs fluctuated based on the physical characteristics of the tower as DKSC claimed, the plate costs should differ between towers with different weights and heights. *See DKSC II*, 600 F. Supp. 3d at 1336. To

---

[8]     Even if this were the case, the steel plate input *is* connected to the characteristics of tower height and weight, both of which are included in the CONNUM, as discussed further in section VII.A.2 below. Dongkuk's argument would thus fail on those grounds as well.

BUSINESS PROPRIETARY        NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

test this principle, Commerce first compared a Japanese tower sale that used plate purchased in September 2018 with a [ **Description** ] U.S. tower sale incorporating plate purchased in September 2018. *See* Appx75. Despite the towers' different physical characteristics, steel plate costs for the towers were nearly the same. *See id.* (showing that steel plate unit-costs for the Japanese sale plates were [ # ] KRW per kg compared to [ # ] KRW/kg for the [ Description ] U.S.-sold tower).

Commerce also compared four types of wind towers incorporating plate that was purchased in May 2018, which had weight codes (*i.e.*, the second number in the CONNUM) ranging from [ #] (corresponding to a tower weighing between [ # ] net tons and [ # ] net tons) to [ # ] (corresponding to a tower weighing between [ # ] net tons and [ #] net tons). Appx69. These towers also had height fields (*i.e.*, the third number in the CONNUM) ranging from approximately [ #] meters to [ # ] meters. *See id.*; *see also* Appx126-128. As with the comparison of the September 2018 plate purchases, plates purchased in May 2018 had per-unit costs that were similar to one another despite the significant height and weight differences between the towers in which the plates were ultimately used. *See* Appx48, Appx 69, Appx75.

Second, Commerce compared an identical tower's plate prices across time periods. *See* Appx69-70 This was, in essence, the control group of Commerce's experiment. If changes in costs were related to physical characteristics, rather than

timing, per-unit plate prices for an identical tower should remain constant from month to month. However, the per-unit price of the wind tower classified under CONNUM [ **Value** ] "increased from [ **#** ] KRW/kg in May 2018 to [ **#** ] KRW/kg." *Id.* The physical characteristics of the towers were identical, yet the towers' plate prices fluctuated depending on the month the plate was purchased. Commerce's analysis revealed [**Description**] pricing differentials among other comparisons, and plate prices in September 2018 were [**Description** ] than plate prices in May 2018, despite similar grades and overlapping dimensions. *See* Appx75. This finding further reinforced Commerce's observation that the purchase timing of a tower's plate, not the tower's physical characteristics, were causing the cost differences. In other words, <u>when</u> the plate was purchased, not <u>what</u> plate was purchased, was the factor that resulted in the cost differential.

Notably, DKSC appears to have abandoned attempts to tie plate costs to the physical characteristics of the finished tower after Commerce explained how this approach is misguided. For example, DKSC previously claimed that the CONNUM with the lowest steel plate costs compared to the average was the CONNUM with the [ **Description** ], the [ **Description** ], and the [ **Description** ]. *See* Appx67. Yet, as Commerce pointed out, this was because the plate for this CONNUM was purchased in 2017, when steel plate costs were low. *See id*. Likewise, DKSC claimed that the [ **Description** ] tower had the highest steel plate costs, but Commerce's

BUSINESS PROPRIETARY      NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

analysis revealed that the [         **Description**         ] tower had the highest

plate costs. *See* Appx68. Ironically, DKSC's examples reinforced that differences in

plate costs were related to factors other than the physical characteristics of DKSC's

towers, and DKSC downplays these arguments on appeal.

