# 2023-1419

In The

# United States Court Of Appeals
## For The Federal Circuit

### DONGKUK S&C CO., LTD.,

*Plaintiff-Appellant,*

v.

### UNITED STATES, WIND TOWER TRADE COALITION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES COURT OF INTERNATIONAL TRADE
ORIGINATING CASE NO.: 1:20-CV-03686-LMG

————————

### NON-CONFIDENTIAL REPLY BRIEF OF APPELLANT

————————

**Jarrod Goldfeder**
**Robert G. Gosselink**
**MacKensie R. Sugama**
TRADE PACIFIC PLLC
**700 Pennsylvania Ave., SE,**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

*Counsel for Appellant Dongkuk S&C Co., Ltd*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..............................................................................i

TABLE OF AUTHORITIES ...................................................... ii

ARGUMENT ...............................................................................2

    I.    SUMMARY OF APPEAL ...................................................2

    II.   DEFENDANTS-APPELLEES FAIL TO EXPLAIN HOW
         THE APPLICATION OF A SINGLE WEIGHTED-AVERAGE
         STEEL PLATE COST WAS SUPPORTED BY
         SUBSTANTIAL EVIDENCE.............................................7

    IV.   DEFENDANTS-APPELLEES FAIL TO JUSTIFY
         COMMERCE'S MISGUIDED REMAND ANALYSIS....................12

    IV.   DEFENDANTS-APPELLEES FAIL TO ADDRESS
         DEFICIENCIES IN COMMERCE'S SELECTION OF CV
         PROFIT AND SELLING EXPENSES ...............................14

CONCLUSION.....................................................................19

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

## **CONFIDENTIAL MATERIALS STATEMENT**

The material omitted in the nonconfidential version all is, or relates to, material subject to a protective order in the administrative proceeding before the U.S. Department of Commerce, the U.S. Court of International Trade, and Federal Circuit Rule 28(d).  Such material omitted on pages 4, 5, 8, 9, 12 & 13, identifies and relates to the nature of products and production processes and manufacturing costs of Dongkuk S&C Co., Ltd., and is not available to the public and which the U.S. Department of Commerce allowed Plaintiff-Appellant to treat as business proprietary pursuant to agency regulations.

Dated:  September 1, 2023

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Marmen Inc. v. United States*,
    Case No. 23-1877 (Fed. Cir. 2023) .............................................................11

*Mid Continent Steel & Wire, Inc. v. United States*,
    203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017).................................................15

*Mid Continent Steel & Wire, Inc. v. United States*,
    941 F.3d 530 (Fed. Cir. 2019) ......................................................................15

**Statutes**

19 U.S.C. § 1677b(e)(2)(B)(iii) ........................................................................15, 16

**Administrative Determinations**

*Certain Color Television Receivers from Malaysia*,
    69 Fed. Reg. 51,989 (Dep't of Commerce Apr. 16, 2004)...........................16

*Certain Pasta from Italy*,
    83 Fed. Reg. 63627 (Dep't of Commerce Dec. 11, 2018) .......................9, 10

*Certain Steel Nails from the Republic of Korea; 2016-2017*,
    84 Fed. Reg. 4,770 (Dep't of Commerce Feb. 19, 2019)............................11

*Pure Magnesium from Israel*,
    66 Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001)..........................16

*Utility Scale Wind Towers from Canada*,
    85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020) .......................11, 12

NON-CONFIDENTIAL VERSION

2023-1419

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

DONGKUK S&C CO., LTD.,

Plaintiff-Appellant,

v.

UNITED STATES, WIND TOWER TRADE COALITION,

Defendant-Appellees.

Appeal from the United State Court of International Trade in
Case No. 20-03686, Judge Leo M. Gordon

REPLY BRIEF OF PLAINTIFF-APPELLANT
DONGKUK S&C CO., LTD.

Plaintiff-Appellant Dongkuk S&C Co., Ltd. ("DKSC" or "Plaintiff-Appellant"), a producer of utility scale wind towers from the Republic of Korea, provides this reply to the arguments raised in the briefs of Defendant-Appellee, the United States ("Govt. Br."), and Defendant-Appellee, the Wind Tower Trade Coalition ("WTTC Br.").  In their response briefs, Defendants-Appellees fail to establish that Commerce relied on substantial evidence when

1

deciding to weight average DKSC's steel plate cost for all reported control numbers ("CONNUMs"). Nor do they justify Commerce's misguided cost analysis that failed to compare the *physical characteristics* of DKSC's reported CONNUMs. Nor do they provide a reasoned explanation for Commerce's failure to select constructed value ("CV") financial ratios that reflect the manufacturing and sales operations of *comparable* steel pipe producers *in Korea*.

