# United States Court of Appeals for the Federal Circuit

———————————————

**DONGKUK S&C CO., LTD.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, WIND TOWER TRADE COALITION,**
*Defendants-Appellees*

———————————————

2023-1419

———————————————

Appeal from the United States Court of International Trade in No. 1:20-cv-03686-LMG, Senior Judge Leo M. Gordon.

———————————————

Decided: April 21, 2025

———————————————

MacKensie R. Sugama, Trade Pacific PLLC, Washington, DC, argued for plaintiff-appellant. Also represented by Jarrod Goldfeder, Robert Gosselink.

Sosun Bae, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by Reginald Thomas Blades, Jr., Brian M. Boynton, Patricia M. McCarthy; Jesus Nieves Saenz, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce,

Washington, DC.

    MAUREEN E. THORSON, Wiley Rein, LLP, Washington, DC, argued for defendant-appellee Wind Tower Trade Coalition. Also represented by THEODORE PAUL BRACKEMYRE, TESSA V. CAPELOTO, ROBERT E. DEFRANCESCO, III, LAURA EL-SABAAWI, DERICK HOLT, ELIZABETH S. LEE, ALAN H. PRICE, JOHN ALLEN RIGGINS.

                        _____

    Before LOURIE, REYNA, and HUGHES, *Circuit Judges*.

    Opinion for the court filed by *Circuit Judge* HUGHES.

    Dissenting opinion filed by *Circuit Judge* REYNA.

HUGHES, *Circuit Judge*.

    Appellant Dongkuk S&C Co., Ltd. appeals a decision of the Court of International Trade, affirming the United States Department of Commerce's final determination that utility scale wind towers from Korea were being sold in the United States at less than fair value. Dongkuk S&C, the sole respondent in Commerce's investigation, is a Korean producer of utility scale wind towers. The final determination resulted in the imposition of an antidumping duty order. Because Commerce's final determination is supported by substantial evidence and in accordance with law, we affirm.

                              I

    We begin with a brief review of the Tariff Act of 1930. Dumping occurs when a foreign firm sells a product in the United States at an export price that is below the product's normal value. *See* 19 U.S.C. § 1673. For producers such as Dongkuk S&C (DKSC), normal value is generally calculated as "the price at which the foreign like product is first sold" in the home market, or, where that data is unavailable, in a third-country market other than the United States. 19 U.S.C. § 1677b(a)(1)(B)(i)–(ii). A "foreign like

product" is a product made by the foreign firm and sold in the home- or third-country market that is "identical in physical characteristics" to the product sold by the foreign firm in the United States. 19 U.S.C. § 1677(16). The amount by which the normal value of the foreign like product exceeds the United States export price is known as the dumping margin, and Commerce must impose an anti-dumping duty on the imported product equal to that amount. *See* 19 U.S.C. § 1673.

Commerce will not consider sales that are made at less than the foreign firm's cost of production to be reflective of normal value because they fail the "sales-below-cost test." *Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1349 (Fed. Cir. 2021). If all sales of foreign like products fail the sales-below-cost test, Commerce may base normal value on a constructed value of the imported product. 19 U.S.C. § 1677b(b)(1), 1677b(a)(4). "Constructed value" approximates a foreign firm's costs of producing and selling the foreign like product, 19 U.S.C § 1677b(e), reflecting the "minimum price level at which imported goods may be sold without incurring antidumping duties." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001).

The Tariff Act specifies that a product's constructed value shall be equal to the sum of (1) "the cost of materials and fabrication or other processing"; (2) "the actual amounts incurred and realized" by the investigated firm "for selling, general, and administrative expenses, and for profits"; and (3) "the cost of all containers and coverings" for exporting the product to the United States. 19 U.S.C § 1677b(e)(1)–(3). When evaluating a firm's reported expenses, Commerce normally relies "on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

In response to a petition filed by Defendant-Appellee, Wind Tower Trade Coalition, Commerce initiated an investigation of utility scale wind tower imports from Korea to determine whether they were being sold at dumped prices. Wind towers are large, tubular steel structures designed to support wind turbines. Commerce selected DKSC, a Korean producer of wind towers, as a mandatory respondent.