DKSC also claims that Commerce failed to conduct a comprehensive analysis

because it only reviewed a sample of [ # ] CONNUM and plate cost comparisons,

rather than analyzing costs for all "[ # ] combined variations of weight, height, and

sections." *See* DKSC's Corrected Br. at 27; *see* Appx73 (comparing plate

dimensions and costs for [ # ] unique CONNUMs). Tellingly, DKSC has not

explained how a more comprehensive analysis would lead to a different result or

identified a single unreviewed comparison that ties plate costs to a tower's physical

characteristics. *See generally* DKSC's Corrected Br. at 22-28; *see also id.* at 36

(providing hypothetical examples of instances where plate characteristics vary

between towers of similar heights or weight). DKSC also fails to identify specific

ways Commerce's sample was unrepresentative or otherwise tainted the cost

analysis. *Cf. Thai Plastic Bags*, 746 F.3d at 1369 (rejecting respondent's claim that

Commerce's allocation methodology was unsupported by substantial evidence

where Commerce compared nine of 100 CONNUMs). As the CIT noted, DKSC's

request for a more comprehensive analysis is no more than a request for the court to

reweigh record evidence. *See DKSC II*, 600 F. Supp. 3d at 1338 (citing *Downhole*

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

*Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2015)). With agency resources and deadlines appropriately in mind, Commerce analyzed a large sample of DKSC's costs, and its thorough analysis indicated that input cost differences were related to purchase timing, not the physical characteristics of the wind towers.

Additionally, despite not referencing any established standard for "significance," DKSC alleges that Commerce "failed to demonstrate that any steel plate cost differences across CONNUMs were significant." DKSC's Corrected Br. at 27-28. However, Commerce explained that DKSC's reported steel plate costs ranged from [ # ] percent to [ # ] percent from the average reported cost and deemed this variation significant. *See* Appx49. While DKSC offered an alternative methodology, steel plate costs still varied significantly from the average reported cost. *See* Appx67. DKSC now claims, based on this latter methodology, that "{o}nly one CONNUM representing just over one percent of total production had steel plate costs that varied more than 15 percent from the average steel plate costs." DKSC's Corrected Br. at 27-28. Yet, DKSC's own analysis shows that greater than [ # ] percent of towers had prices that deviated at least [ # ] percent from the average cost of steel plate. Appx2113-2114. Given that steel plate costs comprise the majority of the costs for a wind tower, any timing-related variation can significantly distort Commerce's comparisons. Moreover, DKSC has not explained why its arbitrary

15 percent variation threshold is the only reasonable measure of "significant variation." In short, DKSC is again asking the Court to reweigh the evidence and reach a different conclusion than Commerce without showing that Commerce's decision was unreasonable. *See DKSC II*, 600 F. Supp. 3d at 1338 (citing *Downhole Pipe & Equip.*, 776 F.3d at 1376).

Finally, DKSC attempts to narrow the CIT's remand order to impugn Commerce's remand decision and the CIT's judgment upholding the remand decision. DKSC claims that "Commerce did not comply with the trial court's instructions to explain why the cost differences reported among the CONNUMs produced by DKSC were *not* attributable to the actual physical characteristics of the finished wind towers." DKSC's Corrected Br. at 15. DKSC then faults the CIT for accepting this alleged non-compliance. *Id.* at 16. However, this misinterprets the CIT's remand order.

The CIT remanded "Commerce's determination as to an adjustment for steel plate costs . . . for further explanation, and if appropriate, reconsideration of its cost analysis . . ." *DKSC I*, 548 F. Supp. 3d at 1382. The CIT was primarily concerned with Commerce's statement, which the court initially found unsupported, that Commerce used the 11 physical characteristics of the finished wind towers as "guideposts." *Id.* at 1381; *DKSC II*, 600 F. Supp. 3d at 1337. On remand, Commerce explained that the weight and height of the towers are the primary physical

characteristics of the tower that determine the dimensions and grade of steel plate required for production. Appx63. Commerce thus based its conclusion on an analysis of plate costs for CONNUMs with differing weights and heights in an isolated time and across time periods and found that costs differences were related to the timing of steel plate purchases. *See DKSC II*, 600 F. Supp. 3d at 1338. As a result of this further explanation, the CIT appropriately ruled that Commerce's decision was supported by substantial evidence. *See DKSC II*, 600 F. Supp. 3d at 1336-37 (citing 19 U.S.C. § 1516a(b)(1)(B)(i)) ("DKSC's argument ignores the fact that the standard for the court's review is whether Commerce's decision-making is reasonable given the circumstances provided by the record as a whole, not whether the agency 'complied with the court's order'").