In sum, Defendants-Appellees do not – or cannot – respond to the critical arguments raised in Appellant's brief, ignore vast portions of the administrative record that significantly undermine Commerce's determinations, and fail to establish that Commerce's decisions were based on substantial evidence. We address each of these issues in turn.

## ARGUMENT

## I.    SUMMARY OF APPEAL

This first issue of this appeal concerns whether Commerce appropriately applied a single weighted-average steel plate cost to all CONNUMs reported by DKSC. At the outset, we reiterate certain incontrovertible facts that have a direct bearing on whether Commerce relied on substantial evidence in finding that DKSC's significant cost differences were unrelated to the CONNUM characteristics of the finished wind towers.

First, DKSC chose the steel plate materials used in production based on its customers' specific standards, specifications, and design requirements.  *See* Letter from Trade Pacific PLLC, "Response to the Department's February 5 Supplemental Section D Questionnaire," at S6-1 (Feb. 12, 2020), Appx1392 ("Feb. 12th Supplemental Response").  Because each wind tower project functioned as a unique cost center in DKSC's accounting system, DKSC followed its normal books and records and, with respect to steel plate inputs, reported costs to Commerce by assigning steel plate costs directly to each individual wind tower project, and then weight-averaged the costs for all wind towers that shared identical CONNUMs.  *See* Letter from Trade Pacific PLLC, "Sections B, C, D Questionnaire Responses" (Oct. 15, 2019), at D-5, Appx794-800 ("DKSC Section D").  Commerce subsequently verified that DKSC recorded costs on a CONNUM-specific basis and that different wind tower designs required steel plates with different gauges, grades, yield strengths, and tensile strengths.  *See* Commerce Memorandum, re: "Verification of Cost Response of Dongkuk S&C CO., Ltd. in the Antidumping Duty Investigation of Utility Scale Wind Towers from the Republic of Korea" (Apr. 17, 2020), at 19, Appx1626 ("Cost Verification Report").  These facts are important because Commerce ordinarily relies on a company's normal books and records, and will depart from such costs only if the records do not reflect the cost to produce the subject

3

[CONFIDENTIAL MATERIAL OMITTED]

merchandise ***based on the physical characteristics of the CONNUMs established by Commerce***.

Second, Commerce decided to calculate a single weighted-average steel plate cost for all CONNUMs reported by DKSC based on its findings of "significant" cost variances in DKSC's reported steel plate costs. *See* Commerce Memorandum, re: "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Dongkuk S&C Co., Ltd." (Feb. 4, 2020), at Attachment 3, Appx1382 ("Prelim Cost Calculation Memo"). But Commerce's decision was driven primarily by the steel plate costs of a single CONNUM, which was an outlier as this CONNUM had the [measure] weight and [measure] height, and was tied among all CONNUMs with having the [measure] number of sections. *Id.* In fact, a comparison of DKSC's reported steel plate costs across all CONNUMs establishes that [ # ] of the [ # ] CONNUMs produced had steel plate costs with less than a [ % ] percent variance from the average steel plate cost for all products. *See* Letter from Trade Pacific, "Comments on Draft Remand Redetermination" (Mar. 7, 2022), at Attachment 1, Appx2001 ("DKSC Comments on Remand"). These facts are important because (1) variances in costs are normal, and (2) Commerce has never explained why such small differences in costs constitute "distortions" that form a basis for departure from DKSC's normal books and records.

[CONFIDENTIAL MATERIAL OMITTED]

Finally, after the trial court remanded to Commerce with instructions to further explain and/or demonstrate how DKSC's reported cost differences were *not* attributable to the physical characteristics of wind towers, Commerce again compared ***steel plate input*** purchases within May 2018 and within September 2018 for two CONNUMs and found that the month-specific costs were comparable. *See* Commerce's Results of Redetermination (Apr. 14, 2022), at Attachment 1, Appx73 ("Remand Results"). The steel plate that DKSC used to produce the selected CONNUMs had overlapping thicknesses, widths, and lengths, and were essentially the same grade of steel.[1] *See* Letter from Trade Pacific PLLC, "Submission of DKSC's Cost Verification Exhibits," (Feb. 28, 2020), at Exhibit CVE-5, CVE-9; Appx1584-1607, Appx2115-2154 ("DKSC Cost Verification Report"). This fact is important because it is not only unsurprising, but also self-evident, that Commerce would find "virtually no cost differences" on a metric ton-basis for the same month purchases of the same steel plate used to produce these products. *See* Remand Results, at 22, Appx65.