The investigation covered sales of utility scale wind towers made by DKSC between July 1, 2018, and June 30, 2019. Though wind towers can vary in size (e.g., from 63 to over 103 meters in height), Commerce is tasked with undertaking a "fair comparison" of the investigated product's United States export price and its normal value. 19 U.S.C. § 1677b(a). To this end, Commerce identified eleven physical characteristics that it considered to be the most significant for comparing costs among wind towers.[1] J.A. 682–91. These physical characteristics, including height and weight, were used to define the unique products (which Commerce refers to as CONNUMs) sold by DKSC during the period of investigation.

Once the investigation was complete, Commerce issued a preliminary determination finding that DKSC's sales of wind towers in the United States had been made below normal value. *See Utility Scale Wind Towers From the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value and Preliminary Affirmative Determination of Critical Circumstances*, 85 Fed. Reg. 8,560 (Feb. 14, 2020) (*Preliminary Results*); *Decision*

---

[1]    In order of importance, the characteristics Commerce identified were: (1) type (i.e., full tower or section); (2) weight; (3) height; (4) total number of tower sections; (5) type of top paint coating; (6) metalizing; (7) electrical conduit - bus bars; (8) electrical conduit - power cables; (9) elevators; (10) number of platforms; and (11) whether other internal components are attached to the tower.

*Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Utility Scale Wind Towers from the Republic of Korea*, 85 ITADOC 8560 (Feb. 4, 2020), J.A. 1357–76 (*Preliminary Results Memo*); *Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination* (Feb. 4, 2020), J.A. 1377–83 (*Cost Calculation Memorandum*). In determining normal value, Commerce mostly relied on DKSC's reported costs except that it, in relevant part, "weight-averaged the steel plate input costs for all CONNUMs to mitigate the unreasonable material cost differences unrelated to the product physical characteristics." J.A. 1374. This weight-averaging increased DKSC's estimated costs of production.

As a result, none of DKSC's comparison market sales were found to pass the sales-below-cost test, and Commerce decided to base normal value on constructed value. J.A. 1375. It again relied on DKSC's reported costs and weight-averaged steel plate input costs to calculate DKSC's cost of materials and fabrication under 19 U.S.C § 1677b(e)(1). J.A. 1375 & n.86. But because DKSC's comparison market sales were made at below-cost prices, Commerce determined that it could not use DKSC's records to approximate "the actual amounts incurred" for expenses and for profits under § 1677b(e)(2)(A). J.A. 1375. In such a situation, the statute directs Commerce to rely on one of three alternatives:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation . . . in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other

than the exporter or producer described in clause
(i)) . . . in connection with the production and sale
of a foreign like product . . . , or

(iii) the amounts incurred and realized . . . based on
any other reasonable method, except that the
amount allowed for profit may not exceed the
amount normally realized by exporters or produc-
ers (other than the exporter or producer described
in clause (i)) in connection with the sale, for con-
sumption in the foreign country, of merchandise
that is in the same general category of products as
the subject merchandise[.]

19 U.S.C § 1677b(e)(2)(B).

Commerce chose to rely on 19 U.S.C
§ 1677b(e)(2)(B)(iii), i.e., "any other reasonable method,"
because the other options were unavailable. DKSC did not
have records on the sale of different products in the same
general category which could be used under subsection (i),
and there were no other firms subject to the investigation
whose records could be used under subsection (ii). Pursu-
ant to subsection (iii), Commerce selected a source of sur-
rogate data to calculate constructed value profit and selling
expenses for DKSC. J.A. 1375–76. It chose the 2018 consol-
idated financial statements of SeAH Steel Holdings Corpo-
ration (SSHC), a Korean holding company which owns
subsidiaries that produce steel pipes. J.A. 1378, 1434.

In July 2020, Commerce issued its affirmative final de-
termination in which it calculated a final weighted average
antidumping duty margin of 5.41 percent. *Utility Scale
Wind Towers from the Republic of Korea*, 85 Fed. Reg.
40,243 (July 6, 2020), J.A. 1972–74 (*Final Determination*);
*Issues and Decision Memorandum for the Final Affirmative
Determination in the Less-Than-Fair-Value Investigation
of Utility Scale Wind Towers from the Republic of Korea*, 85
ITADOC 40243 (June 29, 2020), J.A. 1686–1716 (*Final Re-
sults Memo*). To arrive at this antidumping margin,

Commerce based the normal value of DKSC's wind towers on constructed value using largely the same methodologies employed in the preliminary determination.