### 2. Commerce Reasonably Linked the Physical Characteristics of Steel Plates and Wind Towers

Commerce reasonably explained how the nature of the steel plate inputs relate to the weight and height physical characteristics of the finished tower. While the steel plate input's dimensions are not part of the CONNUM, the thickness, weight, length, and width of the steel plates used in a wind tower ultimately determine the tower's physical characteristics. *See* Appx1394 ("{A} direct correlation exists between the dimensions of a tower and the steel plate used to produce that tower"). A tower's overall height and weight is a function of the plates used in its production. *See, e.g.*, Appx814-820. Because steel plate is sold on a dollars-per-ton basis, the

25

amount of steel plate consumed in producing the tower necessarily impacts the cost of the tower. As more and/or larger plates are used, the input costs for the tower will increase, although the dollar per ton of the plate may remain the same.

DKSC itself recognized on multiple occasions that steel plates are directly tied to the physical characteristics of a tower. *See* Appx1394 ("{A} direct correlation exists between the dimensions of a tower and the steel plates used to produce that tower."); DKSC's Corrected Br. at 29 ("Intuitively, taller and heavier towers require more steel plates"). While DKSC claims Commerce has taken this statement out of context in relation to the specific dimensions of the plate, *see id.* at 29-30, the amount of raw material input needed to produce a tower is clearly related to the tower's overall height and weight.

Even if steel plate dimensions are not directly proportional to the overall dimensions of a finished tower, DKSC fails to show how this would render Commerce's ultimate finding unreasonable. Commerce's analysis demonstrated that, where timing was held consistent, DKSC's towers of different heights and weights nevertheless had nearly identical average unit-prices for steel plate inputs. *See* Appx75. Likewise, plates of different grades and dimensions had similar per-unit prices. *See* Appx48, Appx75. This demonstrates that the differences in plate costs were unrelated to the physical characteristics of the towers or the plates.

DKSC claims Commerce contradicted itself with the following conclusions: (1) "the steel plate input directly impacts the weight and height physical characteristics of the differing finished wind towers produced" and (2) that "the significant cost differences reported for the steel plate inputs for wind towers of differing dimensions are not associated with the difference in the identified physical characteristics (*i.e.*, weight and height) of the wind towers produced." DKSC's Corrected Br. at 28-29.

However, DKSC conflates two separate conclusions from Commerce's analysis. The first conclusion reflects Commerce's finding that a link exists between the physical characteristics of the steel plate input and the height and weight of the tower—a link that DKSC itself recognizes. *See id.* at 29 ("DKSC's clear position was that a relationship exists between the physical characteristics of a finished wind tower (*e.g.*, its height and weight) and the amount of steel plate needed to produce that tower."); Appx1394 ("{A} direct correlation exists between the dimensions of a tower and the steel plate used to produce that tower."). The second statement relates to a separate conclusion that differences in plate <u>costs</u> were unrelated to the physical characteristics of the towers.

Finally, DKSC has failed to explain why it is purportedly unreasonable for Commerce to rely on per-ton purchase volumes for plate, rather than the consumption costs, to illustrate timing-based distortions. *See* DKSC's Corrected Br.

at 31-32. Of course, DKSC's consumption costs are the cost of the steel plate multiplied by the amount of plate consumed for a particular tower (*i.e.*, Steel Plate Cost x Amount of Plate Used in Tower X = Consumption Costs). *See id.* at 31-32. However, DKSC has failed to show that plate prices somehow change based on the tower in which that plate is consumed. Every tower type will require a specific amount of steel plate, but that amount is predetermined. The steel plate cost is the only part of this equation that can change (due to steel plate price fluctuations). *See* Appx1393. It was reasonable for Commerce to analyze per-unit purchase price because this is the variable that is subject to change. Commerce's analysis of per-unit purchase prices for different towers indicated that these prices did not depend on the characteristics of the tower or the plate, but on when the plate was purchased. *See* Appx75.