In summary, by focusing on the steel plate *inputs*, Commerce's analysis failed to explain how or why any reported cost differences in the finished wind towers were not related to the actual physical characteristics of the finished wind

---

[1] Notably, for the time period of May 2018, Commerce compared steel plates with the ***exact same*** grade, [ # ], effectively rendering its analysis futile. *See* Remand Results, at Attachment 1, Appx73.

towers (*i.e.*, the *outputs* upon which the CONNUMs were based). Commerce's finding that the timing of DKSC's steel plate purchases led to cost distortions therefore is not supported by the record evidence. Consequently, Commerce's assignment of a single weighted-average steel plate cost to all of DKSC's reported CONNUMs effectively and unreasonably homogenized the reported costs of DKSC's significantly different finished wind towers.

Furthermore, Commerce's attempt to justify its "smoothing" of DKSC's steel plate costs is unsupported by substantial evidence. In their briefs, Defendants-Appellees continue to disregard the realities of wind tower production. While a relationship exists between the physical characteristics of a finished wind tower (*e.g.*, its height and weight) and the *amount* of steel plate needed to produce that tower, the steel plate does not define or establish the physical characteristics of the finished wind towers that form the basis of the CONNUMs that Commerce itself established for this case. This fact is important because Defendants-Appellees continue to repeat the false assertion that an analysis of the physical characteristics of steel plate inputs is akin to an analysis of the physical characteristics of the finished good (outputs). *See* Gov Br., 30–34; WTTC Br., 25–28. As an analogy, different home designs might require different wood stud wall construction, but whether the timber boards are sawn to dimensions of 2x4", 2x6", or 2x8" does not dictate whether the finished home has a garage or second-floor

6

addition.  But by focusing on the parts instead of the whole, Commerce failed to

consider whether DKSC's normal books and records reasonably reflected the cost

to produce the subject merchandise based on the physical characteristics of the

finished wind towers that Commerce determined to be relevant for purposes of the

CONNUMs used for cost reporting purposes and antidumping duty calculation

purposes.  Defendants-Appellees misrepresent the record evidence, mirror

Commerce's intentional avoidance of these same facts, and re-establish that

Commerce's assignment of a single weighted-average steel plate cost to all of

DKSC's reported CONNUMs was not based on substantial record evidence.

## II.    DEFENDANTS-APPELLEES FAIL TO EXPLAIN HOW THE APPLICATION OF A SINGLE WEIGHTED-AVERAGE STEEL PLATE COST WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

Defendants-Appellees argue in their response briefs that Commerce was

justified in smoothing DKSC's steel plate costs because of the distortive nature of

such costs.  *See* Gov. Br., at 21–30; WTTC Br., at 23–24.  However, Defendants-

Appellees' citations to the record do not support the contention that DKSC's steel

plate costs were in any way distortive.[2]  *Id.*  In fact, record evidence demonstrates

---

[2] In this respect, Defendant-Appellee WTTC responds to an argument that
DKSC is not making, claiming that Appellant argues that Commerce cannot
consider and adjust variances in plate prices merely "because steel plate was not
listed in the CONNUM."  WTTC Br., at 17–18.  But that is not DKSC's argument.
Rather, DKSC argues that it was entirely unreasonable for Commerce to adjust
DKSC's steel plate costs when such costs are not distortive and do not differ
significantly among CONNUMs.

**[CONFIDENTIAL MATERIAL OMITTED]**

that DKSC's steel plate costs, which were based on the company's verified normal

books and records, varied within a normal range of costs.  *See* DKSC Comments

on Remand, at 9, Appx2001.

In deciding to "smooth" DKSC's steel plate costs for all reported

CONNUMs, Commerce relied upon its own analysis that revealed only a minor

variance in DKSC's reported steel plate costs among all CONNUMs produced.