Commerce elaborated on its decision to adjust steel plate costs, explaining that DKSC's records reflected different steel plate costs for CONNUMs sold in the comparison market and CONNUMs sold in the United States. J.A. 1707. Commerce recognized that 19 U.S.C. § 1677b(f)(1)(A) requires it to use a respondent's records when they "reasonably reflect" costs but explained its view that "[i]n cases where the costs reported according to a company's normal books are unreasonable . . . Commerce may revise such costs." J.A. 1706. Because the preliminary determination found that these cost differences were not tied to differences in any of the eleven physical characteristics used to define the CONNUMs—and hence, unreasonable— Commerce maintained that weight-averaging steel plate input costs across CONNUMs was appropriate. *See* J.A. 1707 (finding that "the primary factor driving the plate cost differences is . . . the timing of the raw material purchases, not the physical differences of the input[.]").

The final determination also continued to use SSHC's consolidated financial statement as surrogate data to calculate DKSC's constructed value profit and selling expenses. J.A. 1709. Commerce reviewed eleven different sources of surrogate data on the record by weighing factors that it had developed in prior antidumping determinations. J.A. 1710–11. It reasoned that SSHC's statement was "the only option on the record that includes 12 months of financial data, and reflects profits on the production and sale of comparable merchandise that is produced and sold in the Korean market." J.A. 1712. Although Commerce acknowledged that the statement also included data pertaining to the sale of unrelated merchandise, it found that SSHC's statement was still the best of the eleven options. J.A. 1712.

DKSC challenged Commerce's final results in the Court of International Trade (CIT), alleging that Commerce erred in finding that its records reflected unreasonable costs and in deciding to weight-average its steel plate input costs. The CIT remanded Commerce's decision to adjust steel plate costs because it could not identify analytical support for Commerce's contention that it had "group[ed] CONNUMs by any of the 11 physical characteristics or otherwise use[d] those characteristics as a 'guidepost'" to compare DKSC's steel plate costs and determine that such costs were unrelated to the characteristics of the CONNUMs. *Dongkuk S&C Co. v. United States*, 548 F. Supp. 3d 1376, 1381 (Ct. Int'l Trade 2021) (*DKSC I*); J.A. 38–39. Although DKSC had also challenged Commerce's choice of surrogate data for the calculation of constructed value, the CIT held consideration of this challenge in abeyance pending the filing of Commerce's remand results. *DKSC I*, 548 F. Supp. 3d at 1382.

In April 2022, Commerce issued a redetermination pursuant to the remand seeking to demonstrate that it had used physical characteristics as a guidepost to compare steel plate costs among CONNUMs. Slip-Op. 21-167, *Dongkuk S&C Co. v. United States*, Case No. 1:20-cv-03686 (Ct. Int'l Trade Apr. 14, 2022), ECF No. 45 (*Remand Results*); J.A. 44–75. In support of its preliminary and final determinations, Commerce compared the reported steel plate input costs of two different CONNUMs made in September 2018. "[T]he analysis showed that the purchase price for input steel plate in the selected month was very consistent, despite the fact that the steel plate was incorporated into finished wind towers with different physical characteristics (*i.e.*, weight and height)." J.A. 49. This meant that there was also no cost variation attributable to the different dimensions and grades of steel plate used by the CONNUMs. J.A. 48–49, 64–65. Though this would suggest that steel plate costs on a per-unit weight basis should have remained the same across all CONNUMs, Commerce

identified significant fluctuations in these per-unit costs throughout the period of investigation. J.A. 49.

To bolster its point, Commerce produced additional analysis comparing steel plate purchase costs for three different CONNUMs in September 2018 and four different CONNUMs in May 2018. *See* J.A. 73. This analysis showed that the per-unit cost of steel plate purchased in May 2018 was about the same, just as the per-unit cost of steel plate purchased in September 2018 was about the same—but the per-unit cost of steel in September was far higher than in May. J.A. 64–65, 73. Commerce identified this same pattern in the purchasing records of a single CONNUM, for which the per-unit cost of steel plate increased from May to September despite the lack of any changes in physical characteristics or the type of steel plate purchased. J.A. 69–70. Taken together, this data established that the timing of the purchase was what affected the steel plate price.