### 3. Commerce Reasonably Found that Cost Differences Were Related to the Timing of Steel Plate Purchases

According to DKSC, Commerce's determination is unsupported by substantial evidence because it focused on the timing of the steel plate purchases, rather than the physical characteristics of the finished wind towers that impacted costs. *See* DKSC's Corrected Br. at 33. Specifically, DKSC contends that Commerce unreasonably ignored that reported cost differences "might" relate to the different physical characteristics of the finished wind towers. *See id.* at 36. However, DKSC bases its claim on a series of hypotheticals. *Id.* ("these towers could have

significantly different heights and different costs{,}" "a higher tower <u>might</u> require thinner plate{,}" "wind towers with the same height and the same number of sections <u>might</u> have significantly different weights and, in turn, different costs.") (emphasis added and original emphasis removed). DKSC does not point to any record tower comparison to support its claims. To the contrary, the evidence on the record showed that the steel plate cost differences were related to the timing of their purchases, not the physical characteristics of the downstream product.

DKSC dismisses Commerce's finding that steel plates in the U.S. and Japanese markets had similar per-unit costs, claiming that this analysis was inappropriately based on comparisons of "generally equivalent steel plate types." *See id.* at 33. DKSC also claims Commerce compared products with "overlapping thickness, width, and length dimensions" to "reach the unsurprising conclusion that steel plate purchased in the same month with equivalent grades and overlapping thicknesses, widths, and lengths, had virtually the same prices." *See id.* However, this oversimplifies and mischaracterizes Commerce's finding. Commerce compared [ **Grade**] plates to grade [                    **Grade and Description**

                    ] plates. Appx73. While there was some overlap in the plate dimensions, they were not identical plate products. [**Grade**] plates ranged from [ **#**] to [ **#**] centimeters in thickness, compared to thickness ranges of [ **#**] to [ **#**] centimeters for the [**Description**] plates and [ **#**] to

BUSINESS PROPRIETARY          NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

[ **#** ] centimeters for the [ **Description** ] plates. [ **Grade** ] grade plate purchases in September 2018 included plates that had substantially [ **Description** ] lengths and substantially [ **Description** ] lengths than [ **Grade** ] grade plates, and [ **Grade** ] did not have length overlaps with [ **Grade** ] grade plates. *Id.* Despite these dimensional differences and differences in the towers the plates were used in, the per-unit prices of plates purchased in the same month were nearly identical.

DKSC likewise stresses the importance of yield strength in determining steel plate costs, while attempting to downplay the influence of timing on cost. *See* DKSC's Corrected Br. at 8. According to DKSC, Japanese towers were lower cost because they used lower yield strength plates than towers sold to the United States, *see id.*, but this conclusion is not supported by the record. Per-unit plate prices were nearly identical regardless of yield strength when sold in the same time period. For example, grade [ **Grade** ] plate has a yield strength of [ **#** ] megapascals ("Mpa"), while grade [ **Grade** ] plate has a yield strength of [ **#** ] Mpa. Appx1400. Nevertheless, both plate grades had unit costs of [ **#** ] KRW/kg when purchased in September 2018. Appx, 66, Appx75. Likewise, grade [ **Grade** ] plate has a yield strength between [ **#** ] but had a similar unit cost to [ **#** ] grades when purchased in September 2018. *See* Appx1400; Appx66, Appx75.

Further, DKSC's speculation also does not explain why prices for plate used to produce the same type of tower (*i.e.*, [ **Product Name** ])

BUSINESS PROPRIETARY    NON-CONFIDENTIAL VERSION
INFORMATION HAS BEEN DELETED

—a tower with identical height, weight, and all other physical characteristics—had plate costs that increased from May 2018 to September 2018. *See* Appx69 ("{F}or CONNUM [          **Value**          ], the record showed that the per-unit costs of steel plate purchased to build this wind tower increased from [ **#** ] KRW/kg in May 2018 to [ **#** ] KRW/kg in Sept 2018"). That is, the per-unit purchase price for the same grade and size of plate changes depending on when the plate was purchased.