*See* Prelim Cost Calculation Memo, at Attachment 3, Appx1382.  As shown by

Commerce's own calculations, *only one CONNUM* representing just over [ % ]

percent of total production had steel plate costs that varied more than [ % ] percent

from the average steel plate cost; and when steel plate costs are averaged across

wind towers sharing the same weight, height, and section number characteristics,

all the CONNUMs produced by DKSC had steel plate costs that varied less than

three percent from the average.  *Id.*  Contrary to the Defendant-Appellee United

States's contention that DKSC has admitted to major cost differences, Govt. Br., at

30, the record unequivocally shows that there were no significant cost distortions

in DKSC's data.  *See* DKSC Comments on Remand, at Attachment 1, Appx2001.

Thus, Commerce's entire basis for smoothing DKSC's costs was the

agency's unreasonable interpretation of cost "variance."  If Commerce's approach

of treating any minor cost variance as a gross distortion is allowed to stand, then

every producer in every antidumping proceeding would be subject need to have

[CONFIDENTIAL MATERIAL OMITTED]

costs smoothed to account for any slight indication of varying costs, an entirely illogical and unreasonable result.

Here, Commerce failed to explain how a greater than [%] percent variance for one CONNUM was a reasonable basis to jettison all of DKSC's CONNUM-specific plate costs and calculate a uniform plate cost for all CONNUMs produced, especially when the production leading to such variance represented only one percent of DKSC's total production volume. DKSC is not advocating for any "arbitrary 15 percent variation threshold," as the WTTC contends. *See* WTTC Br., at 23–24. Rather, DKSC finds, as would most other steel producers, that a 15 percent cost variance is by no means an unreasonable variance. It is certainly not large enough to warrant such a distortive measure of "smoothing" reported costs.

Furthermore, Defendants-Appellees continue to misapply prior Commerce decisions in defense of Commerce's decision to smooth DKSC's reported steel plate costs. None of the cases cited by Appellees supports Commerce's practice here, which failed to consider both DKSC's steel consumption and the physical characteristics of the finished wind towers. For example, the Government cites to *Pasta from Italy*, also relied upon by Commerce in its Remand Results, to buttress its contention that unreasonable cost differences for an *input* can be smoothed if such differences do not stem from meaningful physical differences in that input. *See* Gov. Br., at 27. But Commerce re-wrote its decision in *Pasty from Italy* on

remand when it asserted that "{w}hen there is an absence of meaningful physical differences for that input, Commerce will smooth costs for that input." Remand Results, at 8, Appx51. This conclusion was never stated or quoted in the *Pasta from Italy* determination. *See Certain Pasta from Italy*, 83 Fed. Reg. 63627 (Dep't of Commerce Dec. 11, 2018) (final results), and accompanying Decision Memorandum (Dep't of Commerce Dec. 4, 2018) ("*Pasta from Italy*"). In fact, even a brief review of *Pasta from Italy* reveals that Commerce never mentioned the word "input" anywhere in its decision memorandum. Rather, *Pasta from Italy* involved a decision to weight-average semolina costs across the unique CONNUMs of multiple affiliated pasta producers. Unlike steel plate in this case, semolina content was one of the physical characteristics used to define the finished pasta CONNUMs; and Commerce found that identical CONNUMs produced by different producers nonetheless had substantially different semolina costs, leading Commerce to "weight average semolina costs for CONNUMs that are identical in all of Commerce's physical characteristics . . . ." *Pasta from Italy*, at 10.

In the instant case, Commerce notably did not perform any such analysis of DKSC's plate costs based on the physical characteristics of the CONNUMs, *i.e.*, finished wind towers. Commerce never compared steel plate costs for nearly identical CONNUMs with similar heights or weights. Thus, Commerce's approach in *Pasta from Italy* is inapposite here. *Pasta from Italy*'s only relevance

10

is to highlight how Commerce's reasonable analysis in that case was not afforded to DKSC here.