The CIT thereafter sustained Commerce's remand redetermination and entered a final judgment. *Dongkuk S&C Co. v. United States*, 600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) (*DKSC II*); J.A. 78–93. It was satisfied that Commerce used CONNUM physical characteristics as "guideposts" to determine whether DKSC's costs were reasonable under § 1677b(f)(1)(A) and sustained Commerce's adjustment of steel plate costs. *DKSC II*, 600 F. Supp. 3d at 1338. The CIT also sustained Commerce's choice of surrogate financial data for its constructed value calculations. *Id.* at 1340. DKSC timely filed an appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

II

"In reviewing the Trade Court's decision to affirm Commerce's final determination, we apply anew the Trade Court's standard of review; thus, we will uphold Commerce's determination unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Saha Thai Steel Pipe (Pub.) Co. v. United States*,

635 F.3d 1335, 1340 (Fed. Cir. 2011) (internal quotation marks and citations omitted). The applicable "APA court/agency substantial evidence standard . . . require[s] a court to ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion." *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (internal quotation marks and citations omitted).

## III

DKSC challenges Commerce's decision to adjust DKSC's reported steel plate costs under 19 U.S.C. § 1677b(f)(1)(A). In an antidumping duty investigation, Commerce is tasked with allocating a respondent's costs "using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review." Statement of Administrative Action, H.R. REP. NO. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4172 (SAA). Normally, Commerce calculates costs using a respondent's own records so long as "such records are kept in accordance with the generally accepted accounting principles of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). Commerce "shall consider all available evidence" submitted by the respondent regarding the proper allocation of costs. *Id.*

In *Thai Plastic Bags Indus., Co. v. United States*, we confirmed that records reasonably reflect costs if they reflect meaningful cost differences attributable to the finished product's different physical characteristics, and that Commerce is not required by § 1677b(f)(1)(A) to accept reported costs if they are unreliable and unreflective of actual costs. *See Thai Plastic Bags*, 746 F.3d 1358, 1364–67 (Fed. Cir. 2014). On the contrary, "[a]s cost allocation based on physical characteristics is a primary factor in Commerce's analysis, Commerce may adjust a company's allocation method to more reasonably reflect costs." *Id.*

at 1363. This practice has consistently been recognized. *See Remand Results* at J.A. 51 ("Commerce applies its practice of adjusting unreasonable cost reporting both to finished products (*i.e.*, CONNUMs) and to individual inputs for such products." (citing *Certain Pasta from Italy: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 63,627 (Dec. 11, 2018); *Certain Pasta from Italy: Issues and Decision Memorandum for the Final Results; 2016-2017*, 83 ITADOC 63627 at 3–11. (Dec. 11, 2018) (weight-averaging costs for semolina, an input for pasta))); *Final Results Memo* at J.A. 1706–07; SAA, H.R. REP. NO. 103-316, 1994 U.S.C.C.A.N. at 4172 (Commerce has the authority to "adjust costs appropriately, to ensure they are not artificially reduced."); *Saha Thai*, 635 F.3d at 1342 ("[T]his court has recognized that Commerce has the discretion to diverge from a company's books and records when necessary to calculate an accurate dumping margin.").

We conclude that Commerce relied on substantial evidence in determining that DKSC's reported steel plate input costs were distortive and unrelated to the product's physical characteristics. Commerce was not required to rely upon those distortive records and had the authority to adjust steel plate input costs to more accurately approximate DKSC's costs of production during the period of investigation.

As Commerce stated in its final determination, "the question . . . is whether the reported steel plate costs from [DKSC]'s normal books and records reasonably reflect the cost to produce the subject merchandise based on the physical characteristics identified by Commerce." J.A. 1706. Commerce's consistent answer, from its preliminary determination onwards, is that they did not. *See, e.g.*, J.A. 1378; J.A. 1707. To arrive at this conclusion, Commerce analyzed the cost of steel plate used in CONNUMs of similar height and weight, and separately, the cost of steel plate

purchased in an isolated time period for use in CONNUMs of different heights and weights. J.A. 1378 (citing J.A. 1382); *see also* J.A. 63, 1707. The latter analysis is particularly compelling because it revealed a pattern: Commerce found that the per-unit weight cost of steel plate purchased in September 2018 was "virtually the same regardless of the grade, thickness, width, or height" of the steel plate purchased, and regardless of the physical characteristics of the final CONNUM being built. J.A. 1707. Accordingly, Commerce concluded that "the overwhelming factor that caused the differences in the steel plate costs [for the final CONNUMs] was the timing of the steel plate purchases." *Id.*