Not only does DKSC ask this Court to reweigh the evidence, but it also asks the Court to use an incorrect and restrictive standard. DKSC claims that Commerce "failed to establish that the timing of DKSC's plate purchases was the sole reason for any reported cost differences." DKSC's Corrected Br. at 36. Yet, Commerce may adjust costs that do not "reasonably reflect" costs associated differences in the physical characteristics of the merchandise. *See* 19 U.S.C. § 1677b(f)(1)(A); *Thai Plastic Bags*, 746 F.3d at 1368. Even if DKSC had demonstrated that some portion of the cost disparities were related to a factor other than timing, Commerce is not prohibited from adjusting costs that are partially unrelated to the physical characteristics of the merchandise. Moreover, Commerce's decision need only be reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citing *SSIH Equip. SA v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 381 (Fed. Cir. 1983)) ("Substantial evidence . . . can be translated roughly to mean 'is

{the determination} unreasonable?'"). Commerce referenced record evidence to conclude that DKSC's costs did not reasonably reflect cost differences in the physical characteristics of DKSC's wind towers, and DKSC has not provided any compelling reason why this decision was unreasonable. Commerce's underlying decision to smooth plate costs should therefore be upheld.

### 4.    Neither Commerce nor the CIT Erred by Citing an Analogous Proceeding

Finally, DKSC claims that the CIT relied on facts not on the record when it incorporated Commerce's reference to an analogous antidumping case: *Utility Scale Wind Towers from Canada* ("*Wind Towers from Canada*"). DKSC's Corrected Br. at 37. This characterization is incorrect and does not disturb Commerce's cost smoothing determination in the underlying investigation or the CIT's decision upholding Commerce's determination.

As an initial matter, Commerce's decision was not solely or even predominantly reliant on its determination in a prior proceeding. Rather, its determination to smooth DKSC's steel plate costs was reasonable based on evidence collected in this investigation. As discussed previously, Commerce identified differences in steel plate costs that were unrelated to the physical characteristics of the plate or the wind tower incorporating the plate. Appx47. To test this conclusion, Commerce analyzed different plate dimensions and grades purchased in the same month to mitigate the impacts of purchase timing. *Id.* The controlled analysis

neutralized the cost differences. Appx48. This conclusion is reasonable based on the record of the underlying proceeding and remand.

Then, as is common in any legal analysis, Commerce referenced a similar case with similar facts to reinforce its methodology. Commerce cited three previous antidumping proceedings, including *Wind Towers from Canada*, where it adjusted cost reporting for finished products and individual inputs. Appx51. Commerce first analyzed a *Pasta from Italy* review where the agency also adjusted input costs because similar pasta products using the same inputs had vastly significantly different direct material costs. *Id.* (citing *Certain Pasta from Italy* IDM at 3-11). Commerce also referenced *Nexteel*, where the CIT upheld Commerce's decision to adjust input costs that varied for reasons unrelated to the finished product's physical characteristics. Appx52 (citing *NEXTEEL*, 355 F. Supp. 3d at 1336, 1361). Commerce's reference to *Wind Towers from Canada*, where the agency also smoothed steel plate input costs, was therefore part of a larger analysis of the agency's past approach to cost smoothing. DKSC's Corrected Br. at 38.