The Government's interpretation of *Steel Nails from Korea* is equally misguided. *See* Gov. Br., at 28. In that case, Commerce "identified several instances where pairs of CONNUMs that were similar in terms of physical characteristics had meaningfully different manufacturing costs reported." *Certain Steel Nails from the Republic of Korea; 2016-2017*, 84 Fed. Reg. 4,770 (Dep't of Commerce Feb. 19, 2019) (Decision Memorandum, at cmt. 2). Commerce therefore analyzed CONNUMs with similar physical characteristics and corrected distortions in the data, which arose because of a difference in cost accounting that the respondent implemented halfway through the period of review. *Id*. Once again, by analyzing the physical differences in the finished product based on nearly identical CONNUMs, Commerce was able to properly identify whether the cost variances were due to the physical characteristics of the finished good. *Id*. However, Commerce failed to perform that same analysis here for DKSC.

Finally, Defendants-Appellee's reliance on *Wind Towers from Canada* is improper. *See* Gov Br., at 28; WTTC Br., at 32–34 (citing *Utility Scale Wind Towers from Canada*, 85 Fed. Reg. 40,239 (Dep't of Commerce July 6, 2020). That case currently is on appeal before this Court where the appellant similarly seeks a review of Commerce's cost smoothing decision. *See Marmen Inc. v.*

[CONFIDENTIAL MATERIAL OMITTED]

*United States*, 2023-1877.  Moreover, the facts underlying Commerce's decision in *Wind Towers from Canada* are proprietary and not on the record of the instant proceeding.  Therefore, neither this Court nor DKSC can address the reasonableness or comparability of Commerce's cost analysis therein.

Contrary to Appellees-Defendants' arguments, Commerce did not act in accordance with its prior practice when it applied a single weighted-average steel plate cost to DKSC's reported CONNUMs.  More critically, no basis existed for Commerce to presume that DKSC's reported costs based on its own normal books and records were unreasonable, much less that the reported cost differences among the wind towers did not represent differences in the physical characteristics of the finished wind towers.

## III. DEFENDANTS-APPELLEES FAIL TO JUSTIFY COMMERCE'S MISGUIDED REMAND ANALYSIS

Defendants-Appellees next contend that Commerce's analysis in its Remand Results addressed all deficiencies raised by DKSC.  *See* Gov. Br., at 30–40; WTTC Br., at 25–32.  They assert that Commerce sufficiently identified a relationship between the steel plate inputs and the wind towers' physical characteristics and that timing was the only plausible explanation for differences in steel plate costs.  *Id*.  Specifically, Defendants-Appellees assert that because Commerce analyzed two physically different CONNUMS on remand that had the ▓comparison▓ steel plate costs, the differences in DKSC's reported steel plate costs can be explained only

[CONFIDENTIAL MATERIAL OMITTED]

by timing. *See* Gov. Br., at 37, WTTC Br., 29–31. In other words, according to Defendants-Appellants, this analysis "neutralized the effect of time" and therefore revealed that timing was the reason why CONNUMs with *different* physical characteristics and with *different* steel plate dimensions had the *same* steel plate cost. *See* Gov. Br., at 38. However, this reasoning is not sound.

First, the alleged "relationship between steel plate inputs and wind tower's physical characteristics" is not supported by record evidence. As DKSC previously has established, the steel plate dimensions have no direct correlation to the physical characteristics of the finished wind tower. *See* Commerce Memorandum, re: "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Dongkuk S&C Co., Ltd." (June 29, 2020), at Attachment 1, Appx1969. Rather, it is the volume of such steel plate consumed that primarily dictates the weight, height, and build of a wind tower. For example, within its analysis, Commerce included a larger-sized tower, specifically CONNUM [ # ], which incorporated steel plates with smaller dimensions of [ measure ]. *See* DKSC Cost Verification Report, at Exhibit CVE-9, Appx2115-2154. Commerce also included a smaller tower, specifically CONNUM [ # ], which used steel plates with much larger dimensions of [ measure ] [ measure ]. *Id.* These two CONNUMs, which are physically very different,

consumed steel plates with dimensions that were the relative reverse of their finished physical characteristics. *Id*. No record evidence thus supports Defendants-Appellees' arguments that the dimensions of the steel plates were determinative of the physical characteristics of the finished wind towers.

Defendants-Appellees often, if not intentionally, muddle DKSC's argument. The WTTC incorrectly asserts that according to DKSC's "theory. . . comparison of towers with identical or similar heights and weights should have similar plate costs." WTTC Br., at 9–10. In fact, Commerce never analyzed the overall plate costs for CONNUMs with differing heights and weights. Moreover, DKSC's argument is clear: CONNUMs with different physical characteristics have different steel plate consumption profiles, which in turn results in different steel plate costs for that project. Yet, Commerce failed to consider that the wind tower dimensions (*e.g.*, height and weight) impacted the steel plate consumption—and therefore dictated the steel plate *costs* reported by DKSC. Commerce's decision, therefore, is not supported by substantial evidence. The trial court's decision to accept Commerce's Remand Results should be reversed.