At first, the CIT was concerned that Commerce had not adequately explained how cost variation was unrelated to physical characteristics. *DKSC I*, 548 F. Supp. 3d at 1381–82. On remand, Commerce elaborated that DKSC had reported different per-unit steel plate input costs for CONNUMs finished at different times because the price of steel had fluctuated during the period of investigation. J.A. 49–50. In additional analysis, Commerce showed that these fluctuations in raw material prices were reflected by an increase in the per-unit cost of steel plate purchased to build a single CONNUM, despite the lack of any change in the type of steel plate purchased or the physical characteristics of the CONNUM. J.A. 69–70. Commerce also found no evidence to suggest that per-unit steel plate costs corresponded to a CONNUM's size, J.A. 68, and demonstrated that in May 2018, just as in September 2018, the per-unit cost of steel plate varied negligibly when purchased in the same month—despite many differences in the characteristics of the CONNUMs being built and in the dimensions of the plates being purchased. J.A. 64–65.

Accordingly, Commerce's explanation on remand satisfactorily demonstrated that it had used CONNUM physical characteristics as a "guidepost" for its analysis: it had

considered and ruled out CONNUM physical characteristics as the reason for variations in DKSC's reported steel input costs. J.A. 70. The record identifies ample support for Commerce's conclusion that it was timing which was responsible for these variations. Because the timing of steel plate purchases is a cost distortion unrelated to the physical characteristics of the products, Commerce was empowered to mitigate this distortion under § 1677b(f)(1)(A) by averaging DKSC's reported per-unit steel plate costs.

DKSC argues that Commerce's analysis of DKSC's steel plate input costs was irrelevant to the question of whether DKSC's records reasonably reflect costs under § 1677b(f)(1)(A) because steel plate was not identified as one of the eleven CONNUM physical characteristics. Appellant's Opening Br. 25. We agree with Commerce that its authority to adjust costs is not limited to the costs of the physical characteristics used to define CONNUMs. *See* J.A. 51–52; *see also NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361 (Ct. Int'l Trade 2019) ("If factors beyond the physical characteristics influence the costs, . . . Commerce will normally adjust the reported costs in order to reflect the costs that are based only on the physical characteristics."). To hold otherwise would impede Commerce's ability to mitigate cost distortions when calculating antidumping margins. Here, DKSC acknowledged fluctuating raw material prices during the period of investigation, and Commerce found that "differences in [per-unit] steel plate costs . . . are the *only* raw material cost difference between CONNUMs." J.A. 62 (emphasis added). It was reasonable for Commerce to analyze whether or not DKSC's costs were attributable to some relationship between raw material inputs and CONNUM physical characteristics.

We have considered the remainder of DKSC's objections and find them to be unpersuasive. DKSC claims that Commerce's remand determination fails to address the CIT's request that it compare DKSC's CONNUM costs

using physical characteristics as a guidepost. We disagree. Contrary to DKSC's suggestion, Commerce's analysis did not have to focus on comparing the costs of finished wind towers sharing the same physical characteristics. Commerce stated that it did compare the steel plate costs of similar CONNUMs, J.A. 1704, but it was not necessary to divulge this analysis to have substantial evidence in support of its decision to weight-average steel plate costs. DKSC's argument that Commerce should have considered the costs of steel plate consumption for differently sized CONNUMs similarly does not disturb Commerce's finding of variable raw material costs on a per-unit weight basis. Finally, DKSC claims that Commerce did not compare the costs of substantially different steel plate or demonstrate significant differences in steel plate costs across CONNUMs. These claims are unsupported by the record. *See* J.A. 66 (Commerce's explanation of its analysis of the cost of steel plate based on steel grade), J.A. 67 (Commerce finding that both "Commerce's and DKSC's [preferred] methodologies demonstrate that there are significant differences in the per-unit steel plate costs that are not related to the physical characteristics of the products."). We thus affirm the CIT's decision upholding Commerce's input cost adjustment.