DKSC faults the CIT for "accept{ing} Commerce's reliance on a separate determining {sic} arising out of an investigation of *Utility Scale Wind Towers from Canada*." *Id.* at 37. The CIT did not accept any "reliance" from Commerce on a separate determination. The CIT acknowledged that each determination involves a unique set of factual circumstances but that the similar fact patterns may be

instructive. *See DKSC II*, 600 F. Supp. 3d at 1339. DKSC conducts a similar legal analysis in its CIT Remand Comments when it attempts to distinguish the facts of *Pasta from Italy*. Appx2108 ("Commerce claims that its practice of adjusting unreasonable costs reporting applies both to finished products and to production inputs, and relies on *Pasta from Italy* for support. However, the facts are distinguishable.") (internal citations omitted). Yet at the same time DKSC dismissed *Wind Towers from Canada* as inapplicable because the case has a different record, Appx2109, without "identif{ing} what facts, if any, distinguish *Wind Towers from Canada*." *DKSC II*, 600 F. Supp. 3d at 1339. Indeed, DKSC continues to ignore this highly analogous case altogether, despite the CIT's decision to "sustain Commerce's determination to weight-average . . . steel plate costs" in *Wind Towers from Canada*. *Marmen*, 545 F. Supp. 3d at 1315. *See generally* DKSC's Corrected Br. (making no reference to *Marmen Inc. v. United States*). This case is therefore instructive, and Commerce and the CIT did not err by referencing it.

In sum, Commerce's analysis of the highly similar *Wind Towers from Canada* case was neither inappropriate nor unusual, and the CIT did not err in acknowledging that DKSC failed to address this case.

**B.** **Commerce's Selection of SeAH's Consolidated Financial Statements to Calculate DKSC's Profit and Selling Expenses Is Supported by Substantial Evidence and Otherwise Lawful**

Commerce's selection of SSHC's 2018 consolidated financial statements, rather than SeAH's unconsolidated financial data, to calculate CV profit/selling expenses was supported by substantial evidence, *see* Appx1707-1712, and the CIT did not err in upholding this selection.

To calculate dumping margins, Commerce normally compares the respondent's U.S. price for the merchandise under investigation to its normal value (*i.e.*, price in the home market or a third-country market). 19 U.S.C. §§ 1677(35), 1677b(a)(1)(A)-(C). In the underlying investigation, Commerce found that respondent DKSC made no above-cost sales of wind towers in its home market or a third-country market during the POI. Appx1709; DKSC's Corrected Br. at 39. *See* 19 U.S.C. § 1677b(a)(4). Thus, because normal value could not be determined on this basis, Commerce relied on CV to determine normal value. Appx1709.

Under section 1677b(e) of the Act, Commerce calculates CV based on the cost of materials and fabrication or other processing to produce merchandise, packing expenses, and an amount for selling, general, and administrative ("SG&A") costs and profits in connection with the production and sale of the foreign like product. 19 U.S.C. § 1677b(e). If actual SG&A and profit amounts incurred by the

specific producer or exporter under examination for the specific product are not

available, the statute provides Commerce with three alternative bases:

> (i)    the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

> (ii)   the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

> (iii)  the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise;

*Id.* § 1677b(e)(2)(B). As explained in the SAA, "new section {1677b}(e)(2)(B) does

not establish a hierarchy or preference among these alternative methods." SAA at

840, 1994 U.S.C.C.A.N. at 4176. *See also id.* at 840, 1994 U.S.C.C.A.N. at 4176

("the selection of an alternative will be made on a case-by-case basis, and will

depend, to an extent, on available data"). Accordingly, Commerce has discretion to

select a source for CV profit and SG&A costs from any of the three alternative

methods. *See Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1341-42 (Ct. Int'l Trade 2015).

In the preliminary and final determinations, Commerce relied on alternative (iii), under 19 U.S.C. § 1677b(e)(2)(B)(iii), to calculate CV SG&A costs and profit. Appx1375-1376; Appx1710-1711. At the time of the final determination, there were 11 options on the record as a potential CV profit source. Appx1710. Commerce noted that it applied four criteria in choosing among the available options: (1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States; (3) the contemporaneity of the data to the POI, and (4) the extent to which the customer base of the surrogate and the respondent were similar. *See* Appx1711. Relying upon this criteria and the agency's practice requiring completeness of financial statements, Commerce selected SeAH Steel Holding's financial statement as the source of CV profit and SG&A expenses. *See id. See also DKSC* II, 600 F. Supp. 3d at 1339.