## IV. DEFENDANTS-APPELLEES FAIL TO ADDRESS DEFICIENCIES IN COMMERCE'S SELECTION OF CV PROFIT AND SELLING EXPENSES

In response to its second issue on appeal, Defendants-Appellees continue to argue that Commerce's selection of SeAH Steel Holdings Corporation's

("SSHC") *consolidated* financial statements as a source for DKSC's CV profit and selling expenses was reasonable and in accordance with the law. *See* Gov. Br., 40-48; WTTC Br., 40–48. Defendants-Appellees broadly dismiss the critical fact that **92.68** percent of the revenue reflected in SSHC's consolidated financial statements were derived from activities outside of Korea and from activities completed unrelated to the production of comparable merchandise. *See* Letter from Trade Pacific, "CV Profit and Selling Expense Comments and Information" (Feb. 26, 2020), Exhibit CV-6-A, Appx1434-1441 ("DKSC CV Profit Submission"). They further hide behind Commerce's "broad discretion" and ability to choose "any reasonable method" under 19 U.S.C. § 1677b(e)(2)(B)(iii) as justification for selecting a source that does not "approximate the home market profit experience of the respondent." Gov. Br., 45–48; WTTC Br., 35–36. *See also Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 542 (Fed. Cir. 2019) (citing *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1310 (Ct. Int'l Trade 2017) (citation omitted)).

Rather than addressing this glaring shortcoming, Defendants-Appellees fixate instead on the four-month time period of the 2018 unconsolidated financial statements of SeAH Steel Corporation. *See* Gov. Br., 47; WTTC Br., at 40–41. They assert that the four-month time period is reason alone to ignore the other

three mandatory criteria required by Commerce's analytical framework.[3]  *Id.*
Furthermore, they allege that because wind tower projects have long lead times
that "require more than six months" for production time, that a four-month time
period of financial data does not adequately approximate the profit experience of
wind tower producers.  *Id.*  Yet, Defendants-Appellees ignore critical elements of
SeAH Steel's financial data and of wind tower and steel pipe production.

First, SeAH Steel Corporation is a spin-off from SSHC, a longstanding and
large steel pipe conglomerate.  *See* Letter from Trade Pacific, "CV Profit and
Selling Expense Comments and Information" (Feb. 26, 2020), at Exhibit CV-6-B,
Appx1532 ("DKSC CV Profit Submission").  That is, on September 1, 2018,
SSHC spun off its already long-established steel pipe business into a separate
company.  *Id.*  The claim that SeAH's Steel Corporation's financial data only
represented "the company's first four months of operations," is misleading.  *See*
WTTC Br., at 41.  Because SeAH Steel Corporation carried over assets

---

[3] When reviewing financial data for surrogate profit and selling expenses
under the "any reasonable alternative method" of 19 U.S.C. §1677b(e)(2)(B)(iii),
Commerce is guided by the analysis provided in *Pure Magnesium from Israel*, 66
Fed. Reg. 49,349 (Dep't of Commerce Sept. 27, 2001) and *Certain Color
Television Receivers from Malaysia*, 69 Fed. Reg. 51,989 (Dep't of Commerce
Apr. 16, 2004), Decision Memorandum at 58.  This analysis requires Commerce to
consider the:  (1) similarity of the potential surrogate companies' business
operations and products to the respondent's; (2) extent to which the financial data
of the surrogate company reflect sales in the United States and the foreign market;
(3) contemporaneity of the surrogate data to the period of investigation; and (4) the
extent to which the customer base of the surrogate and the respondent were similar.