## IV

19 U.S.C. § 1677b(e)(2)(B) establishes alternative methods for calculating constructed value profit and selling expenses in those instances where the method described in § 1677b(f)(1)(A)—i.e., reliance on a respondent's actual records—cannot be used. In this case, DKSC's records were found not to reasonably reflect the costs associated with the production of wind towers because its sales in the comparison market were at below-cost prices. *See* J.A. 1709. Of the alternatives, Commerce elected to use any "reasonable method" under § 1677b(e)(2)(B)(iii), because the options in subsections (i) and (ii) were not

available. J.A. 1710. Under subsection (iii), "[t]he objective is to find a good proxy (or surrogate) for the profits [and selling expenses] that the respondent can fairly be expected to build into a fair sales price for the particular merchandise." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 542 (Fed. Cir. 2019) (internal citation omitted).

DKSC argues that Commerce's choice of surrogate data could not have been supported by substantial evidence because there was a better option available. Of the eleven options put before Commerce, DKSC thinks that the unconsolidated financial data of SeAH Steel Corporation should have been selected because SeAH Steel Corporation's merchandise—large diameter steel pipes made in Korea—is more comparable to DKSC's steel wind towers. Meanwhile, SSHC is a large Korean holding company, and a majority of its sales are made by non-Korean subsidiaries. Though DKSC claims that SSHC's consolidated 2018 financial statement is not correlated with the sale of comparable merchandise, seven of SSHC's seventeen subsidiaries are directed at the "[m]anufacturing and distributing steel pipe," and of those seven subsidiaries, three are in Korea and one is in the United States. J.A. 1434. One of the Korean subsidiaries is SeAH Steel Corporation, which spun off from SSHC four months before the end of 2018. It is the unconsolidated financial data pertaining to these four months of SeAH Steel Corporation's operations which DKSC believes Commerce was required to select as a proxy.

We find that Commerce's decision to calculate constructed value profit and selling expenses using the consolidated 2018 financial statement of SSHC, rather than the standalone financial data of SeAH Steel Corporation, was supported by substantial evidence. As the CIT concluded, "[w]hile [DKSC] may have preferred that Commerce select SeAH Steel Corporation's financial statement, [DKSC] has failed to demonstrate that Commerce acted unreasonably

by selecting SSHC's statement instead." *DKSC II*, 600 F. Supp. 3d at 1340.

The SAA, which accompanied the bill that was passed by Congress and codified under 19 U.S.C. § 3511(a) (1994), provides that "Commerce will develop [the alternative provided by subsection (iii) for the use of any other reasonable method] through practice" because the Administration did not wish to "establish particular methods and benchmarks for applying this alternative." H.R. REP. NO. 103-316, 1994 U.S.C.C.A.N. at 4176. Accordingly, Commerce developed four factors for analyzing the suitability of sources of surrogate data under § 1677b(e)(2)(B)(iii): "(1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; (2) the extent to which the financial data of the surrogate company reflects sales in the home market and does not reflect sales to the United States; . . . (3) the contemporaneity of the date to the [period of investigation]; . . . [and] [(4)] the extent to which the customer base of the surrogate and the respondent were similar." *See* J.A. 1711 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Pure Magnesium from Israel*, 66 Fed. Reg. 49,349 (Sept. 27, 2001); *Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Pure Magnesium from Israel*, 66 ITADOC 49349 (Sept. 27 2001), at Comment 8; *Notice of Final Determination of Sales at Less Than Fair Value: Certain Color Television Receivers from Malaysia,* 69 Fed. Reg. 20,592 (Apr. 16, 2004); *Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Color Television Receivers from Malaysia*, 69 ITADOC 20592 (Apr. 16, 2004), at Comment 26).

The record contained eleven possible sources for surrogate data, and Commerce weighed these sources against the applicable factors. In so doing, Commerce acknowledged the trade-off posed by using SSHC's

financial statement versus SeAH Steel Corporation's financial statement: SSHC's data was the only option on the record that spanned a full year (the length of the period of investigation), while SeAH Steel Corporation's four months of data more narrowly reflected the sale of comparable merchandise. J.A. 1712. In other words, SeAH Steel Corporation's data failed factor (3), i.e. contemporaneity, and SSHC's data had some non-disqualifying shortcomings under factors (1) and (2).

Though some of SSHC's subsidiaries are engaged in unrelated businesses, Commerce was not incorrect to find that SSHC's consolidated financial statement includes "profits for comparable merchandise in the Korean market" under factor (1). J.A. 1712. Indeed, SeAH Steel Corporation's operations were part of SSHC's before the spin-off. J.A. 1532. DKSC complains that SSHC's data includes sales in the United States and in other countries, but factor (2) does not require Commerce to disregard a source of surrogate data on that basis. Here, Commerce explained its view that SSHC was the only source of surrogate data on record which "includes 12 months of financial data" and could also satisfy the remaining factors. J.A. 1711–12.

DKSC's belief that the four applicable factors should favor SeAH Steel Corporation's data does not disturb Commerce's purview to decide which of two imperfect sources of data to use under § 1677b(e)(2)(B)(iii). "Where we are faced with two opposing views of the record, it is the function of the court to uphold Commerce's determination if it is supported by substantial evidence and is otherwise in accordance with the law. Here, we are presented with a record that amply supports the reasonableness of Commerce's decision to [select SSHC's consolidated 2018 financial statement as a source for calculating constructed value profit and selling expenses]." *Am. Silicon Techs.*, 261 F.3d at 1380–81. We thus affirm the CIT's decision upholding Commerce's use of SSHC's data under 19 U.S.C.

§ 1677b(e)(2)(B)(iii) to calculate constructed value profit and selling expenses.

## AFFIRMED

# United States Court of Appeals for the Federal Circuit

———————————

**DONGKUK S&C CO., LTD.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, WIND TOWER TRADE COALITION,**
*Defendants-Appellees*

———————————

2023-1419

———————————

Appeal from the United States Court of International Trade in No. 1:20-cv-03686-LMG, Senior Judge Leo M. Gordon.

———————————

REYNA, *Circuit Judge*, dissenting.

I agree with the majority's affirmance of Commerce's cost-smoothing determination. I, however, disagree with the majority that under 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce's constructed value determination, which relied on SSHC's financial statement as a proxy for Dongkuk's profits and selling expenses of steel wind towers in Korea, is free from error. This statute requires Commerce to use a "reasonable method" for calculating constructed value. The majority characterizes this issue as simply a matter of whether Commerce's weighing and selection of the better between two "imperfect" options was substantially supported by the record. But that is an oversimplification of the record and the issue on appeal, the result of which

provides Commerce with cover in the future to make arbitrary constructed value determinations.

Part and parcel with substantial evidence review is determining whether the agency provided a rationale adequate to enable us to review its determination. Here, Commerce summarily concluded that SSHC's twelve-month financial statement, almost entirely reflective of non-steel, non-Korean sales, is the better proxy than SeHC's four-month financial statement, reflective of only steel sales in Korea. In other words, Commerce chose a seemingly unreasonable proxy over a seemingly reasonable proxy without explaining why. And even accepting the majority's characterization of SSHC's statement as "imperfect," this is still problematic. Commerce does not adequately explain why using a seemingly unreasonable, or "imperfect," financial statement to calculate constructed value is a "reasonable method" under 19 U.S.C. § 1677b(e)(2)(B)(iii). Without an adequate rationale as to why Commerce selected SSHC's financial statement, over SeHC's, as a reasonable method for calculating constructed value, we are unable to determine whether Commerce's constructed value determination is supported by substantial evidence and comports with 19 U.S.C. § 1677b(e)(2)(B)(iii). I would thus remand Commerce's constructed value determination for a more fulsome explanation. Perhaps Commerce has some reason for using SSHC's financial statement over SeHC's. But this reason is not in the record before us. I do not, and legally cannot, speculate as to this reason. I respectfully dissent.

I.

To fulfill our obligation of determining whether Commerce's constructed value determination is supported by substantial evidence, "we insist that Commerce examine the record and articulate a satisfactory explanation for its action." *CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1376 (Fed. Cir. 2016) (internal quotations omitted).

Commerce "must provide an explanation that is adequate to enable the court to determine whether its choices are actually reasonable, including as to calculation methods." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537 (Fed. Cir. 2019); *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382–83 (Fed. Cir. 2001). "The requirement of explanation presumes the expertise and experience of the agency and still demands an adequate explanation in the particular matter." *CS Wind*, 832 F.3d at 1377. For without a sufficient explanation, we are left to speculate as to Commerce's reasoning, which we cannot do. *See id.*; *SEC v. Chenery*, 318 U.S. 80, 88 (1943).

A "constructed value" is "a good proxy (or surrogate) for the profits [and selling expenses] that the respondent can fairly be expected to build into a fair sales price for the particular merchandise." *Mid Continent Steel & Wire*, 941 F.3d at 542. While such calculations may be imprecise, "Commerce's choice[]" in choosing surrogate financial data "must be reasonable" and "within the dual constraints of the statute and the record." *Id.* And "accuracy and fairness must be Commerce's primary objectives." *Id.* (internal quotations omitted). In this case, Commerce may calculate constructed value profit and selling expenses based on any "reasonable method." 19 U.S.C. § 1677b(e)(2)(B)(iii). In employing a "reasonable method," and as explained further on, Commerce uses certain factors for selecting surrogate data.

## II.

Commerce considers certain factors when selecting surrogate data.[1] The financial statement of SeAH Steel

---

[1]   No party challenges whether these factors are a "reasonable method" under 19 U.S.C. § 1677b(e)(2)(B)(iii). Thus, I do not address this open question.

Holdings Corporation ("SSHC")[2] is undisputedly lacking under two of these factors.[3]  J.A. 1711–12.  Under the first factor, which considers whether the surrogate data reflects sales of comparable merchandise (steel wind towers) in the home market (Korea), SSHC's financial statement reflects little comparability.  *Id.*  SSHC's data shows that *92.68 %* of SSHC's total sales revenue was generated from *non-Korean, non-steel manufacturing entities.*  J.A. 1432–41; J.A. 2051.  The second factor considers the extent to which the data reflects sales in the home market (Korea) and *does not reflect sales to the United States.*  J.A. 1711.  The record shows that 62.68 % of SSHC's overall consolidated sales revenue and 41.03 % of its overall profits were attributable to sales by two affiliated distribution companies located in the United States.  J.A. 1432–41.

Meanwhile, the financial statement of SeAH Steel Corporation ("SeAH"),[4] the second option presented to Commerce, undisputedly satisfies these two factors.  This financial statement reflects sales of comparable merchandise only in Korea.  *See* J.A. 1712.  SeAH is a long-

---

[2]    SSHC is a large holding company with numerous subsidiaries.

[3]    Commerce also considers a third and fourth factor. The third factor considers the "contemporaneity of the date [of the data] to the [period of investigation]."  J.A. 1711. Here, both financial statements were lacking, with SSHC's statement containing six months of data pre-dating the twelve-month POI, and with SeHC's four-month statement corresponding with the POI, but not spanning the entirety of the POI.  *See* J.A. 1711–12; J.A. 1447.  The fourth factor, "the extent to which the customer base of the surrogate and the respondent were similar," did not play a role in Commerce's analysis and thus I do not address it.  J.A. 1711.

[4]    SeAH is a former subsidiary of SSHC.

established steel pipe producer in Korea. *See* Appellant Br. 42; *see also* J.A. 1446–1578.

Commerce selected SSHC's financial statement over SeAH's because SSHC's statement was "the only option on the record that includes 12 months of financial data." J.A. 1712. This rationale is legally insufficient. Commerce does not explain or provide support for why a financial statement with twelve months of largely irrelevant data trumps a financial statement with four months of relevant data. Even assuming Commerce has a practice of requiring financial statements with at least twelve months of data, this standard requirement, without sufficient justification, does not carry the day. A mere statement by Commerce of what it "normally does or has done before" is "not, by itself, an explanation of why its methodology comports with the statute." *Mid Continent Steel & Wire*, 941 F.3d at 544 (cleaned up) (remanding when Commerce only noted that it was following "the Department's practice" (internal quotations omitted)); *see also CS Wind*, 832 F.3d at 1376.

Again, the purpose of selecting surrogate financial data is to create a "constructed value" of the profit and selling expenses Dongkuk would have experienced when selling *steel wind towers in Korea*. Here, Commerce must calculate constructed value using a "reasonable method." 19 U.S.C. § 1677b(e)(2)(B)(iii). Without a rationale from Commerce supporting its decision, I cannot determine whether its choice to select SSHC's twelve-month financial statement, reflecting mostly irrelevant data, over SeHC's four-month financial statement, reflecting only relevant data, is sufficiently supported by the evidence or comports with 19 U.S.C. § 1677b(e)(2)(B)(iii). Such a conclusory decision is not aligned with Commerce's "primary objectives" of "accuracy and fairness." *Mid Continent Steel & Wire,* 941 F.3d at 539. I respectfully dissent.