While the WTTC submitted various alternative data for use as a CV profit/selling expenses source and argued in favor of that alternative information, *see* Appx1681-1683, the WTTC also argued at the agency level and to the CIT that

the consolidated financial statements of SSHC were an appropriate CV profit/selling expenses source. *See* Appx1683-1684.

As DKSC acknowledges, to comply with the substantial evidence standard, Commerce's decisions must rest on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). To show inconsistency with this standard, it is not enough for DKSC to present an alternative reading of the record, even if it were one that a reasonable mind would accept. "Reasonable minds may differ, but a determination does not fail for lack of substantial evidence on that account." *See, e.g.*, *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1233 (Ct. Int'l Trade 2011) (quoting *Siderca S.A.I.C. v. United States*, 391 F.Supp.2d 1353, 1369 (Ct. Int'l Trade 2005)). Rather, DKSC must show that the record could only support a conclusion other than that reached by the agency. *See Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 669 (Fed. Cir. 2019); *see also Nippon Steel Corp.*, 458 F.3d at 1351-52.

Thus, DKSC in effect argues that no "reasonable mind might accept {the record evidence} as adequate to support" Commerce's selection of SSHC's consolidated financial statement as the source to value CV profit/selling expenses. *See Consol. Edison Co.*, 305 U.S. at 229; DKSC's Corrected Br. at 5. DKSC bases its argument on its claim that "SHCC's financial data had no correlation with the

production or sale of comparable merchandise in Korea," and thus that Commerce could not reasonably have found that only SHCC's consolidated financial statement was complete and satisfied all four of the criteria relied on by Commerce. *See* DKSC's Corrected Br. at 41. Further, DKSC appears to argue that Commerce was instead <u>required</u> to select the standalone financial data of SeAH as a source of CV profit. *Id.* at 3, 42. Contrary to DKSC's claims, the agency reasonably determined that SSHC's consolidated statement was superior to SeAH's unconsolidated statement because it was "the only data on the record that included a full twelve months of financial data" (including a greater overlap with the POI than SeAH's four-month data), and because the SSHC statement reflected operations for subject merchandise within the foreign market (*i.e.*, Korea). Appx2085-2087.

In fact, while DKSC now claims that SSHC's data "had no correlation with the production or sale of comparable merchandise in Korea," DKSC's Corrected Br. at 41, during the underlying investigation, DKSC acknowledged "that {SSHC} is a Korean producer of comparable merchandise {and} that its financial data are contemporaneous with the POI." Appx1662.

Despite these acknowledgements, DKSC now argues that Commerce was prohibited from relying on SSHC's financial statements because they reflected, in addition to the production and sale of comparable merchandise within Korea, (1) substantial production and sales activities in Indonesia, Italy, Japan, the United

Arab Emirates, the United States and Vietnam; and (2) profit related to investment companies and non-steel producing activities. DKSC's Corrected Br. at 41-42. Commerce acknowledged that SSHC's data reflected some activities from business activities that did not involve subject merchandise; however, it reasonably found SSHC's data to be the best option in a field of imperfect options. Appx1712. Indeed, DKSC can find no fault with Commerce's accurate conclusion that SSHC's data "is the only option on the record that includes 12 months of financial data and reflects profits on the production and sale of comparable merchandise that is produced and sold in the Korean market." *Id.*

DKSC argues that, despite this, Commerce was required to rely on SeAH's unconsolidated financial statements because they reflected a greater proportion of comparable merchandise production. DKSC's Corrected Br. at 42-43. DKSC claims that this selection was required despite SeAH's statements covering only a 4-month period within the 12-month POI. *Id.* at 43. DKSC cites no authority for its claim that Commerce must prioritize the nature of a company's operations over the contemporaneity of the data, nor for its even more outlandish claim that the "timespan covered by SSHC's consolidated financial data is irrelevant" in such circumstances. *Id.* To the contrary, the contemporaneity of the data is extremely relevant, particularly when, as Defendant explained to the CIT below, the mere four months of data are expected to reflect the profit experience of wind towers, for which

a single order can take more than four months to produce. Appx2086; Appx831 ("Tower projects are long term projects that require more than six months for the production time in order to produce each order tower set by section"). Particularly given the long-term nature of wind tower production, it is likely that there were significant fluctuations felt by DKSC during a typical fiscal year, which would not be captured in SeAH's incomplete financial statements. As such, far from being irrelevant, it was critical that Commerce rely on a financial statement that represents a full annual year, so that the comparison was based on a large enough sample size to reflect an accurate picture of all expenses incurred throughout a year.

Moreover, DKSC fails to acknowledge that, in addition to SeAH's statements covering only the four months from September 1, 2018 through December 31, 2018, SeAH was not even incorporated until September 1, 2018. In other words, SeAH's data did not just represent only four months of operations, it represented the company's _first_ four months of operations. Its financial statements would thus naturally reflect lower profit levels due to startup costs. _See_ Appx1446-1578; Appx1684.

Next, with regard to the applicable standard of review, DKSC has made arguments solely focused on the "substantial evidence" standard and does not reference the legal framework outlined by _Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc._, 467 U.S. 837 (1984). _See generally_ DKSC's

Corrected Br. However, Defendant-Intervenor notes that, in analyzing a similar

challenge to the selection of a CV profit/selling expenses source under 19 U.S.C.

§ 1677b(e)(2)(B)(iii), the CAFC has previously explained:

> Here, we are reviewing Commerce's application of a statute that clearly
> confers authority on it to use 'any other reasonable method' for
> determining amounts incurred for profits. 19 U.S.C.
> § 1677b(e)(2)(B)(iii). Thus, we are squarely within the territory of
> *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S.
> 837 . . . (1984), and the deference it affords an agency's 'construction
> of a statutory scheme it is entrusted to administer.'

*Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1305 (Fed. Cir. 2010).

*See also Atar S.R.L. v. United States*, 730 F.3d 1320, 1326 (Fed. Cir. 2013) (holding

that *Chevron* deference applies when assessing Commerce's interpretation of the CV

profit cap under the same statute, 19 U.S.C. § 1677b(e)(2)(B)(iii)). While that case

dealt specifically with whether Commerce had the authority to exclude sales outside

of the ordinary course of trade from its CV profit/selling expenses source (which the

CAFC found that it had), *Thai I-Mei*, 616 F.3d at 1305, this case similarly involves

the agency's authority to interpret and apply the ambiguous statutory provision.

Thus, while the agency's decision still must be rational and reasonable, it is entitled

to deference under the *Chevron* doctrine.

Finally, in arguing that Commerce was required to rely on SeAH's

unconsolidated financial statements, rather than SSHC's consolidated statements, to

value CV profit/selling expenses, DKSC is effectively asking the Court to

impermissibly reweigh the evidence that was before the agency. Like the CIT before it, the Court should decline this request. The Court may not supplant a reasonable determination by Commerce and "reweigh the evidence of or to reconsider questions of fact anew." *Downhole Pipe & Equip.*, 776 F.3d at 1377 (quoting *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)). As such, the Court should sustain Commerce's decision to rely on SSHC's consolidated financial statements, which are contemporaneous with the POI and reflect operations on the subject merchandise in the relevant foreign country, to value CV profit/selling expenses in the underlying investigation.

## VIII. <u>CONCLUSION</u>

For the foregoing reasons, Commerce's final affirmative antidumping duty determination regarding Korean wind towers should be affirmed.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

Dated: July 12, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 23-1419

**Short Case Caption:** Dongkuk S&C Co., Ltd. v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __9,789__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __7/12/2023__

Signature: __/s/ Alan H. Price__

Name: __Alan H. Price__