(machineries, equipment, land, etc.) and liabilities (debts, accounts payable, etc.) related to its long-established steel pipe production when it was split from its parent (SSHC), SeAH Steel Corporation's financial data did not reflect "lower profit levels due to startup costs." *See* WTTC Br., at 41; DKSC CV Profit Submission, at Exhibit CV-6-B, Appx1549,[4] Appx1555.  A startup steel pipe business, with just four months of operations, would not be able to report 84,577,000,000 KRW (equivalent to $76,119,300 USD in 2018) in finished goods inventories, such as SeAH Steel Corporation did.  *Id*., at Exhibit CV-6-B, Appx1554.  A startup steel pipe business also would not be able to demonstrate some 555,424,000,000 KRW in booked assets, which cover extensive land, buildings, machinery, and vehicles.  *Id*. at Exhibit CV-6-B, Appx1555.  SeAH Steel Corporation's financial statements accordingly do not reflect any startup operations—rather, they reflect the profit experience of an established steel pipe producer that had split from its conglomerate parent company.  Commerce's failure to comprehend the unmistakable factual distinction between a "startup" operation versus the "spinoff" of an existing and long-established entity alone renders its determination unreasonable and unsupported by substantial evidence.

---

[4] This page of SeAH Steel Corporation's financial statements lists its financial liabilities, and shows liabilities between one to five years old, as well as liabilities over five years old.  It is impossible for a startup that was only four months old to report liabilities of such age.  Record evidence therefore establishes that SeAH Steel Corporation is *not* a startup company, but rather, was split from an existing business and carried over relevant assets and liabilities from said business.

Second, while Commerce's selection of producers of *comparable* merchandise, rather than identical merchandise, as sources of CV profit and selling expense is an imperfect exercise, the realities that arise when comparing the production of different merchandise cannot be ignored. Although wind towers have longer production times because of the unique, customer-designed nature of each product, steel pipe does not. *See* Feb. 12th Supplemental Response, at S6-1, Appx1392. Therefore, Defendants-Appellees' contention about the long lead times of wind towers does little to discredit the valid, contemporaneous four-month time period of SeAH Steel Corporation's' financial statements that reflected a robust level of sales and financial performance for the long-established production entity.

Accordingly, Defendants-Appellees' attempts to justify the superiority of SSHC's financial statements—for which only **7.32 percent** of the financial data related to the production of *comparable* merchandise *in the home market*—fall short. Defendant-Appellee WTTC might mock DKSC's statement that "the timespan covered by SSHC's consolidated financial data is irrelevant," but such longer time period *is* necessarily irrelevant when such financial statements reflect almost entirely the financial experience of subsidiaries that either were *not* in Korea or were investment or distribution companies (*i.e.*, not producers of any merchandise), or both. *See* WTTC Br., at 40. Contrary to Defendants-Appellees accusations, DKSC is not asking this Court to "impermissibly reweigh the

evidence that was before the agency." Gov. Br., 45; WTTC Br., at 42–43. Rather, the evidence that was before the agency demonstrates that Commerce's selection of SSHC's non-Korean, non-production-oriented financial data over the financial statements of a Korean steel producer was unreasonable and unsupported by substantial evidence.

## CONCLUSION

For the reasons presented above, the decision of the Court of International Trade on these issues must be vacated and the case should be remanded with instructions requiring Commerce to recalculate the weighted-average dumping margin for DKSC in the manner described herein.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Robert G. Gosselink
Jarrod M. Goldfeder
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
(202) 223-3760

*Counsel to Dongkuk S&C Co. Ltd.*
*Plaintiff-Appellant*

## **CERTIFICATE OF FILING AND SERVICE**

I hereby certify that, on September 1, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I also certify that all parties have been served via electronic e-mail as agreed upon, to:

Alan H. Price
WILEY REIN, LLP
2050 M Street NW
Washington, DC 20036
Direct: 202-719-3375
Email: aprice@wiley.law

*Counsel for Wind Tower Trade Coalition - Defendant - Appellee*

Joshua E. Kurland
UNITED STATES
  DEPARTMENT OF JUSTICE
Commercial Litigation Branch,
Civil Division
PO Box 480
Ben Franklin Station
Washington, DC 20044
Joshua.E.Kurland@usdoj.gov

*Counsel for Defendant - Appellee US*

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder

*Counsel for Appellant Dongkuk S&C Co., LTD*

20

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Circuit Rule

35(d) and Fed. R. App. P. 35(b)(2) because:

this brief contains <u>4,075</u> words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 35(c)(2).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in proportionally space typeface using
<u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

3.      This brief contains fourteen [14] unique words, (including numbers) which

does not exceed the maximum of fifty (50) words permitted by Fed. Cir. R.

25.1(d)(1)(B).

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder